**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

| | |
|---|---|
| ALAMEDA RESEARCH LTD. and CLIFTON BAY INVESTMENTS LLC f/k/a ALAMEDA RESEARCH VENTURES LLC, | |
| Plaintiffs, | |
| -against- | Adv. Pro. No. 23-_____(JTD) |
| MICHAEL KIVES, BRYAN BAUM, K5 GLOBAL HOLDINGS LLC, K5 GLOBAL TECHNOLOGY LLC, MBK CAPITAL LP SERIES T, K5 GROWTH CO-INVEST I GP LLC, K5 GLOBAL GROWTH FUND I GP LLC, K5 GLOBAL VENTURES LLC, MOUNT OLYMPUS CAPITAL LP, MOUNT OLYMPUS CAPITAL LLC, K5 GLOBAL GROWTH FUND II LP, K5 GLOBAL GROWTH FUND II GP LLC, K5X FUND I LP, K5X FUND I LLC, and SGN ALBANY LLC, | |
| Defendants. | |

**COMPLAINT FOR AVOIDANCE AND RECOVERY OF TRANSFERS
AND OBLIGATIONS PURSUANT TO 11 U.S.C. §§ 105, 544, 547, 548 AND 550,
AND DEL. CODE ANN. TIT. 6, §§ 1304 AND 1305, FOR AIDING AND ABETTING
BREACH OF FIDUCIARY DUTY, FOR DISHONEST ASSISTANCE UNDER THE
LAW OF THE BRITISH VIRGIN ISLANDS, FOR UNJUST ENRICHMENT AND
<u>FOR DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502</u>**

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

Plaintiffs Alameda Research Ltd. and Clifton Bay Investments LLC f/k/a

Alameda Research Ventures LLC (together, "Plaintiffs"), through their undersigned counsel, for

their Complaint against Michael Kives, Bryan Baum, K5 Global Holdings LLC ("K5 Global"),

K5 Global Technology LLC, MBK Capital LP Series T, K5 Global Growth Co-Invest I GP LLC,

K5 Global Growth Fund I GP LLC, K5 Global Ventures LLC, Mount Olympus Capital LP,

Mount Olympus Capital LLC, K5 Global Growth Fund II LP, K5 Global Growth Fund II GP

LLC, K5X Fund I LP, K5X Fund I LLC, and SGN Albany LLC (collectively, "Defendants"),

allege the following based upon personal knowledge and upon their investigation to date as to

themselves and their own acts, and upon information and belief as to all other matters:

## NATURE OF THE CASE

1.      On February 11, 2022, Samuel Bankman-Fried attended a dinner party at

the house of Defendant Michael Kives, a celebrity talent agent and co-owner, with Defendant

Bryan Baum, of K5 Global and affiliated entities.  True to Kives's reputation as a high-profile

"super-networker," the attendees at the dinner party included a former Presidential candidate, top

actors and musicians, reality TV stars and multiple billionaires.  That same weekend, Bankman-

Fried joined Kives and several A-list celebrities as guests at the 2022 Super Bowl.

2.      In an internal note that Bankman-Fried drafted just two days later, he

gushed about Kives's access to celebrities and politicians, describing him as "probably, the most

connected person I've ever met."  Bankman-Fried stated that Kives and Baum were "something

of a one-stop shop for relationships that we should utilize," and that they could provide "infinite

connections," "[p]otential unpaid partnerships with celebrities" and "[p]olitical relationships,"

and that they and FTX entities could "work[] together on electoral politics."  Bankman-Fried

noted that, in exchange, Kives and Baum wanted "us to consider endorsements with their

friends," "us to work with them on Democratic politics," and, perhaps most importantly: "Maybe us to invest in them or some stuff, idk."[2]

3.      Bankman-Fried was correct about what Kives and Baum wanted—in *less than three weeks*, Bankman-Fried, Kives and Baum signed a bare-bones term sheet ("Term Sheet") providing that "Sam Bankman-Fried or a related entity" would give each of Kives and Baum $125 million personally and would invest ***billions of dollars*** in K5 Global and affiliated entities over the next three years.  The Term Sheet was little more than a cursory list of investment ideas, and repeatedly stated that the actual "mechanics" of these very substantial investments would be later worked out "in the long form documents."

4.      Though the parties had not agreed on any final terms, much less executed a governing agreement, the Term Sheet provided that "[m]oney will be wired the day after signing the [T]erm [S]heet," and it was—Bankman-Fried executed the Term Sheet and the next day caused Plaintiffs to wire $300 million to Defendant K5 Global's bank account.

5.      No meaningful due diligence was conducted prior to signing the Term Sheet, wiring $300 million to K5 Global, or executing the later "long form documents."  Even minimal due diligence would have revealed, for example, that K5 Global's registered address was the personal residence of Baum's parents in Florida (as was the case for a number of other K5-related entities).  And no financial analysis supported the valuations implied by the terms of the investments, which in many cases were obviously grossly inflated.  For example, the transactions contemplated by the Term Sheet resulted in a payment of $214.5 million for an approximately 38% stake in Defendant MBK Capital LP Series T.  The only asset held by that entity was a 42% ownership stake in a company that owned certain trademarks for and

---

[2]      "Idk" is an abbreviation for "I don't know."

distributed a celebrity-backed brand of tequila, and that, according to SEC filings, had a gross asset value of just *$2.94 million* as of March 2022.

6.       Having received the initial $300 million in March 2022 with little effort, Kives and Baum worked to cultivate a close relationship with their new profligate patron.  Kives and Baum regularly advised Bankman-Fried on other investment strategies and were included in internal FTX Slack Channels.[3]  The luxury apartments that Bankman-Fried purchased in the Bahamas even included a room reserved for Baum.

7.       Kives's and Baum's efforts paid off handsomely.  On May 26, 2022, when the "long form documents" were executed and the K5 Global investment deal formally closed, Bankman-Fried caused Plaintiff Alameda Research Ltd. to transfer another $200 million (in addition to the initial $300 million) to other K5 entities, for a total of ***half a billion dollars*** transferred to Kives and Baum and entities under their control in just under three months.  Fully half of this amount was split between Kives and Baum, as they each personally walked away with $125 million in their pockets at closing.  By the end of September 2022, Plaintiff Alameda Research Ltd. had transferred another $200 million to K5 entities, bringing Plaintiffs' total pre-petition transfers to Kives, Baum and entities under their control to $700 million.

8.       Although Bankman-Fried caused Plaintiffs to fund these $700 million in transfers, Bankman-Fried, Kives and Baum constructed the transactions so that these investments were recorded not in the names of Plaintiffs, but in the names of two newly-created shell corporations:  Defendants SGN Albany LLC and Mount Olympus Capital LP.  Plaintiff Alameda Ventures LLC had no ownership stake in either of these entities, and Plaintiff Alameda Research Ltd. owned only approximately 8% of SGN Albany LLC.

---

[3]       A Slack Channel provides a group chat function and is part of the Slack business application.

9.    Bankman-Fried, Kives and Baum knew that these transactions were anything but typical arm's-length investments, and that Bankman-Fried treated the legal entities that he controlled as a slush fund operated with a near-total disregard for corporate formalities. As just one example, Bankman-Fried described the highly unorthodox, deeply intertwined relationship between K5 and FTX entities in an August 2022 internal document, writing that "Bryan [Baum] is ~100% aligned with FTX," that "FTX is aligned with Bryan too," and that "if there are significant artificial up-downs between FTX and K5 as entities, I'm happy to just true it up with cash estimates."  Referring to himself in the third person as "SBF," Bankman-Fried confirmed that "SBF is aligned with Bryan and K5, *and treats $1 to it as $1 to FTX even though we only own 33%, because whatever, we can always true up cash if needed, but also, who cares*" (emphasis added).  Bankman-Fried added that "[t]here are logistical, PR, regulatory, etc reasons to not just merge K5 100% into FTX but *I and Bryan will both act how we would if they were merged*" (emphasis added).  Bankman-Fried concluded by pronouncing that each of these statements "are true, always have been true, and even if not, will be true going forward," and asked Baum to confirm whether he agreed.  Baum responded: "Agree with all.  FTX FTW!"[4]

10.    Plaintiffs bring this adversary proceeding pursuant to Sections 105, 544, 547, 548 and 550 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and Sections 1304 and 1305 of Title 6 of the Delaware Code,  Del. Code Ann. tit. 6, §§ 1304(a)(1)-(2), 1305, to (a) avoid and recover from Defendants, or anyone else for whose benefit the transfers were made, all transfers of Plaintiffs' property from on or around March 2022 through September 2022, and (b) avoid any obligations that Plaintiffs incurred to Defendants, from on or around March 2022 through September 2022, prior to commencement of

---

[4]    "FTW" is an abbreviation for "For the win."

the above-captioned bankruptcy cases (collectively, the "Chapter 11 Cases" and each a
"Chapter 11 Case") by the above-captioned debtors and debtors-in-possession (collectively, the
"Debtors" and each a "Debtor").  Plaintiffs further bring claims against Defendants Kives and
Baum for aiding and abetting breach of fiduciary duty and dishonest assistance, and against
Defendant SGN Albany LLC for property recovery under Section 550 of the Bankruptcy Code
and for unjust enrichment.

