**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 |
| Debtors. | (Jointly Administered) |
| ALAMEDA RESEARCH LTD. and CLIFTON BAY INVESTMENTS LLC f/k/a ALAMEDA RESEARCH VENTURES LLC, | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 23-50411 (JTD) |
| MICHAEL KIVES, BRYAN BAUM, K5 GLOBAL HOLDINGS LLC, K5 GLOBAL TECHNOLOGY LLC, MBK CAPITAL LP SERIES T, K5 GROWTH CO-INVEST I GP LLC, K5 GLOBAL GROWTH FUND I GP LLC, K5 GLOBAL VENTURES LLC, MOUNT OLYMPUS CAPITAL LP, MOUNT OLYMPUS CAPITAL LLC, K5 GLOBAL GROWTH FUND II LP, K5 GLOBAL GROWTH FUND II GP LLC, K5X FUND I LP, K5X FUND I LLC, and SGN ALBANY LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF THE
<u>K5 DEFENDANTS' MOTION TO WITHDRAW THE REFERENCE</u>**

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................3

    A.    Plaintiffs Invest In K5 Global ............................................................................3
    B.    Plaintiffs File This Litigation..............................................................................5

ARGUMENT ......................................................................................................................7

I.     THE MOTION TO WITHDRAW THE REFERENCE IS TIMELY ................................8

II.    THERE IS STRONG CAUSE TO WITHDRAW THE REFERENCE ............................9

    A.    The Bankruptcy Court Lacks Constitutional Authority To Oversee A Jury Trial In This Proceeding ....................................................................................10
    B.    The Bankruptcy Court Lacks Constitutional Authority To Enter A Final Judgment In This Proceeding.............................................................................14
           1.    The Bankruptcy Court Lacks Constitutional Authority To Resolve Plaintiffs' Fraudulent And Preferential Transfer Claims...........................15
           2.    The Bankruptcy Court Lacks Even Statutory Authority To Resolve Plaintiffs' Non-Fraudulent And Preferential Transfer Claims..................22
    C.    Prudential Considerations Strongly Weigh in Favor of Withdrawing the Reference Now.....................................................................................................24

CONCLUSION.................................................................................................................27

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re 24 Hour Fitness Worldwide, Inc.*,
Civ. No. 21-884-LPS, 2022 WL 605661 (D. Del. Jan. 4, 2022) ............................................21

*In re AgFeed USA, LLC*,
565 B.R. 556 (D. Del. 2016) ........................................................................................8, 9

*In re Allied Sys. Holdings*,
524 B.R. 598 (Bankr. D. Del. 2015) ......................................................................................22

*In re Appleseed's Intermediate Holdings*,
Civ. No. 11-807 (JEI/KM), 2011 WL 6293251 (D. Del. Dec. 15, 2011) ..............23, 24, 25, 27

*In re Axiant, LLC*,
Bankr. No. 09-14118 (MFW), Adv. No. 12-50526 (MFW), 2012 WL 5614588 (Bankr. D. Del. Nov. 15, 2012).................................................................................................................22

*Barnes v. Addy*
(1874) L.R. 9 Ch. App. 244 ...................................................................................................13

*In re Bellingham Ins. Agency, Inc.*,
702 F.3d 553 (9th Cir. 2012) .................................................................................................17

*In re Connelly*,
476 B.R. 223 (Bankr. E.D. Va. Mar. 30, 2012) ....................................................................18

*Curtis v. Loether*,
415 U.S. 189 (1974).................................................................................................................13

*Dev. Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP*,
462 B.R. 457 (S.D.N.Y. 2011).................................................................................................26

*In re Direct Response Media, Inc.*,
466 B.R. 626 (Bankr. D. Del. 2012) .......................................................................................20

*In re Elk Petroleum, Inc.*,
Civ. No. 21-1131 (CFC), 2022 WL 4355285 (D. Del. Sept. 20, 2022)........................9, 24, 25

*In re FTX Trading Ltd., et al.*,
Case No. 22-11068-JTD (Bankr. D. Del) ...........................................................................5, 6

*Galli v. N.J. Meadowlands Comm'n*,
490 F.3d 265 (3d Cir. 2007)....................................................................................................21

ii

*Germain v. Conn. Nat'l Bank*,
    988 F.2d 1323 (2d Cir. 1993) ............................................................13

*Granfinanciera, S.A. v. Nordberg*,
    492 U.S. 33 (1989) ................................................................ *passim*

*Great-West Life & Annuity Ins. Co v. Knudson*,
    534 U.S. 204 (2002) ..........................................................................13

*Hatzel & Buehler, Inc. v. Orange & Rockland Utils., Inc.*,
    107 B.R. 34 (D. Del. 1989) ..............................................................24

*In re Int'l Auction & Appraisal Servs. LLC*,
    493 B.R. 460 (Bankr. M.D. Pa. 2013) ..............................................18

*In re Int'l Benefits Grp.*,
    Civ. A. No. 06-2363 (KSH), 2006 WL 2417297 (D.N.J. Aug. 21, 2006) ..............................26

*Langenkamp v. Culp*,
    498 U.S. 42 (1990) ......................................................................11, 12

*In re Lyondell Chem. Co.*,
    467 B.R. 712 (S.D.N.Y. 2012) (Cote, J.) ..........................................17

*In re Madison Bentley Assocs.*,
    474 B.R. 430 (S.D.N.Y. 2012) (Scheindlin, J.) ..................................17

*Mertens v. Hewitt Assocs.*,
    508 U.S. 248 (1993) ..........................................................................13

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
    59 U.S. 272 (1856) ............................................................................15

*N. Pipeline Constr. Co v Marathon Pipe Line Co.*,
    458 U.S. 50 (1982) ............................................................................19

*In re NDEP Corp.*,
    203 B.R. 905 (D. Del. 1996) ..................................................... *passim*

*In re Northwestern Corp.*,
    No. 04-1494-JJF, 2005 WL 2320113 (D. Del. Sept. 22, 2005) ..............................8

*In re Oakwood Homes Corp.*,
    378 B.R. 59 (D. Del. 2007) ..............................................................13

*Opt-Out Lenders v. Millennium Lab Holdings*,
    242 F. Supp. 3d 322 (D. Del. 2017) ..................................................18

iii

*In re Orion Pictures Corp.*,
    4 F.3d 1095 (2d Cir. 1993) ................................................................................9, 26

*In re Paragon Offshore*
    598 B.R. 761 (Bankr. D. Del. 2019) .......................................................................19

*In re Pelullo*,
    No. 96-MC-303, 1997 WL 535155 (E.D. Pa. Aug. 15, 1997).................................26

*In re Penson Worldwide*,
    587 B.R. 6 (Bankr. D. Del. 2018) ..............................................................................9

*In re Pruitt*,
    910 F.2d 1160 (3d Cir. 1990).........................................................................2, 9, 24

*Schoenthal v. Irving Trust Co.*,
    287 U.S. 92 (1932)...................................................................................................15

*Shengdatech Liquidated Trust v. Hansen, Barnett, & Maxwell, P.C.*,
    No. 3:13-CV-00563-RCJ, 2013 WL 6405818 (D. Nev. Nov. 26, 2013)................25

*In re Star Creditors' Liquidating Tr.*,
    Civ. A. 03-793-KAJ, 2004 WL 406353 (D. Del. Mar. 3, 2004)............................26

*Stern v. Marshall*,
    564 U.S. 462 (2011) ........................................................................................ *passim*

*In re TK Holdings, Inc.*,
    Bankr. No. 17-11375 (BLS), Adv. No. 20-51004 (BLS), 2021 WL 6101496 (Bankr. D. Del.
    Dec. 20, 2021)..........................................................................................................22

*In re Transcon Lines*,
    121 B.R. 837 (C.D. Cal. 1990) ...............................................................................10

*Tull v. United States*,
    481 U.S. 412 (1987).............................................................................................11, 12

*In re TZEW Holdco LLC*,
    Civ. No. 22-1268-GBW, 2023 WL 2663047 (D. Del. Mar. 28, 2023)..................2, 9

*In re U.S. Mortg. Corp.*,
    Civ. A. Nos. 2:11-cv-07222 (DMC) (JAD), 2:11-cv-07223 (DMC) (JAD), 2012 WL 1372284
    (D.N.J. Apr. 19, 2012) .............................................................................................24