　　　　11.　　Plaintiffs also seek to disallow pursuant to Section 502(d) of the
Bankruptcy Code any and all claims filed or held by the Defendants in the Chapter 11 Cases
unless and until the Court has ruled on the avoidance of Plaintiffs' transfers and obligations, and
Defendants have relinquished to Plaintiffs all property that Defendants received in transfers
determined by the Court to be avoidable and/or recoverable.

　　　　12.　　On November 11 and November 14, 2022 (as applicable, the "Petition
Date"), the Debtors filed with the United States Bankruptcy Court for the District of Delaware
(the "Court") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  No trustee
has been appointed for the Plaintiffs or any other Debtor in the Chapter 11 Cases, and the
Debtors continue to operate their businesses and manage their properties as debtors-in-
possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  Joint administration
of the Chapter 11 Cases was authorized by the Court by an order entered on November 22, 2022
[D.I. 128].  Accordingly, Plaintiffs have the authority to file this Complaint to commence, and
thereafter to prosecute, this adversary proceeding.

　　　　13.　　Two transactions in 2022 are the focus of this complaint: the "K5
Transaction" and the "Mount Olympus Transaction," which are depicted in schematics attached
hereto as Exhibits A and B, respectively.  This action seeks to avoid and recover $700 million in
transfers of Debtor funds made in connection with the K5 Transaction and Mount Olympus

Transaction, funds that were misappropriated as part of one of the largest financial frauds in history, and to avoid Plaintiffs' obligations, if any, arising from the K5 Transaction and Mount Olympus Transaction.

14.     Plaintiffs have determined, based on their analysis and investigation to date, that all of the aforementioned transfers and any obligations incurred by Plaintiffs are avoidable under the Bankruptcy Code and Title 6 of the Delaware Code.

15.     During the course of this adversary proceeding, Plaintiffs may learn (through formal discovery or otherwise) of additional transfers made to, or obligations owing to, the Defendants that are avoidable and/or recoverable under the Bankruptcy Code.  Plaintiffs intend to avoid and/or recover all such transfers and obligations made to or for the benefit of Defendants or any other transferee and accordingly reserve the right to amend this Complaint.

## THE PARTIES

16.     Plaintiff Alameda Research Ltd. is a British Virgin Islands company limited by shares.  It is a wholly owned subsidiary of Alameda Research LLC, a Delaware limited liability company that is 90% owned by Bankman-Fried and 10% owned by Zixiao "Gary" Wang (*see* "Other Relevant Persons and Entities").

17.     Plaintiff Clifton Bay Investments LLC f/k/a Alameda Research Ventures LLC ("Alameda Ventures")[5] is a limited liability company incorporated in Delaware that is 67% owned by Bankman-Fried, 23% owned by Wang, and 10% owned by Nishad Singh, all of whom were FTX Insiders, as defined below.

18.     Further investigation and discovery may establish that other Debtor entities may be the original source or proper legal owner of funds transferred from Alameda

---

[5]     Plaintiff Clifton Bay Investments LLC is referred to herein as Alameda Ventures because that was its name at the time of the K5 Transaction and Mount Olympus Transaction.

Ventures and Alameda Research Ltd. in connection with the K5 Transaction and the Mount Olympus Transaction.

19.     Defendant Michael Kives is the founder and a managing member of Defendant K5 Global.

20.     Defendant Bryan Baum is a managing member of Defendant K5 Global.

21.     Defendant K5 Global is a limited liability company incorporated in Delaware on July 6, 2021.  Defendants Kives and Baum each owned 50% of K5 Global prior to the K5 Transaction.

22.     Defendant K5 Global Technology LLC ("K5 Technology") is a limited liability company incorporated in Delaware on January 22, 2018.  Defendants Kives and Baum each owned 50% of K5 Technology prior to the K5 Transaction.

23.     Defendant MBK Capital LP Series T ("MBK Capital") is a series of limited partnership interests in MBK Capital LP, a Delaware series limited partnership incorporated in Delaware on November 14, 2018.  Defendants Kives and Baum together owned 75.27% of the limited partnership interests in MBK Capital prior to the K5 Transaction. Defendant K5 Technology is the general partner of MBK Capital LP.

24.     Defendant K5 Global Growth Co-Invest I GP LLC is a limited liability company incorporated in Delaware on May 20, 2021.  Defendants Kives and Baum each owned 50% of K5 Global Growth Co-Invest I GP LLC prior to the K5 Transaction.

25.     Defendant K5 Global Growth Fund I GP LLC is a limited liability company incorporated in Delaware on December 4, 2020.  Defendants Kives and Baum each owned 50% of K5 Global Growth Fund I GP LLC prior to the K5 Transaction.

26.     Defendant K5 Global Ventures LLC is a limited liability company incorporated in Delaware November 8, 2021.  Defendants Kives and Baum each owned 50% of K5 Global Ventures LLC prior to the K5 Transaction.

27.     Defendants K5 Global, K5 Technology, MBK Capital, K5 Global Growth Co-Invest I GP LLC, K5 Global Growth Fund I GP LLC, and K5 Global Ventures LLC are referred to collectively herein as the "K5 Transaction Entities," and, together with Defendants Kives and Baum, as the "K5 Transaction Defendants."

28.     Defendant Mount Olympus Capital LP ("Mount Olympus") is a Delaware limited partnership established on May 26, 2022 for purposes of the Mount Olympus Transaction.  Mount Olympus was a "mothership fund" that was intended to invest capital in a portfolio of investment partnerships.  Baum was an initial limited partner and SGN Albany LLC was the "anchor" limited partner of Mount Olympus.

29.     Defendant Mount Olympus Capital LLC is the general partner of Mount Olympus.  Defendants Baum and Kives were the managing members of Mount Olympus Capital LLC.

30.     Defendant K5 Global Growth Fund II LP is a limited partnership established in Delaware on April 29, 2022.  It is an investment partnership established for purposes of the Mount Olympus Transaction.

31.     Defendant K5 Global Growth Fund II GP LLC is the general partner of Defendant K5 Global Growth Fund II LP and was established in Delaware on April 29, 2022 for purposes of the Mount Olympus Transaction. Each of Kives, Baum and SGN Albany LLC owned one third of K5 Global Growth Fund II GP LLC.

32.     Defendant K5X Fund I LP is a limited partnership established in Delaware on May 25, 2022.  It is an investment partnership established for purposes of the Mount Olympus Transaction.

33.     Defendant K5X Fund I LLC is the General Partner of Defendant K5X Fund I LP and was established in Delaware on May 25, 2022 for purposes of the Mount Olympus Transaction.  Each of Kives, Baum and SGN Albany LLC owned one third of K5X Fund I LLC.

34.     Defendants Mount Olympus, K5 Global Growth Fund II LP, K5 Global Growth Fund II GP LLC, K5X Fund I LP, and K5X Fund I LLC are referred to collectively herein as the "Mount Olympus Transaction Entities," and together with Defendants Kives and Baum, as the "Mount Olympus Transaction Defendants."  The mailing address for each of the Mount Olympus Transaction Entities is the Florida home of Defendant Baum's parents.

35.     Defendant SGN Albany LLC ("SGN Albany") is a Delaware limited liability company formed on May 16, 2022 for the purpose of engaging in the K5 Transaction and Mount Olympus Transaction.  "SGN" refers to the first initials of Samuel Bankman-Fried, Gary Wang and Nishad Singh, and "Albany" is the luxury resort community where they all lived in the Bahamas.  Before the Petition Date, Bankman-Fried, Wang, and Singh together owned 91.67% of SGN Albany, with Plaintiff Alameda Research Ltd., which was under Bankman-Fried's control, owning the remainder, as set out below:

| Member | % Interest |
|---|---|
| Sam Bankman-Fried | 60.5% |
| Zixiao "Gary" Wang | 21.17% |
| Nishad Singh | 10.00% |
| Alameda Research Ltd. | 8.33% |

## OTHER RELEVANT PERSONS AND ENTITIES

36.     Bankman-Fried was a co-founder of Plaintiff Alameda Research Ltd., a wholly-owned subsidiary of Debtor Alameda Research LLC, and was its chairman and sole director until September 6, 2022.  He controlled Alameda Research Ltd. through his 90% ownership stake in Alameda Research LLC.  Bankman-Fried also held a 67% ownership stake in Plaintiff Alameda Ventures.  Bankman-Fried co-founded Debtor FTX Trading, Ltd. ("FTX.com") and a separate group of operating entities that operated FTX US, a digital asset exchange for U.S. persons (FTX.com and FTX US are referred to together herein as "FTX").