*In re U.S.A. Floral Prods., Inc.*,
    Civ. A. 05-00039-KAJ, 2005 WL 3657096 (D. Del. Jul. 1, 2005).........................8, 10, 11, 26

iv

*In re Uni Marts, LLC*,
   Civ. A. No. 09-164-JJF, 2009 WL 1631821 (D. Del. Jun. 11, 2009) ......................................10

*In re Universal Mktg., Inc.*,
   541 B.R. 259 (Bankr. E.D. Pa. 2015) ...................................................................................18

*In re Visteon Corp.*,
   Civ. A. No. 11-148, 2011 WL 1791302 (D. Del. May 9, 2011)............................9, 10, 14, 25

*In re Winstar Commc'ns, Inc.*,
   554 F.3d 382 (3d Cir. 2009)...................................................................................................22

## STATUTES

11 U.S.C.
   § 548.........................................................................................................................11, 12
   § 548(a)(2) ........................................................................................................................16

28 U.S.C.
   § 157..........................................................................................................................20
   § 157(a) ..............................................................................................................................7
   § 157(b).......................................................................................................................15, 23
   § 157(b)(1) ........................................................................................................................15
   § 157(b)(2) .............................................................................................................14, 15, 22
   § 157(b)(2)(H)....................................................................................................................12
   § 157(c) .............................................................................................................................15
   § 157(c)(1) ........................................................................................................................23
   § 157(d)......................................................................................................................7, 8, 9
   § 157(e) .............................................................................................................................14
   § 1334..................................................................................................................................7

## OTHER AUTHORITIES

Michael Sheetz, *Elon Musk's SpaceX Nears $150 Billion Valuation After Secondary Share Sale*,
   CNBC (July 13, 2023, 4:57 PM), https://www.cnbc.com/2023/07/13/elon-musk-spacex-near-
   150-billion-valuation.html .........................................................................................................5

Wyatte Grantham-Philips, *CEO Plans To Keep 1% Of His Earnings, Give Away The Rest: 'I
   Don't Want A Yacht'*, USA Today (Apr. 5, 2022, 4:33 PM).....................................................3

## INTRODUCTION

In this lawsuit, two entities owned by Samuel Bankman-Fried ("SBF") and other FTX insiders, Plaintiffs Alameda Research Ltd. and Clifton Bay Investments LLC f/k/a Alameda Research Ventures LLC (together, "Plaintiffs"), seek to unwind a 2022 investment with certain of the K5 Defendants.[1]  The transaction, which was organized by SBF and his lawyers, was ultimately completed by "defendant" SGN Albany Capital LLC ("SGN")—a shell entity that shares a similar ownership structure as Plaintiffs except insofar as it purportedly is 8.33% owned by one of the two Plaintiffs themselves.  In the integrated 2022 transaction, Plaintiffs and SGN purchased interests in certain entities and made investments in certain funds under the umbrella of Defendant K5 Global,[2] a venture capital firm controlled by Defendants Michael Kives and Bryan Baum.  Although Plaintiffs bring a laundry list of federal, state, and foreign law claims, they principally allege that their investment in K5 Global amounted to a fraudulent transfer for which they did not receive reasonably equivalent value, and assert that their investment should be clawed back for the benefit of Plaintiffs' bankruptcy estates.

Plaintiffs' claims are meritless.  Among other things, they rest entirely on the fiction that "defendant" SGN is somehow separate from the Plaintiffs in a corporate sense, and ignore that the

---

[1] In this filing, Defendants Michael Kives, Bryan Baum, K5 Global Holdings, LLC, K5 Global Technology, LLC, MBK Capital, LP – Series T, K5 Global Growth Co-Invest I GP, LLC, K5 Global Growth Fund I GP, LLC, K5 Global Ventures, LLC, Mount Olympus Capital, LP, Mount Olympus Capital, LLC, K5 Global Growth Fund II, LP, K5 Global Growth Fund II GP, LLC, K5X Fund I, LP, and K5X Fund I, LLC are collectively referred to as the "K5 Defendants."

[2] For definitional purposes here only, the venture capital firm as a whole is referred to herein as "K5 Global."  K5 Global in fact consists of a number of entities that are not all organized in parent/subsidiary relationships, although they are all managed or advised directly or indirectly by Defendants Kives and Baum, along with an appropriate management team.

IMPAC 10973865v.2

investments and assets purchased by Plaintiffs were well worth the amounts invested and paid. There will be much more to say about all of this when the litigation moves forward.

*This* motion, however, is not about whether Plaintiffs' claims will fail, but rather *where* they must be adjudicated. The Supreme Court's decisions in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989), and *Stern v. Marshall*, 564 U.S. 462 (2011), make the answer clear: because the K5 Defendants are entitled to a jury trial and the Bankruptcy Court lacks constitutional authority to decide this case, this action cannot proceed to judgment in an Article I bankruptcy court and must be resolved in an Article III court. The K5 Defendants appreciate that some lower courts are divided when applying *Granfinanciera* and *Stern*. However, the more persuasive cases (including the sole circuit court case to have addressed the issue) apply the plain language of the Supreme Court's decisions and conclude that claims like Plaintiffs' must be resolved in an Article III, rather than Article I, court. Indeed, because the K5 Defendants inarguably have the right to a jury trial before an Article III court, this case ultimately will end up before this Court under any scenario.

In evaluating whether cause exists to withdraw the reference, courts consider whether the moving party is entitled to a jury; whether the bankruptcy court has authority to enter judgment, or whether an Article III court alone may do so; and a variety of other factors adopted by the Third Circuit in *In re Pruitt*, 910 F.2d 1160, 1168 (3d Cir. 1990), which are designed to assess whether withdrawal of the reference will serve goals of judicial economy, efficiency, and uniformity in bankruptcy administration. *See, e.g.*, *In re NDEP Corp.*, 203 B.R. 905, 907–09, 913 (D. Del. 1996); *In re TZEW Holdco LLC*, Civ. No. 22-1268-GBW, 2023 WL 2663047, at *2 (D. Del. Mar. 28, 2023). As other courts have recognized, such questions of uniformity and efficiency frequently turn on whether the Article III court alone has authority to enter a final judgment, and whether any

2

bankruptcy court findings on the merits must be reviewed *de novo*. *See, e.g.*, *In re NDEP Corp.*, 203 B.R. at 908 (citation omitted).

Here, all those considerations weigh strongly in favor of withdrawal of the reference now. Moreover, there is particularly little efficiency or benefit to leaving this action in bankruptcy court because principal facts at issue here are distinct from those at issue in the bankruptcy proceeding. Accordingly, the K5 Defendants respectfully request that this Court grant their motion to withdraw the reference now.

## BACKGROUND

### A.     Plaintiffs Invest In K5 Global

In 2018, Defendant Michael Kives founded an advisory firm under the K5 Global umbrella, which Defendant Bryan Baum later joined as a second managing member. *See, e.g.*, Compl. ¶¶ 19–23, 57–59, D.I. 1. By March 2022—before any investment by SBF or any SBF-affiliated entity—Plaintiffs acknowledge that K5 Global already had grown to nearly $700 million in assets under management. *Id.* ¶ 83. Today, wholly apart from any investment at issue in this litigation, K5 Global manages over $1 billion in assets and holds investments in nearly 150 companies.

The complaint alleges that, by March 2022, SBF had been "so impressed by Kives and Baum and their 'infinite connections,'" he began working towards an association with K5 Global, including through the acquisition of general partnership interests in the K5 Global business, the formulation by the parties of a new limited partnership for investment, and the subscription by SBF for a limited partnership interest in that investment fund. *See id.* ¶¶ 2, 60–62. SBF likewise appeared to be an attractive partner. At the time, FTX was valued at $40 billion dollars, and SBF was himself understood to possess a net worth in excess of $20 billion dollars. *See* Wyatte Grantham-Philips, *CEO Plans To Keep 1% Of His Earnings, Give Away The Rest: 'I Don't Want*

*A Yacht'*, USA Today (Apr. 5, 2022, 4:33 PM), https://www.usatoday.com/story/money/2022/04/05/cryptocurrency-ceo-donate-charity/7272175001/.