37.     Caroline Ellison was the co-Chief Executive Officer of Alameda Research LLC.

38.     Nishad Singh was FTX's former Director of Engineering and held ownership stakes in various FTX Group[6] companies.

39.     Wang was a co-founder of FTX and its former Chief Technology Officer and held ownership stakes in various FTX Group companies.

40.     Each of Bankman-Fried, Wang, Singh and Ellison was an "FTX Insider."

## JURISDICTION AND VENUE

41.     This adversary proceeding relates to the Plaintiffs' Chapter 11 Cases filed with this Court on the Petition Date.  The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

---

[6]     The "FTX Group" is comprised of four silos.  These silos include:  (a) a group composed of Debtors West Realm Shires, Inc., West Realm Shires Services, Inc., and their Debtor and non-Debtor subsidiaries; (b) a group composed of Plaintiff and Debtor Alameda Research Ltd., Debtor Alameda Research LLC, and their Debtor subsidiaries; (c) a group composed of Plaintiff and Debtor Clifton Bay Investments LLC, Debtor Clifton Bay Investments Ltd., Debtor Island Bay Ventures Inc. and Debtor FTX Ventures Ltd.; and (d) a group composed of Debtor FTX Trading Ltd. and its Debtor and non-Debtor subsidiaries.

42.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court may enter final orders herein.

43.     Venue of this adversary proceeding in this District is proper pursuant to 28 U.S.C. § 1409, and venue in this District is consistent with the interests of justice, judicial economy, and fairness.

44.     The statutory predicates for the relief requested herein are Sections 105(a), 502(d), 544, 547, 548 and 550 of the Bankruptcy Code and Sections 1304 and 1305 of Title 6 of the Delaware Code.

45.     This is an adversary proceeding commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because it seeks, among other things, to recover money or property belonging to the Plaintiffs' Chapter 11 estates.  Fed. R. Bankr. P. 7001(1).

46.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiffs consent to the entry of a final order or judgment by the Court on these claims to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTUAL ALLEGATIONS

### I.     Bankman-Fried Defrauded Investors and Customers of FTX.com

47.     Prior to the Petition Date, the FTX Group operated cryptocurrency exchanges and trading businesses.  As explained in the First Day Declarations (defined below), the FTX Group faced a severe liquidity crisis that necessitated the filing of emergency Chapter 11 Cases on November 11 and 14, 2022.  Additional factual background relating to the FTX Group's businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I.

24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93] (collectively, the "First Day Declarations").

48.    The FTX Insiders, among others, took advantage of the FTX Group's lack of controls and recordkeeping to perpetrate a massive fraud—lavishly spending the FTX Group's assets on, among other things, private homes and jets, political and "charitable" contributions, and various investments.  The K5 Transaction and Mount Olympus Transaction were two such investments.

49.    Bankman-Fried and the other FTX Insiders had surreptitiously and unlawfully transferred assets from FTX.com, the principal international cryptocurrency exchange operated by the FTX Group, to Alameda Research LLC and its affiliates, including Plaintiffs, to spend on the FTX Insiders' pet projects.  By causing Plaintiffs to take money from FTX.com and spend it on the FTX Insiders' pet projects, the FTX Insiders defrauded Plaintiffs, Debtors, and creditors, including customers.

50.    Bankman-Fried pursued the K5 Transaction and Mount Olympus Transaction to burnish his own political and social influence.  In pursuing these transactions, Bankman-Fried cavalierly agreed to make billion-dollar investments using other people's money, with no due diligence, and accepted terms that personally enriched Defendants Kives and Baum by excessively overpaying each of them $125 million as part of the K5 Transaction.  At Bankman-Fried's direction, Plaintiffs provided all funding for SGN Albany's investments in the K5 Transaction and Mount Olympus Transaction, but SGN Albany (which was more than 90% owned by FTX Insiders) received virtually all the economic benefit of those transactions.

Plaintiffs' only interest in SGN Albany was a small stake owned by Plaintiff Alameda Research

Ltd., and as a consequence, Plaintiffs got far less than fair value for what they paid.

51.     All of the FTX Insiders, other than Bankman-Fried, have pleaded guilty to

crimes perpetrated through the very practices that facilitated the K5 Transaction and Mount

Olympus Transaction.  On December 19, 2022, Wang and Ellison pleaded guilty to multiple

felonies in connection with these frauds, including wire fraud, conspiracy to commit wire fraud,

conspiracy to commit commodities fraud, and conspiracy to commit securities fraud; Ellison also

pleaded guilty to conspiracy to commit money laundering.  *See* Min. Entry, Dec. 19, 2022,

*United States* v. *Bankman Fried*, 22-cr-00673 (S.D.N.Y. 2022).  On February 28, 2023, Singh

pleaded guilty to the same felonies as Ellison, as well as to conspiracy to make unlawful political

contributions and defraud the Federal Election Commission.  *See* Min. Entry, Feb. 28, 2023,

*United States* v. *Bankman Fried*, 22-cr-00673 (S.D.N.Y. 2022).

52.     In connection with his plea, Wang admitted that in 2019 he made "certain

changes to [the FTX.com] code" to give Alameda Research LLC "special privileges on the FTX

platform," including to allow Alameda Research LLC unfettered use of assets on the FTX.com

exchange, even while Alameda Research LLC maintained negative balances in its own holdings

of fiat (*i.e.*, government-issued) currencies and cryptocurrencies.   Plea Tr. 24:6-10, ECF No. 21,

*United* States v. *Wang*, 22-cr-00673 (S.D.N.Y. 2022).  Using these "special privileges," the FTX

Insiders frequently caused FTX Group entities, including Plaintiffs, to misappropriate funds from

FTX.com for their own benefit, including to make investments like those in the K5 Transaction

and Mount Olympus Transaction.

53.     Bankman-Fried has repeatedly claimed that Alameda Research LLC

operated as "a wholly separate entity" from FTX.com.  Annie Massa *et al.*, *Sam Bankman-Fried*

*and Alameda CEO Caroline Ellison Spoke About Red Flags 3 Months Before It Collapsed.*

*Here's What They Said – and How They Lied*, Fortune (Nov. 18, 2022),

https://fortune.com/2022/11/18/sam-bankman-fried-alameda-ceo-caroline-ellison-spoke-red-

flags-ftx-3-months-before-it-collapsed-what-said-how-lied/.  Ellison also stated in media reports

that "[w]e keep [FTX and Alameda Research LLC] quite separate in terms of day to day

operations."  *Id*.  In reality, Bankman-Fried and others caused Alameda Research LLC to

secretly loot "several billion dollars" from FTX.com using its "special privileges," thereby

defrauding FTX.com's creditors.  Plea Tr. 28:23-29:2, ECF No. 102, *United States* v. *Singh*, 22-

cr-00673 (S.D.N.Y. 2022); Plea Tr. 24:6-10, ECF No. 21, *United States* v. *Wang*, 22-cr-00673

(S.D.N.Y. 2022).

      54.    According to Ellison's plea agreement, by approximately July 2022,

Ellison had conspired with Bankman-Fried to "provide materially misleading financial

statements to Alameda's lenders," such as "balance sheets that concealed the extent of

Alameda's borrowing and the billions of dollars in loans that Alameda had made to FTX

executives and to related parties."  Plea Tr. 28:9-16, ECF No. 19, *United States* v. *Ellison*, 22-cr-

00673 (S.D.N.Y. 2022).  Ellison also agreed with Bankman-Fried and others "not to publicly

disclose the true nature of the relationship between Alameda and FTX, including Alameda's

credit arrangement."  *Id*. at 28:19-21.

      55.    The FTX Insiders were aware at all relevant times of Alameda Research

LLC's "special privileges on the FTX platform," and that Alameda Research LLC was

"borrowing" (*i.e.*, looting) billions of dollars from FTX.com in order to, among other things,

finance sham "loans" from Alameda Research Ltd. and other entities to the FTX Insiders.

Ellison admitted that, from 2019 through 2022, she was aware of this arrangement, which she

described as "permitt[ing] Alameda access to an unlimited line of credit without being required

to post collateral, . . . pay interest . . . or being subject to margin calls or FTX.com's liquidation protocols." *Id*. at 27:11-15.