SBF and other FTX insiders ultimately acquired a considerable interest in K5 Global entities. Pursuant to a March 7, 2022 Term Sheet (the "Term Sheet," and the transaction contemplated thereby, the "K5 Transaction"), the parties agreed that SBF or an affiliated entity would acquire a substantial equity interest in certain of K5 Global's general partnerships and investment holding companies, for which Kives and Baum (each of whom held a 50% interest) would each receive $125 million. Compl. ¶ 63. In addition, SBF or an affiliated entity agreed to contribute $50 million plus stock of substantial value to one of the general partnerships. *Id.* ¶ 78. The Term Sheet also committed SBF or an affiliated entity to making a further substantial investment—up to $3 billion—in K5 Global funds over the coming several years via contributions to a new fund, Defendant Mount Olympus Capital LP ("Mount Olympus"). *Id.* ¶¶ 64–65.

The K5 Transaction closed on May 26, 2022 (the "Closing").[3] *Id.* ¶ 67. In advance of the Closing, SBF purported to transfer $300 million to defendant K5 Global Holdings, LLC as partial consideration for the transaction and relatedly informed K5 Global that he would use a special purpose company, SGN, to serve as the counterparty in the final documentation. *Id.* ¶¶ 64, 80. Beginning on the date of the Closing, and consistent with a subscription agreement signed as part of the Closing, funds were transferred to Mount Olympus for the committed capital investments and Mount Olympus in turn allocated those funds to two K5 Global investment funds. *Id.* ¶ 86.

---

[3] Plaintiffs inaccurately describe the K5 Transaction as two transactions—the "K5 Transaction" and the "Mount Olympus Transaction*." Id.* ¶ 13. But there was only one transaction—what this filing describes as the "K5 Transaction." As the complaint acknowledges, what Plaintiffs describe as two transactions were simply components of an integrated agreement set forth on *one* Term Sheet. *Id.* ¶ 62.

4

By September 2022, the vast majority of those funds had been invested in a handful of select companies, including substantial and valuable investments in two startup companies founded by Elon Musk, SpaceX ($189.7 million) and The Boring Company ($23 million).  *Id.* ¶ 87.  In July 2023, SpaceX's valuation crossed $150 billion, reflecting significantly increased share value and making it "one of the most valuable private companies in the world."  Michael Sheetz, *Elon Musk's SpaceX Nears $150 Billion Valuation After Secondary Share Sale*, CNBC (July 13, 2023, 4:57 PM), https://www.cnbc.com/2023/07/13/elon-musk-spacex-near-150-billion-valuation.html.

Plaintiffs do not allege that the overwhelming majority of the $3 billion investment SGN committed to make (Compl. ¶ 82) ever occurred, however, as FTX suddenly collapsed in November 2022 and SBF's liquidity evaporated.  On November 11, 2022, FTX, Plaintiffs, and various other affiliated entities controlled by SBF—but not, oddly, SGN—filed for chapter 11 protection in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  *See In re FTX Trading Ltd., et al.*, Case No. 22-11068-JTD (Bankr. D. Del).  The K5 Defendants are neither creditors of any of the Debtors nor listed on any of the Debtors' schedules of assets and liabilities, and accordingly have not filed any proofs of claim in the chapter 11 proceeding.

**B.      Plaintiffs File This Litigation**

On June 22, 2023, Plaintiffs filed a complaint in the bankruptcy proceeding against the K5 Defendants and SGN.  But neither Kives nor Baum, nor any of the other K5 Defendants, holds any interest in SGN.  Compl. ¶ 35.  Rather, SGN refers to the first initials of Samuel Bankman-Fried and his fellow FTX insiders, Gary Wang and Nishad Singh; "Albany" is the luxury resort community where the three resided in the Bahamas.  Plaintiffs allege that SBF, Wang, Singh, and Plaintiff Alameda Research Ltd. itself nominally own the entirety of SGN.  *Id.*  Thus, although

5

SGN is named as a Defendant in this action, SGN is merely the vehicle through which Plaintiffs'

investment was effected.  *Id.* ¶ 50.  Putting SGN on the Defendants' side of the v. is entirely

artificial; as Plaintiffs themselves concede, "Bankman-Fried treated the legal entities that he

controlled"—among them Plaintiffs and SGN—"as a slush fund operated with a near-total

disregard for corporate formalities."  Compl. ¶ 9; *see also* First Interim Report of John J. Ray III

to the Independent Directors on Control Failures at the FTX Exchanges at 17, *In re FTX Trading*

*Ltd., et al.*, Case No. 22-11068-JTD (Bankr. D. Del. Apr. 9, 2023), D.I. 1242-1 ("The FTX Group

did not observe any discernable corporate formalities when it came to intercompany transactions.

Assets and liabilities were routinely shuffled among the FTX Group entities and insiders without

proper process or documentation.").[4]

Plaintiffs assert sixteen causes of action, twelve of which seek to avoid the K5 Transaction

on the theory that it was a fraudulent or preferential transfer under federal or Delaware law.  *See*

Compl. ¶¶ 102–64.  Plaintiffs also charge Kives and Baum with dishonest assistance and aiding

and abetting SBF's breaches of fiduciary duty under British Virgin Islands and Delaware law,

respectively.  *Id.* ¶¶ 165–74.  Plaintiffs also cite Bankruptcy Code section 502(d), which requires

a *creditor* to repay the estate or turn over to the estate any avoided transfer before that creditor can

recover on any claim it holds against such estate.  *Id.* ¶¶ 181–83.  However, as stated above, the

K5 Defendants are not creditors and accordingly have not filed any claim in the bankruptcy

proceeding; thus, this "claim" should be disregarded.

---

[4] It seems that Plaintiffs are attempting to create this fiction to support a theory that Plaintiffs did not obtain reasonably equivalent value for their "transfers"  because the investment interests were transferred to SGN rather than Plaintiffs themselves.  Addressing that construct is a topic for another day.  Suffice it here to say that the fact that Plaintiffs have named SGN as a defendant does not impact the *K5 Defendants'* rights to have Plaintiffs' claims resolved by an Article III court.

6

To prevail on their claims against the K5 Defendants, Plaintiffs must prove a host of facts that are unique to the K5 Transaction.  Among other things:

- Plaintiffs must prove that they "did not receive reasonably equivalent value in exchange for the K5 Transfer." *Id.* ¶¶ 112, 117; *see also id.* ¶¶ 140, 167, 172, 178 (same).

- Plaintiffs must prove that Defendants "Kives and Baum knew that the K5 transaction did not provide and had virtually no prospect of providing Alameda Ventures [or Alameda Research Ltd.] with reasonably equivalent value." *Id.* ¶ 168; *see also id.* ¶ 173 (same).

- Plaintiffs must prove that the K5 Transaction was made "with actual intent to hinder, delay, or defraud present or future creditors." *Id.* ¶¶ 104; 108; *see also id.* ¶¶ 123, 128.

The K5 Defendants' current deadline to respond to Plaintiffs' complaint is September 11, 2023.  *See* Stipulation & Order for Extension of Time for K5 Defs. to Answer, Move, or Otherwise Respond to the Compl. at ¶ 4, D.I. 4.  The K5 Defendants intend to demand a jury when timely to do so.  Further, the K5 Defendants have not consented and will not consent to a jury trial before the Bankruptcy Court.

## ARGUMENT

District courts "have original and exclusive jurisdiction of all cases under title 11."  28 U.S.C. § 1334.  By the District Court's *Amended Standing Order of Reference* dated February 29, 2012 (Bankr. D. Del.) (Sleet, C.J.) (the "Standing Order"), the United States District Court for the District of Delaware, pursuant to 28 U.S.C. § 157(a), has referred cases and proceedings arising under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") to the United States Bankruptcy Court for the District of Delaware.  Notwithstanding the Standing Order, 28 U.S.C. § 157(d) provides that the District Court "may withdraw, in whole or in part, any case or proceeding referred [to a bankruptcy court] under this section, on its own motion or on timely motion of any party, for cause shown."