56.      Bankman-Fried used his control over the FTX Group entities and this "unlimited line of credit" to misappropriate Debtor assets for the K5 Transaction and Mount Olympus Transaction.

**II.    Bankman-Fried's Drive to Obtain Celebrity Connections and Political Influence**

57.      Defendant Kives graduated from Stanford University in 2003.  From August 2003 to February 2018, he worked at Creative Artists Agency ("CAA") as a talent agent representing high-profile Hollywood actors and other clients.  Kives left CAA in 2018 to found K5 Global.

58.      Media reports have referred to Kives as a "super networker."  Guests at Kives's wedding included a former President, a former Secretary of State, a U.S. Senator, the Mayor of Los Angeles, and a long list of billionaires, CEOs of major corporations, and A-list celebrities.

59.      Defendant Baum graduated from Swarthmore College in 2011.  Although Baum has described himself as a "co-founder" of K5 Global, he actually joined K5 Global in 2020.

60.      Kives and Bankman-Fried first connected via email on November 16, 2021, when Kives helped introduce Bankman-Fried to world-renowned Australian musician Sia.  Shortly thereafter, Kives began inviting Bankman-Fried to dinner parties with Wall Street titans, Academy Award-winning actors, and NBA stars.  On February 11, 2022, the Friday before the Super Bowl, Bankman-Fried attended a dinner party at Kives's house alongside former high-ranking politicians, a centibillionaire CEO, and various other celebrities.

The next day, February 12, 2022, Kives connected Bankman-Fried via email to a tech company CEO and his wife, a former U.S. Ambassador to the Bahamas.

61.     On February 13, 2022, Bankman-Fried attended the Super Bowl as Kives's guest, along with A-list celebrities.  Bankman-Fried was captivated by Kives's star-studded circle of friends, and two days later raved in an internal document that K5 Global was "something of a one-stop shop for relationships that we should utilize."  Bankman-Fried noted that Kives and Baum wanted several things in exchange, including "[m]aybe us to invest in them," and, as described below, such investments quickly followed.

### III.   Bankman-Fried, Kives and Baum Hastily Execute a Term Sheet for Bankman-Fried to Invest Billions in the K5 and Mount Olympus Transactions

62.     Bankman-Fried was so impressed by Kives and Baum and their "infinite connections," that Bankman-Fried and Kives almost immediately began working on a Term Sheet for a wide-ranging "association of Sam Bankman-Fried or a related entity" with K5 Global entities.  The Term Sheet contemplated "an acquisition of general partnership interests in the K5 Global business, the formation by the parties of a new limited partnership for investment ('New Fund') and the subscription by [Bankman-Fried] for a limited partnership interest in the New Fund."  The Term Sheet was executed on March 7, 2022.

63.     The Term Sheet included highly favorable terms for Kives and Baum, and contemplated total consideration in cash and securities of $575 million in exchange for "interests" in K5 Global's various funds and special purpose vehicles ("SPVs"), consisting of (i) $300 million in cash, (ii) $250 million in shares of FTX Trading Ltd. and West Realm Shires, Inc. to "vest quarterly over three years," and (iii) $25 million in payments to non-profits "with

the details to be worked out later." Significantly, of the $300 million in cash consideration, $250 million was to be divided equally between Kives and Baum personally.[7]

64.     The Term Sheet also described the formation of a "New Fund" (later named Mount Olympus) that would invest in a portfolio of investment funds. The general partner of each portfolio fund would be owned equally by Kives, Baum and SGN Albany and would be entitled to substantial carried interest on the funds' profits. SGN Albany, as the "anchor limited partner," committed to providing the investment capital, and would receive any remaining profits after the carried interest was paid.

65.     Specifically, under the Term Sheet, Mount Olympus would start with an initial capital contribution of $200 million "from SBF," and would target a total annual contribution of $1 billion "for at least the first three years." Kives and Baum stood to reap substantial personal gains from the Mount Olympus Transaction, which would more than double K5's assets under management in the first year alone. If the $3 billion were fully invested and earned annual returns of 5% (*i.e.*, $150 million), Kives and Baum would each stand to receive $12.5 million per year in carried interest alone.

66.     As described more fully below, beginning on March 8, 2022 (the day after the Term Sheet was signed) through September 20, 2022, Bankman-Fried directed Plaintiffs to make a series of wire transfers totaling $700 million in furtherance of the K5 Transaction and Mount Olympus Transaction.

IV.     **The K5 Transaction**

67.     The K5 Transaction closed on May 26, 2022 (even though the full amount of the cash consideration—$300 million—had been transferred on March 8, 2022, the day after

---

[7]     The $25 million for non-profits "to be worked out later" and $250 million in shares of FTX Trading Ltd. and West Realm Shires, Inc. do not appear to have been transferred prior to the Petition Date.

the Term Sheet was signed).  As noted, the K5 Transaction was intended to provide SGN Albany with a one-third interest in the K5 Transaction Entities.

        **a.**    **K5 Global**

      68.    Prior to the K5 Transaction, Kives and Baum each held a 50% interest in Defendant K5 Global.

      69.    K5 Global owned mostly minority stakes in a number of start-up companies that had been founded or "incubated" by K5 Global or its affiliates.  These companies included, for example, (i) JetWallet LLC, "an NFT celebrity business combined with crypto wallet," which later changed its name to JetTech Inc. and "pivoted to AI"; (ii) The Expert Inc., a "marketplace for finding top experts" that "allows customers to book video consultations with interior design experts"; and (iii) Laundry Boat LLC, a "software development agency."

      70.    Some of these investments directly benefited Baum's family members. For example, K5 Global indirectly owned an almost 20% stake in Felicitas LLC, purportedly a "software development company of AI generated court reporting tools" operating under the trade name "Parrot."  Like so many other K5 entities, Felicitas LLC's registered address was also the home of Baum's parents.  Felicitas LLC was founded by Baum's brother, Eric Baum, who also serves as in-house counsel for K5 Global.

      71.    In connection with the K5 Transaction, SGN Albany agreed to pay $35.5 million for a one-third interest in K5 Global.  No due diligence was conducted into K5 Global's investments and no financial advisor assisted in evaluating the terms of this transaction or its expected return.  Plaintiffs' investigation has not uncovered any information to substantiate the implied $106.5 million valuation for K5 Global, which Kives and Baum knew was not well founded and was materially inflated.

b.    **MBK Capital**

72.    Prior to the K5 Transaction, Defendants Kives and Baum collectively held a 75.27% interest in MBK Capital.

73.    MBK Capital's only asset was a 41.76% stake in K & Soda LLC, a Delaware LLC that does business as "818 Spirits" and distributes "818 Tequila." Baum is the managing member of K & Soda LLC.  Kendall Jenner has promoted 818 Tequila on social media and the brand's website, and Baum, Kives, Kendall Jenner and Kris Jenner are the directors of K & Soda, Inc., a related Florida corporation.  Once again, the registered address for both K & Soda LLC and K & Soda, Inc. is the home of Baum's parents.

74.    As part of the K5 Transaction, SGN Albany agreed to pay $214.5 million for an approximately 38% partnership interest in MBK Capital (*i.e.*, 50% of the 75.27% held by Kives and Baum prior to the transaction).  But according to an SEC Form ADV filed by a K5 Global affiliate in March 2022, MBK Capital had a gross asset value of just *$2.94 million*— meaning that SGN Albany overpaid more than 200-fold.  Moreover, SGN Albany's $214.5 million payment for what effectively represented a 16% stake in K & Soda LLC implied an equity valuation of K & Soda LLC of nearly *$1.4 billion*.

75.    As with K5 Global, no due diligence or financial analysis was conducted to support these inflated valuations for MBK Capital and K & Soda LLC, and Kives and Baum knew that these valuations were not well founded and were materially inflated.

c.    **K5 Technology**

76.    Prior to the K5 Transaction, Kives and Baum each held a 50% interest in Defendant K5 Technology.

77.    K5 Technology is the general partner of four private investment funds that collectively held approximately $418 million as of March 2022, according to SEC filings.  As

general partner, K5 Technology is entitled to receive certain carried interest from each of these funds.

78.     SGN Albany agreed to pay $300 million for a one-third interest in K5 Technology, comprised of $50 million in cash and $250 million in shares of FTX Trading Ltd. and West Realm Shires, Inc.  The funds that K5 Technology managed would have needed to produce astronomical returns to justify the valuation implied by SGN Albany's investment.  As with K5 Global and MBK Capital, no due diligence or financial analysis was conducted to support this inflated valuation for K5 Technology, and Kives and Baum knew that this valuation was not well founded and was materially inflated.