7

Here, the K5 Defendants' motion is timely, and strong cause exists to withdraw the reference. Because Plaintiffs' claims must be resolved in an Article III court, and the Bankruptcy Court lacks constitutional authority either to oversee a jury trial in this case or to render a final judgment, this Court alone has the authority to oversee a jury trial in this case and enter a final judgment. It makes little sense for the Bankruptcy Court to issue advisory rulings on the myriad issues that would inform the contours of that jury trial, from the scope of discovery to *Daubert* motions, motions *in limine*, and dispositive motions, when this Court will need to revisit those decisions and assume responsibility for managing the trial.

For the same reason, "it would constitute a tremendous waste of judicial resources to permit the bankruptcy judge to continue to maintain jurisdiction over the issues presented in this litigation." *In re NDEP Corp.*, 203 B.R. at 913 (internal quotation omitted). This is particularly so in the instant litigation because to prevail on their claims, Plaintiffs would need to prove numerous facts independent of and disconnected with the focus of the bankruptcy proceeding. For these reasons and others discussed below, the motion to withdraw the reference should be granted.

## I.      THE MOTION TO WITHDRAW THE REFERENCE IS TIMELY

"A § 157(d) motion is timely if it is filed at the first reasonable opportunity after the movant has notice of the grounds for removal, taking into consideration the circumstances of the proceeding." *In re AgFeed USA, LLC*, 565 B.R. 556, 565 (D. Del. 2016) (internal quotation omitted). Because Defendants are moving to withdraw the reference at the earliest possible stage of proceedings, even before responding to Plaintiffs' complaint, the K5 Defendants' motion is timely. *See, e.g.*, *In re Northwestern Corp.*, No. 04-1494-JJF, 2005 WL 2320113, at *2 (D. Del. Sept. 22, 2005) (motion to withdraw reference timely where it "was made at a relatively early stage in the proceedings and significant discovery ha[d] not yet occurred"); *In re U.S.A. Floral Prods.*,

8

*Inc.*, Civ. A. 05-00039-KAJ, 2005 WL 3657096, at *1 (D. Del. Jul. 1, 2005) (finding motion timely even when filed after resolution of motion to dismiss because the case was "still at a procedurally early stage" and "no discovery ha[d] taken place"); *In re AgFeed USA, LLC*, 565 B.R. at 566 (motion timely when filed at "outset of th[e] litigation" while "case [was] in its infancy").

The timeliness of Defendants' motion weighs in favor of withdrawal of the reference. *See, e.g.*, *In re Elk Petroleum, Inc*., Civ. No. 21-1131 (CFC), 2022 WL 4355285, at *5 (D. Del. Sept. 20, 2022) ("Plaintiff concedes that the request is not untimely, and this weighs in Defendants' favor."); *In re AgFeed USA, LLC*, 565 B.R. at 563 (identifying "the timing of the request for withdrawal" as a factor bearing on whether a motion to withdraw the reference should be granted).

## II.     THERE IS STRONG CAUSE TO WITHDRAW THE REFERENCE

A district court may withdraw a proceeding from the bankruptcy court for "cause shown." 28 U.S.C. § 157(d); *In re Visteon Corp.*, Civ. A. No. 11-148, 2011 WL 1791302, at *3 (D. Del. May 9, 2011).  To evaluate whether cause to withdraw the reference exists, courts in this district consider factors including: (1) whether the matter at hand is to be tried to a jury; (2) whether a bankruptcy court may hear and determine the matter, or whether it must be resolved by an Article III court; and (3) a set of five factors set forth in *In re Pruitt*, 910 F.2d at 1171, designed to test whether withdrawal will serve judicial economy and efficiency, such as by promoting uniformity in bankruptcy administration and fostering the economical use of debtors' and creditors' resources. *See In re NDEP Corp.*, 203 B.R. at 913; *In re TZEW Holdco LLC*, 2023 WL 2663047, at *2.  As courts have recognized, those "'questions of efficiency and uniformity'" generally "'will turn'" on whether bankruptcy court oversight of the matter at hand is subject to *de novo* review by an Article III court, in which case "'unnecessary costs could be avoided by a single proceeding in the district court.'"  *In re NDEP Corp.*, 203 B.R. at 908 (quoting *In re Orion Pictures Corp.*, 4 F.3d 1095,

IMPAC 10973865v.2

1101 (2d Cir. 1993)); *see also In re Penson Worldwide*, 587 B.R. 6, 16 (Bankr. D. Del. 2018) ("When it is necessary for the district court to review any portion of the dispute *de novo*, it may be more appropriate (i.e. more efficient) for the entire matter to be withdrawn.").

All of the foregoing factors favor withdrawal of the reference in this case. The K5 Defendants are entitled to a jury trial on Plaintiffs' claims, and the Bankruptcy Court lacks authority to resolve those claims absent the parties' consent. This alone provides a basis to withdraw the reference. Moreover, because Plaintiffs' claims are "quintessentially common-law suits" that require Plaintiffs to prove facts particular to the K5 Transaction, there is little efficiency or benefit to requiring the parties first to try those issues as part of the sprawling proceedings in Bankruptcy Court, and then repeat the process a second time in this Court. For all those reasons, there is strong cause to withdraw the reference now.

### A. The Bankruptcy Court Lacks Constitutional Authority To Oversee A Jury Trial In This Proceeding

Courts have recognized that a party's right to a jury trial before an Article III court weighs strongly in favor of withdrawing the reference. While "a district court is not compelled to withdraw a reference simply because a party is entitled to a jury trial," *In re Visteon Corp.*, 2011 WL 1791302, at *3 (citation and internal quotation omitted), the fact that a party "'has expressed its intention to seek a jury trial on the legal claims at issue' supports withdrawal, because '[t]he Bankruptcy Court cannot hold a jury trial without the parties' consent[.]'" *Id.* at *4 (quoting *In re Uni Marts, LLC*, Civ. A. No. 09-164-JJF, 2009 WL 1631821, at *2 (D. Del. Jun. 11, 2009)).

Where "'a District Court Judge must eventually preside over [a] jury trial,'" courts recognize that "'it would constitute a tremendous waste of judicial resources to permit the bankruptcy judge to continue to maintain jurisdiction'" over issues that must eventually be decided before a jury overseen by an Article III court. *In re NDEP Corp.*, 203 B.R. at 913 (citing *In re*

*Transcon Lines*, 121 B.R. 837, 838 (C.D. Cal. 1990)). *In re USA Floral Prods.*, 2005 WL 3657096, at *2, is on point. In that case, the defendants to a complaint alleging breach of duty and fraudulent transfer claims had asserted a jury trial right. In rejecting the plaintiff's argument that all pretrial matters should be remanded to the bankruptcy court, the court explained that such a result "would not promote uniformity in the bankruptcy administration, reduce forum shopping, foster the economical use of the parties resources, or expedite the bankruptcy process." *Id.* To the contrary, the court found that "judicial economy favor[s] withdrawal." *Id.* Citing *NDEP*, the court stated: "Because it is essentially conceded that Defendants are entitled to a jury trial, it will likely be more efficient for this court to manage the case through the pretrial process." *Id.* (citing *In re NDEP Corp.*, 203 B.R. at 913).

Here, under binding Supreme Court authority, the K5 Defendants are entitled to a jury trial with respect to Plaintiffs' claims for fraudulent or preferential transfer. In *Granfinanciera, S.A. v. Nordberg*, the Supreme Court held that under the Seventh Amendment, "a person who has not submitted a claim against a bankruptcy estate has a right to a jury trial when sued by the trustee in bankruptcy to recover an allegedly fraudulent monetary transfer." 492 U.S. at 36. The Supreme Court has held the same to be true with respect to claims "to recover allegedly preferential transfers." *Langenkamp v. Culp*, 498 U.S. 42, 45 (1990). Because the K5 Defendants have not submitted a claim against the bankruptcy estates, their right to a jury trial is indisputable.

In *Granfinanciera*, the Supreme Court explained that the Seventh Amendment compels that result. The Seventh Amendment preserves the right to jury trial not only in actions at common law, but also those "to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty." 492 U.S. at 42 (citation omitted). To resolve whether the

11

Seventh Amendment applies to statutory actions, like actions to avoid fraudulent transfers under 11 U.S.C. § 548, the Court reiterated that courts should "'[f]irst . . . compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity,'" and "'[s]econd . . . examine the remedy sought and determine whether it is legal or equitable in nature.'" *Id.* (quoting *Tull v. United States*, 481 U.S. 412, 417–18 (1987)).  The Court explained "[t]he second stage of this analysis is more important than the first." *Id.* (citing *Tull*, 481 U.S. at 421).