### d.     "Profits Interest" in Other K5 Funds

79.     Finally, SGN Albany acquired a one-third "profits interest" in Defendants K5 Global Growth Co-Invest I GP LLC, K5 Global Growth Fund I GP LLC, and K5 Global Ventures LLC, with Baum and Kives each owning one-third.  Each of these companies was the general partner of a private investment fund.  As was acknowledged at the time, these funds had little-to-no value as of the closing of the K5 Transaction on May 26, 2022.

### V.     Plaintiffs Transferred $300 Million to K5 Global for the Benefit of the K5 Transaction Defendants Without Receiving Equivalent Value

80.     On March 8, 2022—the day after the Term Sheet was executed and before SGN Albany even existed—Bankman-Fried caused Alameda Research Ltd. to wire $300 million to Alameda Ventures, and he directed Alameda Ventures the same day to wire the $300 million received from Alameda Research Ltd. to K5 Global (the "K5 Transfer").  Bankman-Fried caused the K5 Transfer to be made despite knowing that Alameda Research Ltd. and Alameda Ventures had misappropriated Debtor funds—to the detriment of Plaintiffs, Debtors, and creditors, including customers.

81.     Plaintiffs did not receive reasonably equivalent value in exchange for the $300 million transfer to K5 Global.  SGN Albany's investments in the K5 Transaction Entities were overvalued and unsupported by any due diligence or financial analysis.  Both Kives and Baum knew that the K5 Transaction Entities were overvalued and that the K5 Transaction did not provide Alameda Ventures (which had no stake in SGN Albany), or Alameda Research Ltd., (which had a small minority stake in SGN Albany) with reasonably equivalent value.  Kives and Baum also understood that, by virtue of SGN Albany's ownership structure, nearly all of the economic benefit of Alameda Research Ltd.'s investment went to Bankman-Fried, Wang and Singh personally.

## VI.     The Mount Olympus Transaction

82.     As set out above, SGN Albany agreed on May 26, 2022 to invest $1 billion in Mount Olympus each year for three years.  Mount Olympus was conceived as a "mothership fund" that would acquire interests in K5-affiliated investment funds.  The general partners of the investment funds were entities owned one-third each by SGN Albany, Kives and Baum, and the funds were to be managed by Kives and Baum.

83.     At the time of the agreement, all K5-related investment funds had a total of approximately $671 million under management.  Bankman-Fried had thus proposed in the Term Sheet to more than double the assets under Kives's and Baum's management in the first year alone, and to quintuple it over three years.

84.     As explained above, Kives and Baum stood to reap enormous benefits from this arrangement (on top of the $125 million that each of them had already received through the K5 Transaction).  Even with modest returns of 5% per annum on the $3 billion that Bankman-Fried proposed to invest would result in Kives and Baum each receiving $12.5 million per year in carried interest alone.

85.     Plaintiffs' investigation has not uncovered any information provided by Kives or Baum to substantiate their investment track record or to demonstrate their ability to prudently manage the investment funds.  Indeed, they had no experience whatsoever managing a multi-billion dollar investment fund of the size contemplated by the Mount Olympus Transaction.  Plaintiffs have not identified any financial advisors who assisted Bankman-Fried in evaluating or structuring this transaction.

86.     As set out below, Bankman-Fried caused Plaintiff Alameda Research Ltd. to transfer $400 million to Mount Olympus.  Of this amount, $375 million was transferred to K5X Fund I LP and the remaining $25 million was transferred to K5 Global Growth Fund II LP.

87.     As of September 18, 2022, K5X Fund I LP had invested $280.5 million. The vast majority—$252 million—was invested in just eight companies, two of which were SpaceX ($189.7 million invested) and The Boring Company ($23 million invested), both founded by Elon Musk, with whom Kives purported to be close friends.  These two investments represented approximately 76% of K5X Fund I LP's portfolio.  K5X Fund I LP invested another $28.6 million in assorted venture capital funds, and had another $40.5 million in unfunded commitments to those same funds.  As of September 2022, K5X Fund I LP was reviewing other venture capital funds for potential investments.

88.     Plaintiffs have not identified any investments made with the $25 million transferred to K5 Global Growth Fund II LP.

**VII.    Plaintiff Alameda Research Ltd. Transferred $400 Million to the Mount Olympus Transaction Entities Without Receiving Equivalent Value**

89.     Beginning on May 26, 2022, Bankman-Fried caused Plaintiff Alameda Research Ltd. to wire a total of $400 million to Mount Olympus, consisting of (i) $200 million on May 26, 2022; (ii) $100 million on June 7, 2022; and (iii) $100 million on September 20,

2022 (the "Mount Olympus Transfers").  Mount Olympus in turn transferred $375 million to

K5X Fund I LP and $25 million to K5 Global Growth Fund II LP.  (*See* Exhibit B.)

90.     Bankman-Fried caused the Mount Olympus Transfers to be made despite

knowing that Alameda Research Ltd. and Alameda Ventures had improperly misappropriated

FTX Group funds, to the detriment of Plaintiffs, Debtors, and creditors, including customers.

91.     Plaintiff Alameda Research Ltd. did not receive reasonably equivalent

value in exchange for the Mount Olympus Transfers, and both Kives and Baum knew that the

Mount Olympus Transaction had virtually no prospect of providing Plaintiff Alameda Research

Ltd. with reasonably equivalent value.

92.     Moreover, Defendants Kives and Baum knew or should have known that

the huge amounts of money they received in both the K5 Transfer and Mount Olympus Transfers

did not come from SGN Albany's bank accounts or from the personal bank accounts of

Bankman-Fried, Wang or Singh.

## VIII.   The Effective "Merger" of K5 Global and FTX and the Close Relationship of Kives, Baum and Bankman-Fried

93.     Having easily secured $700 million in capital through the K5 Transaction

and the Mount Olympus Transaction and the prospect of billions more in investments into the K5

entities, Kives and Baum sought to further ingratiate themselves with Bankman-Fried by offering

advice on potential FTX Group transactions unrelated to K5 Global, helping Bankman-Fried

arrange high-profile political and celebrity speakers for his conferences, and providing various

other services for Bankman-Fried.  Baum in particular was a frequent visitor to the Bahamas, to

the point that the luxury apartments that Bankman-Fried purchased in the Bahamas included a

room reserved for Baum.  Kives's and Baum's efforts paid off—in a matter of months, they

cultivated such a close relationship with Bankman-Fried that he treated FTX and the K5 Global

entities as one and the same.

94.     In one particularly stark example from August 2022, Bankman-Fried was mediating a dispute between Baum and an FTX executive who had raised concerns about Baum's attempt to structure "one of the FTX side projects" such that Baum would "get[] some equity, rather than it just flowing through FTX." Bankman-Fried noted in an internal document that the FTX executive had questioned whether Baum was acting in FTX's best interest and had suggested that this "reek[ed]" of Baum "trying to nickel and dime FTX, or scam it a little bit . . . ."

95.     Despite these concerns, Bankman-Fried defended Baum, describing what he believed was the root of the issue: "*Is Bryan an FTX employee, or a random 3rd party?* The answer, really, is *neither*. The answer is that it's sorta complicated and liminal and unclear. Bryan lives in the uncanny valley" (emphasis in original).

96.     Bankman-Fried also described his solution to the problem (which he referred to as "collaps[ing] the uncanny valley"). Bankman-Fried emphasized that:

- "FTX is aligned with Bryan," and that "if there are significant artificial up-downs between FTX and K5 as entities, I'm happy to just true it up with cash estimates";

- "SBF is aligned with Bryan and K5, and treats $1 to it as $1 to FTX even though we only own 33%, because whatever, we can always true up cash if needed, but also who cares"; and that

- "There are logistical, PR, regulatory, etc reasons to not just merge K5 100% into FTX but I and Brian will both act how we would if they were merged."

Bankman-Fried concluded by declaring that these points "are true, always have been true, and even if not, will be true going forward," and asked Baum and the FTX executive to confirm in writing whether they agreed. Baum responded enthusiastically: "Agree with all—FTX FTW!"

97.     Kives and Baum continued to expand their relationship with Bankman-Fried despite the concerns raised by FTX employees. For example, in September 2022, Dan

Friedberg, FTX's former Chief Regulatory Officer, instructed an FTX executive to "send to [Baum] the stuff FTX Ventures has bought into recently" to ensure that "K5 and our internal ventures team" were "keep[ing] each other informed on what is being invested." Friedberg stressed that "this is important *as we view K5 as part of SBF's team*" (emphasis added).