Applying those principles, the Court noted that "actions to recover preferential or fraudulent transfers were often brought at law in late 18th-century England," and resolved that courts of equity would not have adjudicated actions to recover an alleged fraudulent conveyance of a determinate sum of money. *Id.* at 43, 46–47.  The Court next found that the nature of the relief sought—the recovery of money—"strongly support[ed]" the conclusion that respondent's fraudulent transfer claim should be treated as legal rather than equitable. *Id.* at 47.

*Granfinanciera* also made clear that Congress could not deprive parties litigating such rights of the Seventh Amendment's guarantee to a jury trial. *Id.* at 63.  The Court noted that when Congress creates new, statutory "public rights," it may assign their adjudication to an administrative agency without violating the Seventh Amendment. *Id.* at 51.  But the Court cautioned that Congress "lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury." *Id.* at 51–52.  The Court definitively held that fraudulent transfer claims were "quintessentially suits at common law that more nearly resemble state-law contract claims" and reflect "matters of private rather than public right." *Id.* at 56.

Thus, although the Court acknowledged that Congress had designated fraudulent conveyance actions as "core proceedings triable by bankruptcy judges," *id.* at 60 (citing 28 U.S.C.

12

§ 157(b)(2)(H)), it held that "Congress cannot eliminate a party's Seventh Amendment right to a jury trial merely by relabeling the cause of action to which it attaches and placing exclusive jurisdiction" in the bankruptcy court. *Id.* at 61. Plaintiffs' claims for fraudulent and preferential transfer thus must be resolved by a jury. *See id.* at 36; *Langenkamp*, 498 U.S. at 45.

The K5 Defendants are also entitled to a jury with respect to Plaintiffs' remaining state and foreign-law claims for aiding and abetting a breach of fiduciary duty and dishonest assistance.[5] A claim for aiding and abetting a breach of fiduciary duty is "historically equitable" in nature. *In re Oakwood Homes Corp.*, 378 B.R. 59, 66 (D. Del. 2007). But Plaintiffs seek *damages* as compensation for that alleged wrong. *See* Compl. ¶ 186 (asking the Court to "award[] damages" with respect to Plaintiffs' aiding-and-abetting claim). And "'[money] damages are, of course, the classic form of *legal* relief.'" *Great-West Life & Annuity Ins. Co v. Knudson*, 534 U.S. 204, 210 (2002) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993)) (alterations in original). Thus, "weigh[ing] the claim[] against the relief sought, with more weight on the latter," as directed by *Granfinanciera*, 492 U.S. at 42, "clearly favors" a "right to a jury trial." *In re Oakwood*, 378 B.R. at 68 (holding right to jury trial attaches to claim for aiding-and-abetting breach of fiduciary duty).

Plaintiffs' claim for dishonest assistance under British Virgin Islands law originated in a court of equity. *See generally Barnes v. Addy*, (1874) L.R. 9 Ch. App. 244 (Eng.). But one equitable claim does not strip Defendants of their Seventh Amendment right to a jury trial. Because Plaintiffs' equitable claim is joined by a slew of legal claims, "the right to jury trial on

---

[5] The only remaining count, Count 16, merely restates Bankruptcy Code section 502(d), which conditions payment of creditor claims on the return by such creditor of any avoided transfer. As the K5 Defendants have made no such claims, this cause of action is inapt and need not be considered.

13

the legal claim[s], including all issues common to [the legal and equitable] claims, remains intact" and "cannot be abridged." *Curtis v. Loether*, 415 U.S. 189, 196 n.11 (1974); *Germain v. Conn. Nat'l Bank*, 988 F.2d 1323, 1329 (2d Cir. 1993) ("In general, if some claims are legal, a party will not be denied a jury trial just because other claims arising out of the same facts are equitable.").[6]

A bankruptcy judge may conduct a jury trial only if the matter may be heard by the bankruptcy court *and* the parties expressly consent.  28 U.S.C. § 157(e); *see also In re Visteon Corp.*, 2011 WL 1791302, at *3 n.1.  Because the K5 Defendants do not so consent, the jury trial in this case must be overseen by this Court rather than the Bankruptcy Court.  The Bankruptcy Court's inability to hold a jury trial weighs in favor of withdrawing the reference.  *Id.* at *4; *see also In re NDEP Corp.*, 203 B.R. at 908 (whether a party will request a jury trial is an "important" factor to analyzing whether withdrawal is appropriate because the bankruptcy court may not hold a jury trial absent "express consent of both parties").

**B.      The Bankruptcy Court Lacks Constitutional Authority To Enter A Final Judgment In This Proceeding**

As the Supreme Court made clear in *Granfinanciera*, whether "the Seventh Amendment permits Congress to assign [a cause of action] to a tribunal that does not employ juries as factfinders requires the same answer as the question whether Article III allows Congress to assign adjudication of that cause of action to a non-Article III tribunal."  492 U.S. at 53.  Just as the Seventh Amendment entitles the K5 Defendants to a jury trial, Article III precludes Congress from assigning to a bankruptcy court the power to finally adjudicate this action.  This lack of

---

[6] In any event, as explained *infra*, Section II.B, Plaintiffs' claim under British Virgin Islands law is not a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2).  Accordingly, as a *statutory* matter, a bankruptcy court has no authority to resolve that claim and can only enter proposed findings that must be reviewed *de novo* by the district court.  Therefore, like Plaintiffs' other claims, it ultimately must be resolved by this Court.

constitutional authority to resolve Plaintiffs' claims provides further support to withdraw the reference.

### 1.    The Bankruptcy Court Lacks Constitutional Authority To Resolve Plaintiffs' Fraudulent And Preferential Transfer Claims

Under the Bankruptcy Amendments and Federal Judgeship Act of 1984, Congress proposed to divide cases presented to bankruptcy courts into "core" and "non-core" proceedings. 28 U.S.C. § 157(b). Congress provided that bankruptcy judges may "hear and determine" all core proceedings, subject to deferential review. 28 U.S.C. § 157(b)(1); *Stern v. Marshall*, 564 U.S. 462, 487 (2011). As to non-core proceedings, however, Congress provided that bankruptcy judges may only submit proposed findings of fact and conclusions of law to the district court, which would review those findings *de novo* and alone would retain authority to enter a final order or judgment. 28 U.S.C. § 157(c).

Prior to 1978, "'[s]uits to recover preferences constitute[d] no part of the proceedings in bankruptcy.'" *Granfinanciera*, 492 U.S. at 49 (quoting *Schoenthal v. Irving Trust Co.*, 287 U.S. 92, 94–95 (1932)). Rather, "fraudulent conveyance and preference actions brought by a trustee in bankruptcy were deemed separate, plenary suits to which the Seventh Amendment applied." *Id.* at 50. The 1984 Act, however, designated fraudulent conveyance actions "core proceedings" and purported to afford bankruptcy judges *statutory* authority to resolve them. *Id.*

In *Stern v. Marshall*, though, the Supreme Court made clear that bankruptcy courts lack constitutional authority to enter a final judgment with respect to certain "core proceedings" enumerated by § 157(b)(2). As *Stern* explained, Congress "may not 'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty.'" 564 U.S. at 484 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1856)). As a result, Congress's enumeration of certain actions as "core

15

proceedings" cannot constitutionally authorize a bankruptcy court to hear and finally resolve those claims.