98.     Kives and Baum also continued to take advantage of opportunities to benefit themselves at Bankman-Fried's expense (which, in reality, was at the expense of Plaintiffs and their affiliated Debtors). For example, in September 2022, an Alameda Research LLC employee flagged for a senior FTX executive that K5 Global had "racked up over $777k in design expenses" that had been sent to Alameda Research LLC for payment. The employee noted that he had been "planning to spot check a couple of the invoices against the contractor agreements," but that the first one he looked at "was pretty bizarre," so he "decided to review all of the agreements entered into with K5." He found that K5 Global had "billed, for one contractor, 100 hours of work over the course of three days," and that there were other financial discrepancies and facially implausible charges. The senior FTX executive responded: "Can we file this under the 'Something seems off with the K5 camp?'"

## IX.    As Bankman-Fried's Schemes Crumbled, Kives and Baum Scrambled to Help Bankman-Fried Find a Bail-Out

99.     Notwithstanding their "insider" perspective on the complete lack of controls at the FTX Group and Bankman-Fried's cavalier misuse of hundreds of millions of dollars of Plaintiffs' funds, when Bankman-Fried's fraudulent scheme began to collapse, Kives and Baum worked behind the scenes with Bankman-Fried on a strategy to find someone to bail out the FTX Group (and to protect their golden goose).

100.     Kives and Baum took full advantage of their extensive contacts, and reached out to various billionaires, private equity firms and financiers on Bankman-Fried's behalf. After days of effort, Kives messaged Bankman-Fried on November 9, 2022 that he had

told a major asset manager "that this would be $9 billion and they didn't blink. Said they could do that full amount for the right deal." That potential investor, like everyone else, ultimately declined to move forward: the billions of dollars that Bankman-Fried and the other FTX Insiders had misappropriated from the FTX Group, including the $700 million transferred to Kives, Baum and the K5 Global entities, had gouged a hole too large to be filled.

**X. The Transfers Involved Multiple Badges of Fraud Evidencing Actual Intent to Hinder, Delay, or Defraud Creditors**

101. As set forth above, multiple badges of fraud recognized by bankruptcy law and Del. Code Ann. tit. 6, § 1304(b) permeate the K5 Transaction and Mount Olympus Transaction, including that:

i. The K5 Transfer and Mount Olympus Transfers were part of a scheme to enrich and otherwise benefit Bankman-Fried, Wang, Singh, Kives and Baum;

ii. Numerous material facts relating to those transfers were concealed;

iii. Bankman-Fried removed or concealed Plaintiffs' assets;

iv. The value of the consideration received by Plaintiffs was not reasonably equivalent to the value of the assets transferred or the amount of the obligations incurred;

v. Plaintiffs were insolvent when, or became insolvent shortly after, the transfers were made; and

vi. The transfers occurred shortly before or shortly after Plaintiffs incurred substantial debts.

<u>**CAUSES OF ACTION**</u>

**COUNT ONE**
**FRAUDULENT TRANSFERS AND OBLIGATIONS**
**PURSUANT TO 11 U.S.C. § 548(a)(1)(A)**
**(AGAINST THE K5 TRANSACTION DEFENDANTS AND SGN ALBANY)**

102. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 101 as if fully set forth here.

103.    Plaintiffs made the K5 Transfer on or around March 8, 2022 for the benefit of the K5 Transaction Defendants and SGN Albany.  The K5 Transfer was a transfer of property of Plaintiffs.

104.    The K5 Transfer and any obligations incurred by Plaintiffs to the K5 Transaction Defendants or SGN Albany were made with actual intent to hinder, delay, or defraud present or future creditors.

105.    Accordingly, the K5 Transfer and any obligations incurred by Plaintiffs to the K5 Transaction Defendants or SGN Albany should be avoided as fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover from the K5 Transaction Defendants and SGN Albany the full amount of the K5 Transfer, plus interest from the relevant date, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

**COUNT TWO**
**FRAUDULENT TRANSFERS AND OBLIGATIONS**
**PURSUANT TO 11 U.S.C. § 548(a)(1)(A)**
**(AGAINST THE MOUNT OLYMPUS**
**TRANSACTION DEFENDANTS AND SGN ALBANY)**

106.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 105 as if fully set forth here.

107.    Plaintiff Alameda Research Ltd. made the Mount Olympus Transfers addressed herein between May 26, 2022 and the Petition Date for the benefit of the Mount Olympus Transaction Defendants and SGN Albany.  Each of the Mount Olympus Transfers was a transfer of property of Plaintiff Alameda Research Ltd.

108.    The Mount Olympus Transfers and any obligations incurred by Plaintiff Alameda Research Ltd. to the Mount Olympus Transaction Defendants or SGN Albany were made with actual intent to hinder, delay, or defraud present or future creditors.

109.     Accordingly, each of the Mount Olympus Transfers and any obligations incurred by Plaintiffs to the Mount Olympus Transaction Defendants or SGN Albany should be avoided as fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiff Alameda Research Ltd. may recover from the Mount Olympus Transaction Defendants and SGN Albany the full amount of the Mount Olympus Transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

**COUNT THREE**
**FRAUDULENT TRANSFERS AND OBLIGATIONS**
**PURSUANT TO 11 U.S.C. § 548(a)(1)(B)**
**(AGAINST THE K5 TRANSACTION DEFENDANTS AND SGN ALBANY)**

110.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 109 as if fully set forth here.

111.     Plaintiffs made the K5 Transfer on or around March 8, 2022 for the benefit of the K5 Transaction Defendants and SGN Albany.  The K5 Transfer was a transfer of property of Plaintiffs.

112.     Plaintiffs did not receive reasonably equivalent value in exchange for the K5 Transfer and for any obligations incurred by Plaintiffs to the K5 Transaction Defendants or SGN Albany.

113.     Each of the Plaintiffs:  (i) was insolvent on the date of the K5 Transfer and when any obligations in connection with the K5 Transfer were incurred; (ii) became insolvent as a result of the K5 Transfer and any obligations incurred in connection with the K5 Transfer; (iii) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (iv) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

114.     Accordingly, the K5 Transfer and any obligations incurred by Plaintiffs to the K5 Transaction Defendants or SGN Albany should be avoided as fraudulent pursuant to

Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiffs may recover from the K5 Transaction Defendants and SGN Albany the full amount of the K5 Transfer, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT FOUR**
**FRAUDULENT TRANSFERS AND OBLIGATIONS**
**PURSUANT TO PURSUANT TO 11 U.S.C. § 548(a)(1)(B)**
**(AGAINST THE MOUNT OLYMPUS**
**TRANSACTION DEFENDANTS AND SGN ALBANY)**

115.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 114 as if fully set forth here.

116.    Plaintiff Alameda Research Ltd. made the Mount Olympus Transfers between May 26, 2022 and the Petition Dates for the benefit of the Mount Olympus Transaction Defendants and SGN Albany.  Each of the Mount Olympus Transfers was a transfer of property of Plaintiff Alameda Research Ltd.

117.    Plaintiff Alameda Research Ltd. did not receive reasonably equivalent value in exchange for the Mount Olympus Transfers and for any obligations incurred by Plaintiff Alameda Research Ltd. to the Mount Olympus Transaction Defendants or SGN Albany.

118.    Plaintiff Alameda Research Ltd.:  (i) was insolvent on the dates of each of the Mount Olympus Transfers and when any obligations in connection with the Mount Olympus Transfers were incurred; (ii) became insolvent as a result of the Mount Olympus Transfers and any obligations incurred in connection with the Mount Olympus Transfers; (iii) was engaged in a business or a transaction for which any property remaining with Plaintiff Alameda Research Ltd. was an unreasonably small capital; or (iv) intended to incur, or believed that it would incur, debts that would be beyond Plaintiff Alameda Research Ltd.'s ability to repay as such debts matured.

119.    Accordingly, the Mount Olympus Transfers and any obligations incurred by Plaintiff Alameda Research Ltd. to the Mount Olympus Transaction Defendants or SGN Albany should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiff Alameda Research Ltd. may recover from the Mount Olympus Transaction Defendants and SGN Albany the full amount of the Mount Olympus Transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estate.

## COUNT FIVE
## FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b) (AGAINST THE K5 TRANSACTION DEFENDANTS)

120.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 119 as if fully set forth here.

121.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

122.    Plaintiffs made the K5 Transfer on or around March 8, 2022 for the benefit of the K5 Transaction Defendants.  The K5 Transfer was a transfer of property of Plaintiffs.

123.    The K5 Transfer and any obligations incurred by Plaintiffs to the K5 Transaction Defendants were made with the intent to hinder, delay, or defraud the Plaintiffs' present or future creditors, including creditors who hold allowable unsecured claims.  The K5 Transfer and any obligations are avoidable by creditors who hold allowable unsecured claims.