*Stern* and *Granfinanciera* should leave little doubt that the Bankruptcy Court lacks constitutional authority to resolve Plaintiffs' fraudulent and preferential transfer claims against the non-creditor K5 Defendants. In *Granfinanciera*, the Supreme Court expressly held that "if a statutory cause of action is legal in nature, the question whether the Seventh Amendment permits Congress to assign its adjudication to a tribunal that does not employ juries as factfinders requires the same answer as the question whether Article III allows Congress to assign adjudication of that cause of action to a non-Article III tribunal." 492 U.S. at 53; *see also id.* ("[I]f a statutory cause of action, such as respondent's right to recover a fraudulent conveyance under 11 U.S.C. § 548(a)(2), is not a 'public right' for Article III purposes, *then Congress may not assign its adjudication to a specialized non-Article III court* lacking 'the essential attributes of the judicial power.'") (emphasis added). *Stern* reaffirmed that conclusion, explaining that "Congress could not constitutionally assign resolution of [a] fraudulent conveyance action to a non-Article III court." *Id.* at 492 n.7. Indeed, even the *dissent* in *Stern* conceded that "the jury trial question and the Article III question are highly analogous." *Id.* at 517 (Breyer, J., dissenting).[7]

Both *Stern* and *Granfinanciera* make clear, therefore, that bankruptcy courts might possess constitutional authority to resolve statutory claims only when they fall within one of the "limited circumstances covered by the public rights exception"—*i.e.*, a claim that "derives from a federal regulatory scheme, or in which resolution of the claim by an expert Government agency is deemed

---

[7] Indeed, the *Stern* dissent only believed the counterclaim at issue was appropriate for resolution by a bankruptcy judge because it believed that the party asserting the counterclaim had *consented* to jurisdiction of the bankruptcy court by filing a counterclaim in that proceeding. *Id.* at 516 (Breyer, J., dissenting). That is not at issue here.

essential to a limited regulatory objective within the agency's authority," as opposed to matters of "private right, that is, of the liability of one individual to another under the law as defined." *Stern*, 564 U.S. at 489–90, 499 (internal quotations omitted). *Granfinanciera*, however, definitively "rejected [the] argument that a fraudulent conveyance action filed on behalf of a bankruptcy estate against a noncreditor in a bankruptcy proceeding fell within the 'public rights' exception." *Id.* at 492. And *Stern* reaffirmed that "the fraudulent conveyance claim at issue in *Granfinanciera* [did] not fall within any of the varied formulations of the public rights exception in [the Supreme] Court's cases." *Id.* at 493.

For that reason, numerous courts after *Stern* and *Granfinanciera*—including the only court of appeals to address the question—have recognized that bankruptcy courts lack constitutional authority to enter judgment on a fraudulent transfer claim against a non-creditor. *See, e.g.*, *In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 565 (9th Cir. 2012) ("Taken together, *Granfinanciera* and *Stern* settle the question of whether bankruptcy courts have the general authority to enter final judgments on fraudulent conveyance claims asserted against noncreditors to the bankruptcy estate. They do not."); *In re Madison Bentley Assocs.*, 474 B.R. 430, 438–39 (S.D.N.Y. 2012) (Scheindlin, J.) ("Courts in this district have consistently held that, after *Stern*, bankruptcy courts lack authority to issue final judgments on fraudulent conveyance claims brought against a person who has not submitted a claim against the estate.") (citing cases); *In re Lyondell Chem. Co.*, 467 B.R. 712, 720 (S.D.N.Y. 2012) (Cote, J.) ("Under both *Stern* and *Granfinanciera*, then, it is axiomatic that a fraudulent conveyance claim against a person who has not submitted a claim against a bankruptcy estate, brought solely to augment the bankruptcy estate, is a matter of private right.").

This Court has likewise recognized that after *Stern*, it is clear that in the absence of the parties' consent to jurisdiction, (1) bankruptcy courts lack constitutional authority to resolve

17

certain claims enumerated by Congress as "core proceedings" and (2) claims that do not fall within the "public rights" exception, but rather are matters of private right, must be adjudicated by an Article III court. *See Opt-Out Lenders v. Millennium Lab Holdings*, 242 F. Supp. 3d 322, 328 (D. Del. 2017). Several bankruptcy courts within this Circuit have reached the same result. *See In re Universal Mktg., Inc.*, 541 B.R. 259, 307 (Bankr. E.D. Pa. 2015) ("[T]he Supreme Court's rationale in *Stern*, when combined with the Court's prior holding that the right to recover fraudulent transfers is a 'private right' not a 'public right,' *see Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 109 S. Ct. 2782, 106 L. Ed. 2d 26 (1989), compels the conclusion that the bankruptcy court lacks the authority to enter a final judgment in such matters."); *In re Int'l Auction & Appraisal Servs. LLC*, 493 B.R. 460, 465 (Bankr. M.D. Pa. 2013) (same).

We recognize that some courts have reached a different conclusion, generally inferring that *Stern* purported to be a narrow decision. *See, e.g.*, *In re Connelly*, 476 B.R. 223, 232 (Bankr. E.D. Va. Mar. 30, 2012). To be sure, the Supreme Court in *Stern* stated that it "agree[d] with the United States that *the question presented* [in the case was] a 'narrow' one." 564 U.S. at 502 (citing Br. for U.S. as Amicus Curiae Supporting Petitioner at 23, No. 10-179) (emphasis added). But, as explained more fully in the Solicitor General's brief (to which the Supreme Court was referring), the constitutional question presented was "narrow" because neither party nor the court below had suggested that it violated Article III for a bankruptcy judge to adjudicate a *creditor's claim against a bankruptcy estate*. Br. for U.S. as Amicus Curiae Supporting Petitioner at 23; *see also Stern*, 564 U.S. at 505 (Scalia, J., concurring) (question of whether historical practice permits non-Article III judges to process claims *against the bankruptcy estate* was not presented). That is not implicated by the issue here—whether a bankruptcy estate asserting a "quintessential[] suit[]

18

at common law" *against a non-creditor* can deprive the non-creditor of its right to have the dispute resolved in an Article III court.

Other courts have reasoned that neither *Granfinanciera* nor *Stern* had occasion to formally resolve the question of whether fraudulent transfer claims against non-creditors must be resolved by Article III courts, because that question was not formally presented in either case.  But the Supreme Court's analysis leaves little doubt about the correct result, finding that Article III did not permit bankruptcy courts to enter final judgment on the counterclaim before it and separately explaining that "[w]e see no reason to treat [the] counterclaim any differently from the fraudulent conveyance action in *Granfinanciera*." *Stern*, 564 U.S. at 499.  Indeed, lower courts that have declined to give effect to *Granfinanciera* and *Stern* ignore that, with each successive decision in this area, the Supreme Court has reiterated that it is serious about the Constitution's limits on the authority of bankruptcy courts to oversee fraudulent transfer claims.[8]

Two judges sitting on the Bankruptcy Court for this district have declined to hold that fraudulent transfer claims must be resolved by Article III courts.  But neither decision is persuasive given the Supreme Court's clear direction in *Granfinanciera* and *Stern*.  In *In re Paragon Offshore PLC*, the Bankruptcy Court acknowledged that language in both *Granfinanciera* and *Stern supported* the conclusion that fraudulent transfer claims could be resolved only by an Article III court.  *See* 598 B.R. 761, 770-75 (Bankr. D. Del. 2019).  The court in *Paragon* even went so far as to agree that "[p]erhaps *Stern* provides compelling evidence of how the Supreme Court would

---

[8] Even Justice White, who dissented in *Granfinanciera*, recognized that after *N. Pipeline Constr. Co. v Marathon Pipe Line Co.*, 458 U.S. 50 (1982), state law contract claims "could *never* be assigned by Congress to anything other than an Article III tribunal, in which the Seventh Amendment would apply." 492 U.S. at 79 n.5 (White, J., dissenting) (emphasis added).  After *Granfinanciera* and *Stern*, it is clear that the same result follows for fraudulent transfer claims brought by an estate against a non-creditor.

rule on this issue if it were to address it directly." *Id.* at 775.  Nonetheless, the court in *Paragon* declined to issue that ruling itself, reasoning that principles of judicial constraint weighed against finding unconstitutional that portion of 28 U.S.C. § 157 that envisioned that bankruptcy courts could determine core claims themselves.  *Id.*  The Bankruptcy Court's attempted deference to judicial restraint was unwarranted.  *Stern* already resolved that the statute providing that bankruptcy courts could resolve all core claims themselves was unconstitutional.  Having recognized that *Stern* and *Granfinanciera* provided "compelling evidence" that fraudulent conveyance claims must be resolved by Article III courts, the court in *Paragon* should have so held.