124.    Accordingly, the K5 Transfer and any obligations incurred by Plaintiffs to the K5 Transaction Defendants should be avoided as a fraudulent transfer pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiffs may recover from the K5 Transaction Defendants the full amount of the K5 Transfer, plus interest from the relevant date, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT SIX**
**FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO**
**DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b)**
**(AGAINST THE MOUNT OLYMPUS TRANSACTION DEFENDANTS)**

125.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 124 as if fully set forth here.

126.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest of their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

127.    Plaintiff Alameda Research Ltd. made the Mount Olympus Transfers between May 26, 2022 and the Petition Date for the benefit of the Mount Olympus Transaction Defendants.  Each of the Mount Olympus Transfers was a transfer of property of Plaintiff Alameda Research Ltd.

128.    The Mount Olympus Transfers and any obligations incurred by Plaintiff Alameda Research Ltd. to the Mount Olympus Transaction Defendants were made with the intent to hinder, delay, or defraud Plaintiff Alameda Research Ltd.'s present or future creditors, including creditors who hold allowable unsecured claims.  The Mount Olympus Transfers and each associated obligation is avoidable by creditors who hold allowable unsecured claims.

129.     Accordingly, the Mount Olympus Transfers and any obligations incurred by Plaintiff Alameda Research Ltd. to the Mount Olympus Transaction Defendants should be avoided as a fraudulent transfer pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiff Alameda Research Ltd. may recover from the Mount Olympus Transaction Defendants the full amount of the Mount Olympus Transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT SEVEN**
**FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO**
**DEL. CODE ANN. TIT. 6, §§ 1304(a)(2), 1305 AND 11 U.S.C. § 544(b)**
**(AGAINST THE K5 TRANSACTION DEFENDANTS)**

130.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 129 as if fully set forth here.

131.     Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

132.     Plaintiffs made the K5 Transfer on March 8, 2022.  The K5 Transfer was a transfer of property of Plaintiffs.

133.     Plaintiffs did not receive reasonably equivalent value in exchange for the K5 Transfer and for any obligations incurred by Plaintiffs to the K5 Transaction Defendants.

134.     Each of the Plaintiffs:  (i) was insolvent on the date of the K5 Transfer and when any obligations in connection with the K5 Transfer were incurred; (ii) became insolvent as

a result of the K5 Transfer and any obligations incurred in connection with the K5 Transfer; (iii) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (iv) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

135.    The K5 Transfer and any obligations incurred by Plaintiffs to the K5 Transaction Defendants are avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the K5 Transfer and obligations.

136.    Accordingly, the K5 Transfer and any obligations incurred by Plaintiffs to the K5 Transaction Defendants should be avoided as fraudulent pursuant to 11 U.S.C. § 544(b) and Del. Code Ann. tit. 6, §§ 1304(a)(2), 1305, and Plaintiffs may recover from the K5 Transaction Defendants the full amount of the K5 Transfer, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

## COUNT EIGHT
### FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO DEL. CODE ANN. TIT. 6, §§ 1304(a)(2) AND 1305 AND 11 U.S.C. § 544(b) (AGAINST THE MOUNT OLYMPUS TRANSACTION DEFENDANTS)

137.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 136 as if fully set forth here.

138.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

139.    Plaintiff Alameda Research Ltd. made the Mount Olympus Transfers between May 26, 2022 and the Petition Date for the benefit of the Mount Olympus Transaction

Defendants.  Each of the Mount Olympus Transfers was a transfer of property of Plaintiff Alameda Research Ltd.

140.    Plaintiff Alameda Research Ltd. did not receive reasonably equivalent value in exchange for any of the Mount Olympus Transfers and any obligations incurred by Plaintiff Alameda Research Ltd. to the Mount Olympus Transaction Defendants.

141.    Plaintiff Alameda Research Ltd.:  (i) was insolvent on the dates of each of the Mount Olympus Transfers and when any obligations in connection with the Mount Olympus Transfers were incurred; (ii) became insolvent as a result of the Mount Olympus Transfers and any obligations incurred in connection with the Mount Olympus Transfers; (iii) engaged or was about to engage in a business or a transaction for which the remaining assets of Plaintiff Alameda Research Ltd. was unreasonably small in relation to the business or transaction; or (iv) intended to incur, believed that it would incur, or reasonably should have believed that it would incur debts that would be beyond Plaintiff Alameda Research Ltd.'s ability to repay as such debts became due.

142.    The Mount Olympus Transfers and any obligations incurred by Plaintiff Alameda Research Ltd. to the Mount Olympus Transaction Defendants are avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the Mount Olympus Transfers and obligations.

143.    Accordingly, each of the Mount Olympus Transfers and any obligations incurred by Plaintiff Alameda Research Ltd. to the Mount Olympus Transaction Defendants should be avoided as fraudulent pursuant to  Del. Code Ann. tit. 6, §§ 1304(a)(2) and 1305, and 11 U.S.C. § 544(b), and Plaintiff Alameda Research Ltd. may recover from the Mount Olympus Transaction Defendants the full amount of the Mount Olympus Transfers, plus interest from the

relevant dates, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

**COUNT NINE**
**PREFERENTIAL TRANSFER PURSUANT TO 11 U.S.C. § 547(b)**
**(AGAINST THE MOUNT OLYMPUS TRANSACTION DEFENDANTS)**

144.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 143 as if fully set forth here.

145.    Plaintiff Alameda Research Ltd. transferred $100 million to Defendant Mount Olympus on September 20, 2022 ("September 2022 Transfer").

146.    The September 2022 Transfer to Defendant Mount Olympus was a transfer of property of Plaintiff Alameda Research Ltd.

147.    The September 2022 Transfer was made to benefit the Mount Olympus Transaction Defendants.

148.    With respect to the September 2022 Transfer, the Mount Olympus Transaction Defendants were creditors of Plaintiff Alameda Research Ltd. within the meaning of 11 U.S.C. § 101(10), or, alternatively, all or some of these Defendants received the September 2022 Transfer for the benefit of a creditor or creditors of Plaintiffs.

149.    The September 2022 Transfer was made within 90 days of the Petition Date and was made on account of an antecedent debt owed to the Mount Olympus Transaction Defendants.

150.    The September 2022 Transfer was made while Plaintiff Alameda Research Ltd. was insolvent.

151.    The September 2022 Transfer enabled the Mount Olympus Transaction Defendants to receive more than they would have received if (i) Plaintiffs' Chapter 11 Cases were cases under Chapter 7 of the Bankruptcy Code; (ii) the September 2022 Transfer had not

been made; and (iii) the amount paid to the Mount Olympus Transaction Defendants on account of the debt were determined by the provisions of the Bankruptcy Code.

152.    The Mount Olympus Transaction Defendants have not returned to Plaintiff Alameda Research Ltd. any of the funds conveyed in the September 2022 Transfer.

153.    Pursuant to 11 U.S.C. § 547(b), Plaintiff Alameda Research Ltd. has undertaken reasonable due diligence under the circumstances of the case and taken into account known or reasonably knowable affirmative defenses and believes the September 2022 Transfer is avoidable.

154.    Accordingly, the September 2022 Transfer should be avoided as a preferential transfer pursuant to Section 547(b) of the Bankruptcy Code, and Plaintiff Alameda Research Ltd. may recover from the Mount Olympus Transaction Defendants the full amount of the September 2022 Transfer, plus interest from the transfer date, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

## COUNT TEN
## PROPERTY RECOVERY PURSUANT TO 11 U.S.C. § 550(a)(1)
## (AGAINST THE K5 TRANSACTION DEFENDANTS)

155.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 154 as if fully set forth here.

156.    As alleged above, Plaintiffs are entitled to avoid the K5 Transfer under Sections 547 and 548 of the Bankruptcy Code.

157.    As the K5 Transaction Defendants are the initial, immediate, or mediate transferees of the K5 Transfer or the entities for whose benefit such transfer was made, Plaintiffs are entitled to receive for their bankruptcy estates the value of the K5 Transfer pursuant to 11 U.S.C. § 550(a)(1), plus interest from the transfer date, and costs and fees to the extent available, for the benefit of Plaintiffs' bankruptcy estates.

**COUNT ELEVEN**
**PROPERTY RECOVERY PURSUANT TO 11 U.S.C. § 550(a)(1)**
**(AGAINST THE MOUNT OLYMPUS TRANSACTION DEFENDANTS)**

158.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 157 as if fully set forth here.

159.     As alleged above, Plaintiff Alameda Research Ltd. is entitled to avoid the Mount Olympus Transfers under Sections 547 and 548 of the Bankruptcy Code.