A different bankruptcy judge declined to give effect to *Stern* and *Granfinanciera* for a different and, respectfully, incorrect reason in *In re Direct Response Media, Inc.*, 466 B.R. 626 (Bankr. D. Del. 2012).  There, the court assumed "arguendo" that *Stern*'s majority opinion should be broadly interpreted to signal that bankruptcy courts lack authority to enter final judgments with respect to fraudulent conveyance claims.  *Id.* at 643.  But it believed that the majority opinion "did not receive a majority of the votes on the Supreme Court" because Justice Scalia—one of the five votes in the majority—had authored a separate concurrence.  *Id.*  But Justice Scalia's concurrence makes clear that he "[a]gree[d] with the Court's interpretation of [its] Article III precedents, and [he] accordingly *join*[*ed*] *its opinion*."  564 U.S. at 503 (Scalia, J., concurring) (emphasis added). His concurrence dealt only with his narrower view of what constitutes a public right.  Following the reasoning in his concurrence would actually further limit the circumstances in which Article I courts could process claims brought by the bankruptcy estate against non-creditors.  This opinion provides no basis for disputing that Article III courts must adjudicate fraudulent transfer claims.

20

This Court, of course, is not bound by these two prior decisions of the Bankruptcy Court. But it is telling that even those decisions recognized that the plain import of the majority analyses in *Stern* and *Granfinanciera* indicated that bankruptcy courts lack authority to enter final judgments with respect to fraudulent conveyance claims against non-creditors.[9] Regardless, this Court *is* bound to follow Supreme Court precedent—and it would elevate form over substance to treat the Supreme Court's decisions in *Granfinanciera* and *Stern* as falling short of providing an answer to whether bankruptcy courts possess constitutional authority to resolve fraudulent transfer claims. Even if the Supreme Court's statements could be treated as *dicta*, moreover, the Third Circuit has rightly recognized that the Supreme Court's *dicta* should not be treated lightly, and explained that failing to follow such *dicta* could "'frustrate the evenhanded administration of justice by giving litigants an outcome other than the one the Supreme Court would be likely to reach were the case heard there.'" *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 274 (3d Cir. 2007) (citation omitted).

The Supreme Court's decisions leave no real doubt that the Bankruptcy Court lacks constitutional authority to adjudicate Plaintiffs' fraudulent and preferential transfer claims. Where, as here, claims are subject to a jury demand, and bankruptcy courts lack authority to enter a final judgment, there is strong cause to withdraw the reference. *See, e.g.*, *In re NDEP Corp.*, 203 B.R. at 912–13.[10]

---

[9] Neither case, of course, involved a decision responding to a motion to withdraw the reference, nor did either case's discussion account for or turn on whether a jury demand had been made.

[10] Some courts within this district have suggested that courts should consider withdrawing the reference only at the time that a matter is ready for trial, "so that the Bankruptcy Court, which is already familiar with the parties and issues, may oversee discovery and pre-trial matters, and narrow the issues for trial." *In re 24 Hour Fitness Worldwide, Inc.*, Civ. No. 21-884-LPS, 2022 WL 605661, at *3 (D. Del. Jan. 4, 2022). There is inefficiency, however, in leaving myriad pre-

### 2.    The Bankruptcy Court Lacks Even Statutory Authority To Resolve Plaintiffs' Non-Fraudulent And Preferential Transfer Claims

The Bankruptcy Court lacks even statutory authority to determine Plaintiffs' remaining state and foreign law claims against the K5 Defendants.  Congress enumerated a non-exhaustive list of claims that are deemed core proceedings.  *See* 28 U.S.C. § 157(b)(2).  None of Plaintiffs' non-fraudulent transfer state or foreign law claims qualify as core claims under that list.  Nor do Plaintiffs' claims meet the test for whether an unenumerated claim is a core claim.  As to that, courts review whether the claim "[1] invokes a substantive right provided by title 11 or [2] if it is a proceeding, that by its nature, could arise only in the context of a bankruptcy case." *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 405 (3d Cir. 2009); *see also In re Allied Sys. Holdings*, 524 B.R. 598, 605 (Bankr. D. Del. 2015).

Plaintiffs' breach of fiduciary duty and dishonest assistance claims (like their unjust enrichment claim against SGN) do not invoke substantive rights provided by Title 11, nor do such claims exist only in the context of a bankruptcy case.  Accordingly, such claims are non-core.  *See, e.g.*, *In re Allied Sys. Holdings*, 524 B.R. at 606 (finding claim for aiding and abetting breach of fiduciary duty under Delaware law to be a non-core claim and explaining that "the overwhelming majority of courts in this district and other districts conclude that breach of fiduciary claims do not involve the application of bankruptcy law, are ordinary state law causes of action, and could proceed outside the bankruptcy court"); *In re Axiant, LLC*, Bankr. No. 09-14118 (MFW), Adv.

---

trial matters to be resolved by the Bankruptcy Court when this Court may disagree with those decisions, requiring an expensive and time-consuming redo, and fostering uncertainty regarding the finality of those pretrial determinations.  More fundamentally, even assuming there are benefits to permitting a bankruptcy court to retain for pretrial matters oversight over a claim for which the parties and factual issues substantially overlap with the bankruptcy proceeding, there is little justification for that outcome where, as here, the K5 Defendants are not parties to the bankruptcy proceeding and key facts on which Plaintiffs' claims turn are not at issue in the chapter 11 proceeding.  *See infra* at Section II.C.

22

No. 12-50526 (MFW), 2012 WL 5614588, at *3–4 (Bankr. D. Del. Nov. 15, 2012) (state law claim for unjust enrichment is non-core because it arises under non-bankruptcy law and would exist independent of the bankruptcy case); *In re TK Holdings, Inc.*, Bankr. No. 17-11375 (BLS), Adv. No. 20-51004 (BLS), 2021 WL 6101496, at *9–10 (Bankr. D. Del. Dec. 20, 2021) (finding foreign law claim to be non-core claim).

Because Plaintiffs' state and foreign law claims do not qualify as core proceedings within the meaning of 28 U.S.C. § 157(b), a final judgment with respect to such claims can be issued only by an Article III court. *See* 28 U.S.C. § 157(c)(1). And there is no basis to afford *greater* constitutional authority to bankruptcy courts to adjudicate non-core, common law state or foreign law claims as opposed to core claims. Accordingly, all of Plaintiffs' actionable claims against the K5 Defendants, *see supra* n.4, must be resolved by an Article III court.

Indeed, the presence of these non-core claims in the complaint, combined with the fact that Plaintiffs' fraudulent transfer claims must be resolved by a jury trial in an Article III court, provides a strong basis to withdraw the reference regardless of whether this Court concludes, *see supra* Section II.B.1, that only an Article III court can enter final judgment with respect to Plaintiffs' fraudulent transfer claims. *In re Appleseed's Intermediate Holdings*, Civ. No. 11-807 (JEI/KM), 2011 WL 6293251 (D. Del. Dec. 15, 2011) is instructive. In that case, in which a court confronted a mix of claims designated core and non-core by statute, the court found that withdrawing the reference not only would conserve the parties' and judicial resources and expedite the litigation process, but also would promote uniformity in the administration of the case at hand by ensuring (1) that all decisions originated from one court and (2) that the same standard of review applied to all claims—regardless of whether designated core or non-core. *Id.* at *2–4.

23

By contrast, the *Appleseed's* court pointed to the difficulties that would arise if "different standards of review would apply to different claims, depending on whether the claim was core or non-core." *Id.* at *3. For instance, if the district court found one of the bankruptcy court's factual findings erroneous, but not clearly erroneous, the district court noted it "would be required to accept that fact for the core claim and reject that fact for the non-core claim," an "irrational result" that would not promote uniformity in bankruptcy administration. *Id.* Accordingly, without resolving the question of whether bankruptcy courts had authority to enter a final judgment with respect to a fraudulent transfer claim after *Stern*, the court concluded that there was cause to withdraw of the reference, and that such a course would "conserve resources and avoid piecemeal litigation." *Id.* at *4. Other courts have likewise found that the presence of core and non-core claims in a complaint weighs in favor of withdrawal of the reference, so as to "promote uniformity by allowing all decisions to originate from one court and be subject to the same standard of review." *In re U.S. Mortg. Corp.*, Civ. A. Nos. 2:11-cv-07222 (DMC) (JAD), 2:11-cv-07223 (DMC) (JAD), 2012 WL 1372284, at *2 (D.N.J. Apr. 19, 2012). That concern is particularly weighty in this case because key facts—such as whether the K5 Transaction provided Plaintiffs with reasonably equivalent value—are common to Plaintiffs' core and non-core claims.