160.     Because the Mount Olympus Transaction Defendants are the initial, immediate, or mediate transferees of the Mount Olympus Transfers or the entities for whose benefit such transfers were made, Plaintiff Alameda Research Ltd. is entitled to receive for its bankruptcy estate the value of the Mount Olympus Transfers pursuant to 11 U.S.C. § 550(a)(1), plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of Plaintiff Alameda Research Ltd.'s bankruptcy estate.

**COUNT TWELVE**
**PROPERTY RECOVERY PURSUANT TO 11 U.S.C. § 550(a)(1)**
**(AGAINST DEFENDANT SGN ALBANY)**

161.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 160 as if fully set forth here.

162.     As alleged herein, the K5 Transaction Defendants and Mount Olympus Transaction Defendants provided to SGN Albany substantial interests in the K5 Transaction Entities and Mount Olympus Transaction Entities in exchange for the K5 Transfers and Mount Olympus Transfers.

163.     As alleged above, Plaintiffs are entitled to avoid the K5 Transfer and Mount Olympus Transfers under Sections 547 and 548 of the Bankruptcy Code.

164.     Because SGN Albany is a mediate transferee of the K5 Transfer and Mount Olympus Transfers or the entity for whose benefit such transfers were made, Plaintiffs are

entitled to receive from SGN Albany pursuant to 11 U.S.C. § 550(a)(1) the value of the K5

Transfer and Mount Olympus Transfers, plus interest from the transfer dates, and costs and fees

to the extent available, for the benefit of Plaintiffs' bankruptcy estates.

**COUNT THIRTEEN**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(AGAINST DEFENDANTS KIVES AND BAUM)**

165.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 164

as if fully set forth here.

166.    At all relevant times, Bankman-Fried was a managing member of

Alameda Ventures and owed fiduciary duties to Alameda Ventures under Delaware law,

including duties of care, loyalty, honesty, and disclosure.  Bankman-Fried was required to act in

Alameda Ventures' best interests, and not for his personal benefit.  Defendants Kives and Baum

knew that Bankman-Fried owed such duties to Alameda Ventures.

167.    By causing Alameda Ventures to make the K5 Transfer, in exchange for

which Alameda Ventures did not receive, and had virtually no prospect of receiving, reasonably

equivalent value, and from which Bankman-Fried personally benefited, Bankman-Fried breached

his fiduciary duties to Alameda Ventures.

168.    Defendants Kives and Baum knew that the K5 Transaction did not provide

and had virtually no prospect of providing Alameda Ventures with reasonably equivalent value,

and that Bankman-Fried personally benefited from the K5 Transaction.  Defendants Kives and

Baum thus knowingly participated in Bankman-Fried's breaches of fiduciary duty to Alameda

Ventures.

169.    As a result of Bankman-Fried's breaches of fiduciary duty in connection

with the K5 Transactions, and Defendants Kives's and Baum's aiding and abetting those

breaches, Alameda Ventures suffered damages in the amount of the K5 Transfer.

### COUNT FOURTEEN
### DISHONEST ASSISTANCE
### (AGAINST DEFENDANTS KIVES AND BAUM)

170.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 169 as if fully set forth here.

171.    At all relevant times, Bankman-Fried was the chairman and the sole member of the board of directors of Alameda Research Ltd.  Bankman-Fried owed fiduciary duties to Plaintiff Alameda Research Ltd. under the law of the British Virgin Islands, including duties of care and loyalty.  Bankman-Fried was required to act in Alameda Research Ltd.'s best interests, and not for his personal benefit.

172.    By causing Alameda Research Ltd. to make the K5 Transfer and Mount Olympus Transfers, in exchange for which Alameda Research Ltd. did not receive and had virtually no prospect of receiving reasonably equivalent value, and from which Bankman-Fried personally benefited, Bankman-Fried breached his fiduciary duties to Alameda Research Ltd.

173.    Defendants Kives and Baum knew, should have known, or were willfully blind to the fact that the K5 Transaction and Mount Olympus Transaction did not provide and had virtually no prospect of providing Alameda Research Ltd. with reasonably equivalent value, and that Bankman-Fried personally benefited from the K5 Transaction and Mount Olympus Transaction.  Defendants Kives and Baum thus acted with dishonest minds by knowingly assisting in Bankman-Fried's breaches of fiduciary duty to Alameda Research Ltd.

174.    As a result of Bankman-Fried's breaches of fiduciary duty in connection with the K5 Transaction and Mount Olympus Transaction and Defendants Kives's and Baum's dishonest assistance to Bankman-Fried in committing those breaches, Alameda Research Ltd. suffered damages in the amount of the K5 Transfer and Mount Olympus Transfer.

## COUNT FIFTEEN
## UNJUST ENRICHMENT
## (AGAINST DEFENDANT SGN ALBANY LLC)

175.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 174 as if fully set forth here.

176.     As a result of the K5 Transaction, Defendant SGN Albany was enriched by the acquisition of a one-third interest in Defendant K5 Global; an approximately 38% partnership interest in Defendant MBK Capital; a one-third interest in Defendant K5 Technology; and one-third "profits interest" in Defendants K5 Global Growth Co-Invest I GP LLC, K5 Global Growth Fund I GP LLC, and K5 Global Ventures LLC.

177.     As a result of the Mount Olympus Transaction, Defendant SGN Albany LLC was enriched by the acquisition of a $400 million stake in Mount Olympus and its associated funds.

178.     Plaintiffs Alameda Research Ltd. and Alameda Ventures were impoverished by the K5 Transaction, which did not provide and had virtually no prospect of providing Alameda Research Ltd. or Alameda Ventures with reasonably equivalent value for the K5 Transfer.

179.     Plaintiffs Alameda Research Ltd. was impoverished by the Mount Olympus Transaction, which did not provide and had virtually no prospect of providing Alameda Research Ltd. with reasonably equivalent value for the Mount Olympus Transfers.

180.     Plaintiffs lack an adequate remedy at law against SGN Albany for its unjust enrichment at Plaintiffs' expense.

## COUNT SIXTEEN
## DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502(d)
## (AGAINST ALL DEFENDANTS)

181.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 180 as if fully set forth here.

182.     As alleged above, Defendants are transferees of the K5 Transfer and Mount Olympus Transfers that are avoidable under Section 547 of the Bankruptcy Code and entities from which property is recoverable under Section 550 of the Bankruptcy Code.

183.     By reason of the foregoing facts and pursuant to Section 502(d) of the Bankruptcy Code, the claims of Defendants in these Chapter 11 Cases should be disallowed unless and until Defendants have relinquished to Plaintiffs the property transferred, or have paid Plaintiffs the value of such transferred property, for which and to the extent the Court has determined Defendants are liable pursuant to Section 550 of the Bankruptcy Code.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs respectfully pray that this Court:

184.     Enter an order that the K5 Transfer and Mount Olympus Transfers and any obligations incurred by Plaintiffs to Defendants are fraudulent transfers and obligations under 11 U.S.C. §§ 544 and 548 and Del. Code Ann. tit. 6, §§ 1304 and 1305;

185.     Enter an order that the September 2022 Transfer is an avoidable preferential transfer under 11 U.S.C. § 547;

186.     Enter an order that Defendants Kives and Baum aided and abetted Bankman-Fried's breach of his fiduciary duties to Alameda Ventures, and awarding damages to be paid in an amount to be determined by this Court;

187.    Enter an order that Defendants Kives and Baum dishonestly assisted in Bankman-Fried's breach of his fiduciary duties to Alameda Research Ltd., and awarding equitable relief;

188.    Enter an order requiring Defendant SGN Albany to provide restitution to Plaintiffs for its unjust enrichment;

189.    Award Plaintiffs under 11 U.S.C. § 550 no less than $700 million (plus the value of any additional avoidable transfers Plaintiffs learn, through discovery or otherwise, were made to the Defendants during the Avoidance Period);

190.    Enter an order under 11 U.S.C. § 502(d) disallowing any and all claims filed or held by Defendants in these bankruptcy proceedings unless and until Defendants have turned over to Plaintiffs the amount ordered as an award for avoidable transfers and obligations;

191.    Award Plaintiffs their attorneys' fees, pre- and post-judgment interests, and costs of suit; and

192.    Award Plaintiffs all other relief, at law or equity, to which they may be entitled.

Dated: June 22, 2023
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
       mcguire@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Steven L. Holley (admitted *pro hac vice*)
Andrew G. Dietderich (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Jacob M. Croke (admitted *pro hac vice*)
Hilary M. Williams (*pro hac vice* application pending)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: holleys@sullcrom.com
       dietdericha@sullcrom.com
       gluecksteinb@sullcrom.com
       dunnec@sullcrom.com
       crokej@sullcrom.com
       williamsh@sullcrom.com

*Counsel for the Debtors*
*and Debtors-in-Possession*