### C. Prudential Considerations Strongly Weigh in Favor of Withdrawing the Reference Now

In evaluating whether cause exists to withdraw the reference, the Third Circuit also has directed courts to examine various prudential considerations that speak to whether a case would be more efficiently handled by an Article III court or a bankruptcy court. *See In re Pruitt*, 910 F.2d at 1168. Those factors are: "(1) whether retention of the proceeding promotes the uniformity of bankruptcy administration; (2) whether retention of the proceeding reduces forum shopping and confusion; (3) whether retention of the proceeding fosters the economical use of debtor/creditor

24

resources; (4) whether retention of the proceeding would expedite the bankruptcy process; and (5) whether the request for withdrawal was timely." *In re Elk Petroleum, Inc*., 2022 WL 4355285, at *3. Where a party is entitled to a jury trial, and the bankruptcy court lacks authority to hear and determine the matter at hand, those prudential considerations of economy and efficiency counsel strongly in favor of withdrawing the reference. *See, e.g.*, *In re NDEP Corp.*, 203 B.R. at 913; *Hatzel & Buehler, Inc. v. Orange & Rockland Utils., Inc.*, 107 B.R. 34, 40 (D. Del. 1989).

*First*, this is not a case where Bankruptcy Court retention of Plaintiffs' claims would promote the uniformity of bankruptcy administration. Plaintiffs' "fraudulent conveyance actions . . . are quintessentially suits at common law that more nearly resemble state-law contract claims . . . than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res." *Granfinanciera*, 492 U.S. at 56. The Bankruptcy Court's retention of such claims will not, therefore, promote the uniformity of bankruptcy administration. Nor would retention of Plaintiffs' state law and foreign law claims (including Plaintiffs' state law fraudulent transfer claims). *See In re Visteon Corp.*, 2011 WL 1791302, at *4 (retention of Missouri common law claim would not promote uniformity of bankruptcy administration). In addition, many of the principal issues on which Plaintiffs' claims turn involve factual inquiries that are unique to this action and have little relevance to the broader bankruptcy proceeding—questions like the value of Plaintiffs' investment in K5 Global, or Kives and Baum's state of mind in entering into the relevant agreements. Resolution of such issues would not promote uniformity in bankruptcy information.

By contrast, "withdrawing the reference *would* promote uniformity in the administration of this particular case insofar as all decisions would originate from one court." *In re Appleseed's Intermediate Holdings*, 2011 WL 6293251, at *3 (emphasis added). Moreover, because the district court will be required to review any findings of fact or law made by the Bankruptcy Court *de novo*

25

anyway, retention of the action by this Court to begin with cannot disrupt the uniformity of bankruptcy administration. *See*, *e.g.*, *Shengdatech Liquidated Trust v. Hansen, Barnett, & Maxwell, P.C.*, No. 3:13-CV-00563-RCJ, 2013 WL 6405818, at *2 (D. Nev. Nov. 26, 2013).

*Second*, there is no risk of forum shopping in this case. This is not a case in which the K5 Defendants are purportedly seeking to escape prior adverse findings or a negative reputation. *See*, *e.g.*, *In re Elk Petroleum, Inc.*, 2022 WL 4355285, at *4 (noting allegations that bankruptcy court had been made aware of Defendants' misconduct). Nor are Defendants seeking to leave federal court in Delaware. Defendants are seeking to place the case under the supervision of the court that is obligated to render the final judgment in this action. Forum shopping is not a concern. *See, e.g.*, *In re Int'l Benefits Grp.*, Civ. A. No. 06-2363 (KSH), 2006 WL 2417297, at *4 (D.N.J. Aug. 21, 2006) ("There is no evidence nor any suggestion that movants seek to withdraw the reference to the bankruptcy court because they hope this Court will be more hospitable to their interests").

*Third*, retention of the proceeding would not foster the economical use of debtor/creditor resources. To the contrary, because the district court would exercise *de novo* review over this proceeding, leaving this case in Bankruptcy Court would waste both party and judicial resources. *See, e.g.*, *In re NDEP Corp.*, 203 B.R. at 913 ("Due to the fact that a District Court Judge must eventually preside over the jury trial in this matter, it would constitute a tremendous waste of judicial resources to permit the bankruptcy judge to continue to maintain jurisdiction over the issues presented in this litigation.") (internal quotation omitted); *In re Star Creditors' Liquidating Tr.*, Civ. A. 03-793-KAJ, 2004 WL 406353, at *1 (D. Del. Mar. 3, 2004) (same); *In re U.S.A. Floral Prods., Inc.*, 2005 WL 3657096, at *2 (same); *In re Pelullo*, No. 96-MC-303, 1997 WL 535155, at *2 (E.D. Pa. Aug. 15, 1997) (withdrawing reference, stating that "permitting this action to proceed in the bankruptcy court, even for pre-trial matters, would require duplication of the

26

bankruptcy court's efforts . . . [T]his court would have to review the bankruptcy court's orders de novo . . . ."); *see also In re Orion Pictures Corp.,* 4 F.3d at 1101; *Dev. Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP*, 462 B.R. 457, 472 (S.D.N.Y. 2011) ("[A]ny recommendations [the bankruptcy court] makes will need to be reviewed *de novo* in this Court.  It would be inefficient to allow these proceedings to go forward, knowing that they will have to be substantially repeated.").

*Fourth*, retention of the proceeding would not expedite the bankruptcy process.  To the contrary, it would mire the Bankruptcy Court in overseeing a hotly contested proceeding with over a dozen claims that are only tangential to the bankruptcy proceeding, including foreign law claims that would require the court to learn British Virgin Islands law.  Far from expediting the bankruptcy process, forcing the Bankruptcy Court to oversee this action would slow down the process and delay ultimate resolution of the chapter 11 proceedings.  *See In re Appleseed's Intermediate Holdings*, 2011 WL 6293251, at *3 (touting the efficiency of eliminating a round of appeals by skipping straight to the District Court, which as an added bonus has greater "expertise to efficiently dispose of adversarial litigation" relative to the Bankruptcy Court).

*Finally*, as discussed *supra* in Section I, there can be no question that Defendants' request for withdrawal is timely.

For all these reasons, the K5 Defendants have established strong cause why the reference should be withdrawn, such that this action can be resolved efficiently and expeditiously before the Court that would be required to oversee its ultimate resolution in any event.

## CONCLUSION

For the foregoing reasons, Defendants' motion to withdraw the reference should be granted.

27

Dated:  August 17, 2023
Wilmington, Delaware

Respectfully submitted,

**POTTER ANDERSON & CORROON LLP**

*/s/ Jeremy W. Ryan*
Jeremy W. Ryan (No. 4057)
Kevin R. Shannon (No. 3137)
Andrew L. Brown (No. 6766)
1313 N. Market Street, 6th Floor
Wilmington, DE 19801-6108
Telephone: (302) 984-6108
Facsimile: (302) 658-1192
E-mail: jryan@potteranderson.com
          kshannon@potteranderson.com
          abrown@potteranderson.com

-and-

**LATHAM & WATKINS LLP**
James E. Brandt (admitted *pro hac vice*)
Suzzanne Uhland (admitted *pro hac vice*)
Hugh Murtagh (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: james.brandt@lw.com
          suzzanne.uhland@lw.com
          hugh.murtagh@lw.com

Michael J. Reiss (admitted *pro hac vice*)
355 S. Grand Avenue Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
Email: michael.reiss@lw.com

Michael E. Bern (admitted *pro hac vice*)
555 11th St. NW
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
Email: michael.bern@lw.com

*Attorneys for K5 Defendants Michael Kives, Bryan Baum, K5 Global
Holdings, LLC, K5 Global Technology, LLC, MBK Capital LP - Series T, K5
Global Growth Co-Invest I GP, LLC, K5 Global Growth Fund I GP, LLC,
K5 Global Ventures, LLC, Mount Olympus Capital, LP, Mount Olympus
Capital, LLC, K5 Global Growth Fund II, LP, K5 Global Growth Fund II
GP, LLC, K5X Fund I, LP, and K5X Fund I, LLC*

28