# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

Case No. 22-11068 (JTD)

_____

(1) **ALAMEDA RESEARCH LTD**

(2) **CLIFTON BAY INVESTMENTS LLC f/k/a ALAMEDA RESEARCH VENTURES LLC**

                                                                PLAINTIFFS

v

(1) **MICHAEL KIVES**

(2) **BRYAN BAUM**

**AND OTHERS**

                                                                DEFENDANTS

_____

## DECLARATION OF TOM SMITH KC

11 September 2023

I, **TOM SMITH KC**, of 3-4 South Square, London, England, state as follows:

1. I make this declaration at the request of the K5 Defendants in relation to the above-captioned proceedings.[1]

2. A list of the authorities that I refer to in this declaration is attached as **Exhibit 1**.

---

[1] "**K5 Defendants**" refer collectively to defendants Michael Kives, Bryan Baum, K5 Global Holdings, LLC, K5 Global Technology, LLC, MBK Capital, LP- Series T, K5 Global Growth Co-Invest I GP, LLC, K5 Global Growth Fund I GP, LLC, K5 Global Ventures, LLC, Mount Olympus Capital, LP, Mount Olympus Capital, LLC, K5 Global Growth Fund II, LP, K5 Global Growth Fund II GP, LLC, K5X Fund I, LP, and K5X Fund I, LLC.

A.  **BIOGRAPHY**

3.  I am a barrister in full time practice at South Square in London. South Square is a leading set of commercial barristers. Our members have acted in many of the most important restructuring, insolvency, banking, commercial, company and fraud-related disputes of recent times. South Square has won numerous awards and is consistently ranked in the legal directories as the pre-eminent set of chambers for insolvency and restructuring, as well as a leading set in its other main areas of practice.

4.  South Square's work extends beyond England and Wales, with members regularly appearing in courts and tribunals around the world, including in the British Virgin Islands ("**the BVI**"), the Cayman Islands, Bermuda and Dubai.

5.  I hold a M.A. in Law, with First Class Honours, from Clare College in the University of Cambridge. I also hold a First Class LL.M. from the same College and University.

6.  I was called to the Bar of England and Wales in 1999, and I was appointed Queen's Counsel (now known as King's Counsel) in 2014. I am also called to the Bars of Bermuda, the BVI, Gibraltar and Trinidad & Tobago, and have rights of audience before the courts of the Dubai International Financial Centre and the Abu Dhabi Global Market. I am also frequently admitted as an Attorney-at-Law on a case-by-case basis to represent clients before the Grand Court of the Cayman Islands.

7.  I am a Deputy High Court Judge, authorised to sit in the High Court of Justice of England and Wales, Chancery Division. As a Deputy High Court Judge, I exercise the same jurisdiction as a full time High Court Judge, and I hear a range of matters in the Chancery Division including commercial and fraud-related disputes.

8.  I am Head of Chambers at South Square. I am also a member of the UK Financial Markets Law Committee, which is a body aimed at assisting the functioning of the financial markets by identifying and resolving areas of legal uncertainty.

9.  My full curriculum vitae can be found at **Exhibit 2**.

10. The questions which I am asked to consider in the present case concern matters of BVI law. As noted above, I was called to the Bar of the BVI in 2017. I have since appeared in numerous cases in the BVI both at first instance before the Supreme Court and at appellate level before the Court of Appeal.

11. I confirm that I have no past or present relationships with any of the parties to the above-captioned proceedings.

12. For the above reasons, I consider myself competent to assist the Court by providing expert evidence on the questions of BVI law that I have been asked to consider.

**B.  SCOPE OF THIS DECLARATION**

13. I have been provided with a copy of the Complaint of the Plaintiffs in the above-captioned proceedings dated 22 June 2023 ("**the Complaint**"). The Complaint asserts various claims against the K5 Defendants.

14. Of relevance to this Declaration, Count Fourteen of the Complaint asserts a claim in dishonest assistance under BVI law against the First and Second Defendants, Michael Kives and Bryan Baum ("**the BVI Dishonest Claim**"): see paragraphs 170 to 174 of the Complaint.

15. In essence, it is alleged that Sam Bankman-Fried owed fiduciary duties to Plaintiff Alameda Research Ltd by virtue of being a director of that entity. Since Alameda Research Ltd is a company incorporated under the law of the BVI, those duties are alleged to arise under BVI law. It is further said that Mr Bankman-Fried breached those duties by causing Alameda Research Ltd to make certain money transfers, defined in the Complaint as the K5 Transfer and the Mount Olympus Transfers; and that Mr Kives and Mr Baum dishonestly assisted those breaches.

16. A claim is made for "*equitable relief*," which appears to be for compensation for the amount of K5 Transfer and Mount Olympus Transfer.

17. The question which I have been asked is whether the Complaint, as pleaded, discloses a proper claim for dishonest assistance as a matter of BVI law.

**C.   THE LAW OF THE BVI**

18. The BVI is a British Overseas Territory. As such, it is not part of the United Kingdom itself, but is self-governing with the United Kingdom retaining responsibility for defence and foreign relations.

19. The law of the BVI is based on English common law, with its own statutory law in certain areas. BVI statutory law includes, for example, the BVI Business Companies Act and the BVI Insolvency Act. These Acts are typically similar to, and often based upon, equivalent UK legislation, but with differences to reflect the particular local requirements of the BVI.

20. Outside of areas where the BVI has its own statutory law, English common law applies by virtue of the Common Law (Declaration of Application) Act (see also *Niyazov v Maples and Calder* BVIHCMAP 2018/0051 at [31]). As a result, decisions of the English Courts, whilst not strictly binding as a matter of precedent, are persuasive and are routinely relied on by the BVI Courts. Decisions of the higher English Courts (the Court of Appeal and the Supreme Court of the United Kingdom, previously the House of Lords) are particularly persuasive.

21. The Eastern Caribbean Supreme Court is the superior court of record in the BVI, often referred to as the High Court. The Supreme Court has a Commercial Division which typically hears higher value commercial and financial cases. Appeals from the Supreme Court are heard by the Court of Appeal of the Eastern Caribbean Supreme Court. The Court of Appeal rotates through the Caribbean member states, and usually sits in the BVI twice a year. Advocates before the Supreme Court and the Court of Appeal typically comprise either local attorneys or, in the higher value and more complex cases, King's Counsel from London who have been admitted to the BVI Bar.

22. The final court of appeal is the Judicial Committee of the Privy Council ("**the Privy Council**") which usually sits in London. The Judges who make up the Privy Council are

typically the same judges who sit in the Supreme Court of the United Kingdom (which replaced the House of Lords as final court of appeal in the UK). The approach of the Privy Council is to treat decisions of the Supreme Court and English Court of Appeal on corresponding matters as highly persuasive (*Frankland v R* 1987-89 LR 65 at 80):

> "*Such decisions should generally be followed unless either there is some provision to the contrary, or, exceptionally, there is some good reason for not following the particular English decision. The persuasive effect of a judgment of the House of Lords, which has largely the same composition of the Judicial Committee of the Privy Council, the final Court of Appeal from a Manx court[2], is bound to be very high.*"

23. The commonality of the constitution of the Supreme Court and the Privy Council is a further reason why decisions of the Supreme Court (and the House of Lords) are highly persuasive as a matter of BVI law.

**D.    THE LAW RELATING TO DISHONEST ASSISTANCE**

24. The law relating to dishonest assistance forms part of the common law and is not the subject of a specific BVI statute. As such, English decisions on the law of dishonest assistance, particularly those of the higher English courts, are highly relevant and persuasive in determining BVI law on the same topic.

25. Indeed, consistent with this, the BVI Courts when dealing with claims of dishonest assistance have applied the law as explained in the English authorities and textbooks: see, for example, *IsZo Capital LP v Nam Tai Property Inc*, 16 March 2022 at [14]-[24] (Supreme Court); *Nam Tai Property Inc v West Ridge Investment Company Ltd* BVIHCMAP 2022/0046 (Court of Appeal).

26. The general principle is that a person who renders assistance to a breach of trust or fiduciary duty that causes loss to another person can be liable for dishonest assistance: *Nam Tai v West Ridge* at [48]. The liability is to pay equitable compensation for losses

---

[2] *Frankland v R* concerned an appeal from the Isle of Man. However, the position applies equally to the BVI.

caused by the breach of duty or trust in which they assisted: *Snell's Equity*, 34th ed., at 20-033.

27. The necessary elements to plead a dishonest assistance cause of action are as follows:

    (1) there must be a trust or fiduciary duty owed by the trustee/fiduciary to the plaintiff;

    (2) because dishonest assistance is a type of accessory liability, there must be a breach of trust or fiduciary duty by the trustee/fiduciary: *Royal Brunei Airlines v Tan* [1995] 2 AC 378, at 382; *Novoship (UK) Ltd v Mikhaylyuk* [2015] QB 499;

    (3) unlike in the case of the third party, the breach *by the trustee/fiduciary* need not be dishonest: because liability of the third party is fault-based, what matters is the nature of their fault, not that of the trustee/fiduciary: *Royal Brunei Airlines* at 384-385, 392; *Twinsectra Ltd v Yardley* [2002] 2 AC 164 at [109];

    (4) the third party must have assisted in, induced or procured the breach;

    (5) the third party must have acted dishonestly in providing the assistance;

    *FM Capital Partners Ltd v Marino* [2018] EWHC 1768 (Comm) at [82].

*Breach of trust or fiduciary duty*

28. It is essential that there must have been a breach of trust or fiduciary duty owed by a party to the plaintiff[3]. The reason why a breach of duty or trust is essential is that dishonest assistance is concerned with the liability of accessories for breach of trust or fiduciary duty, and if there is no breach of trust or fiduciary duty, the defendant cannot be an accessory: *Lewin on Trusts*, 20th ed., 43-029.

*Nature of the breach of trust*

---

[3] Where the relevant party and the plaintiff are in a fiduciary relationship, it may not be necessary for the particular duty which was breached to be a fiduciary duty: *Snell's Equity*, 30-078.

29. So far as (3) is concerned, the breach of trust or fiduciary duty need not itself be dishonest since what matters is the dishonesty of the third party, i.e. the person who allegedly procured or assisted the breach, rather than that of the trustee or fiduciary: *Nam Tai v West Ridge* at [48] citing *FM Capital Partners v Marino* and *Madoff Securities International Ltd v Raven* [2013] EWHC 3147 (Comm) at [350]. However, in practice, it will usually be the case that if the third party is acting dishonestly in assisting the breach, then the trustee or fiduciary will also have been dishonest: *Royal Brunei v Tan* at p.392.

*Assistance*

30. There must have been assistance by the defendant with the breach of trust or fiduciary duty. It is necessary to show that the relevant assistance played more than a minimal role in the breach being carried out, but there is no requirement to show that the assistance provided would inevitably have resulted in the beneficiary suffering a loss: *Baden v Société General pour Favoriser le Development du Commerce et de l'Industrie en France SA* [1993] 1 WLR 509 at [246]; *Lewin on Trusts* at 43-032.

*Dishonesty*

31. The third party must have acted dishonestly in providing the assistance. The test in its modern form derives from *Royal Brunei Airlines* at pp.386-387 and is now authoritatively stated in the UK Supreme Court decision of *Ivey v Genting Casinos (UK) t/a Crockfords* [2018] AC 391 at [74][4]:

> "*When dishonesty is in question the fact-finding tribunal must first ascertain (subjectively) the actual state of the individual's knowledge or belief as to the facts. The reasonableness or otherwise of his belief is a matter of evidence (often in practice determinative) going to whether he held the belief, but it is not an additional requirement that his belief must be reasonable; the question is whether it is genuinely held. When once his actual state of mind as to knowledge or belief as to facts is established, the question whether his conduct was honest or*

---

[4] See also *Barlow Clowes International Ltd v Eurotrust International Ltd* [2006] 1 WLR 1476 at [10].

>  *dishonest is to be determined by the fact-finder by applying the (objective) standards of ordinary decent people. There is no requirement that the defendant must appreciate that what he has done is, by those standards, dishonest.*"

32. The test for dishonesty therefore has both a subjective and an objective element. The subjective element requires ascertainment of the defendant's actual state of mind at the time of the alleged participation. Having determined the defendant's actual (subjective) state of mind, it is then necessary to determine objectively whether the defendant's conduct was honest by applying the standards of ordinary decent people.

33. In applying the objective part of the test, the standards are those of an ordinary honest person in the circumstances of the defendant. Thus, the Court must have regard to all the circumstances known to the defendant at the time, and have regard to the defendant's personal attributes, such as their experience and the reason why they acted as they did: *Royal Brunei Airlines v Tan* at p.391; *FM Capital Partners* at [82(vi)].

34. The following principles are also relevant:

    (1) There is no need to prove that the defendant was aware of the details of the underlying fraud, that there existed a trust, and/or they knew the facts which give rise to the trust. It suffices if they know that they are assisting the fiduciary to do something he or she is not entitled to do: *Ultraframe (UK) Ltd v Fielding* [2005] EWHC 1638 (Ch) at [1505]; *Twinsectra v Yardley* at [24].

    (2) The defendant has the requisite dishonest state of mind if he or she deliberately closes their eyes and ears, or deliberately refrains from asking questions, lest they learn something they would rather not know, and then proceeds regardless: *Royal Brunei Airlines* at p.389; *Manifest Shipping Co v Uni-Polaris Insurance Co* [2003] 1 AC 469.

    (3) A defendant does not have the requisite dishonest state of mind if he merely suspects what is going on: *Heinl v Jyske Bank (Gibraltar) Ltd* [1999] Lloyd's Rep Bank 511.

*Causation and loss*

35.  In order for the defendant to pay equitable compensation to the plaintiff, the relevant breach of trust or fiduciary loss must have caused loss to the plaintiff: *Snell's Equity* at 30-081.

*Pleading*

36.  In order to disclose a proper cause of action for dishonest assistance all of the elements set out above have to be pleaded.  In particular, the allegation of dishonesty must be clearly pleaded in the statement of case.  This requires pleading the facts upon which the allegation of the subjective element of dishonesty is founded, and also the facts upon which reliance is placed as demonstrating that the objective element is satisfied: *Lewin on Trusts*, 43-048.

37.  One of the key requirements is that where dishonesty is alleged the facts which are relied on must support a case of dishonesty as opposed to negligence, and thus facts which are consistent with negligence will not suffice: *Three Rivers DC v Governor and Company of the Bank of England* [2003] 2 AC 1 at [184]:

> "*It is well established that fraud or dishonesty (and the same must go for the present tort) must be distinctly alleged and as distinctly proved; that it must be sufficiently particularised; and that it is not sufficiently particularised if the facts pleaded are consistent with innocence: see Kerr on Fraud and Mistake, 7th ed (1952), p 644; Davy v Garrett (1878) 7 Ch D 473, 489; Bullivant v Attorney General for Victoria [1901] AC 196; Armitage v Nurse [1998] Ch 241, 256. This means that a plaintiff who alleges dishonesty must plead the facts, matters and circumstances relied on to show that the defendant was dishonest and not merely negligent, and that facts, matters and circumstances which are consistent with negligence do not do* so."

E.  **THE COMPLAINT**

38. As noted above, the question which I have been asked is whether the Complaint (specifically, Count Fourteen) discloses a proper claim for dishonest assistance as a matter of BVI law.

39. For these purposes, I proceed on the assumption that the underlying facts alleged in the Complaint are true. Rather, the question is whether those pleaded facts disclose a valid claim for dishonest assistance. This requires a comparison of the pleaded facts and allegations as against the requirements of the cause of action for dishonest assistance which I have set out and explained above.

*Breaches of duty*

40. So far as breach of duty is concerned, the Complaint pleads that Mr Bankman-Fried was a director of Alameda Research Ltd, that he owed duties as a director of Alameda Research Ltd under BVI law to act in its best interests and not for his personal benefit, and that by causing Alameda Research Ltd to make the K5 Transfer and the Mount Olympus Transfers (as defined in the Complaint) he breached those duties. In my opinion, so far as this element of the cause of action is concerned, the Complaint (at paragraphs 171 and 172) pleads sufficient facts.

*Assistance in the alleged breaches*

41. However, as explained above, dishonest assistance is a form of accessory liability, and it is therefore essential to plead that the relevant defendants (here, Mr Kives and Mr Baum) assisted the breach.

42. There is no plea in paragraphs 171 to 174 of the Complaint of assistance by Mr Kives and Mr Baum in the relevant breaches. In my opinion, this is a clear defect in the pleaded claim. If this matter was before the BVI Court, then this would in my opinion itself cause the BVI Court to strike out the BVI Dishonest Assistance Claim on the basis that one of the essential ingredients of the cause of action had not been pleaded. As such, the pleaded case does not disclose a proper cause of action as a matter of BVI law.

43. I note that paragraph 170 of the Complaint refers to, and repeats, paragraphs 1 to 169 of the Complaint. These paragraphs, inter alia, plead various underlying allegations.

44. The two transactions which are the focus of the Complaint are the K5 Transaction and the Mount Olympus Transaction: Complaint, paragraph 13. As to these:

    (1) The pleaded case is that the K5 Transaction involved US$300 million being transferred by Alameda Research Ltd to Alameda Ventures LLC which in turn transferred the funds to K5 Global Holdings LLC ("**K5 Global**"): Complaint, paragraphs 4 and 80. This transfer is defined in the Complaint as the "**K5 Transfer**".

    (2) The pleaded case is that the Mount Olympus Transaction involved Alameda Research Ltd transferring US$400 million in the aggregate to Mount Olympus Capital LP ("**Mount Olympus**"). Of this amount, US$375 million was transferred to K5X Fund I LP and the remaining US$25 million was transferred to K5 Global Growth Fund II LP: Complaint, paragraphs 86 and 89. These transfers are defined in the Complaint as the "**Mount Olympus Transfers**".

45. It is critical to note that the relevant allegation of breach for the purposes of the BVI Dishonest Assistance Claim is that Mr Bankman-Fried caused Alameda Research Ltd to make the K5 Transfer and the Mount Olympus Transfers, i.e. the transfers of funds to the entities set out in the preceding paragraph of this opinion. This is clear from paragraph 172 of the Complaint.

46. However, there are no pleaded facts anywhere in the Complaint as to how it is said that Mr Kives and Mr Baum assisted *in those breaches*. Not only is there no pleaded allegation to that effect within the Complaint, but it appears entirely improbable that Mr Bankman-Fried in fact required any assistance from either Mr Kives or Mr Baum to effect those transfers. As the Complaint pleads, Mr Bankman-Fried was the sole director of Alameda Research Ltd and controlled that entity through his 90% interest in Alameda Research LLC: Complaint, paragraph 36. Plainly, Mr Bankman-Fried would either

himself, or through his subordinates, have been able to effect the transfers of funds without any assistance from Mr Kives or Mr Baum.

47. Moreover, neither Mr Kives nor Mr Baum were the immediate recipients of funds pursuant to either the K5 Transfer or the Mount Olympus. As clearly pleaded in the Complaint, and summarised above, those transfers were to various legal entities.

48. I understand from the Complaint that the Plaintiffs allege that Mr Kives and Mr Baum each personally ultimately received US$125 million as part of the K5 Transaction: see Complaint, paragraphs 50 and 84 and Exhibit A. However, this was a *subsequent* transfer made by K5 Global to those individuals. This subsequent transfer does not form any part of the K5 Transfer, nor of the alleged breach of duty on the part of Mr Bankman-Fried in effecting the K5 Transfer (or the Mount Olympus Transfers). As such, this cannot amount to assistance in the relevant breaches of duty for the purposes of the BVI Dishonest Assistance Claim.

49. I also note that this point is in any event of no application to the Mount Olympus Transaction.

50. For these reasons, even if the BVI Court (generously to the Plaintiffs) was to take a broader view of the entire Complaint in seeking to identify an arguable allegation of assistance, it would still conclude that there is no adequately pleaded case of assistance by Mr Kives or Mr Baum in the relevant alleged breaches of duty by Mr Bankman-Fried. As such, the BVI Dishonest Assistance Claim would be liable to struck out.

*Dishonesty*

51. As explained above, even if a case of assistance by Mr Kives and Mr Baum had been pleaded in the Complaint, it would also have been necessary to plead sufficient facts to support a case that such conduct on the part of Mr Kives and Mr Baum was dishonest.

52. The establishment of dishonesty is a high hurdle, since it involves pleading and proof of a state of mind of conscious wrongdoing on the part of the relevant defendant. As

described above, it requires pleading and proof of both the subjective and objective elements.

53. The operative part of the Complaint in this respect is paragraph 173 where it is alleged that:

> "*Defendants Kives and Baum knew, should have known, or were willfully blind to the fact that the K5 Transaction and Mount Olympus Transaction did not provide and had virtually no prospect of providing Alameda Research Ltd. with reasonably equivalent value, and that Bankman-Fried personally benefited from the K5 Transaction and Mount Olympus Transaction.*"

54. As an initial observation, the "*should have known*" allegation within paragraph 173 of the Complaint is clearly inapt to a claim of dishonest assistance. For the purposes of establishing dishonesty, it is necessary to plead facts which establish a subjective state of mind on the part of the defendant i.e. that the defendant actually knew the relevant or deliberately refrained from making inquiries. An allegation that a defendant should have known certain matters, but did not in fact do so, is irrelevant and does not disclose a proper cause of action.

55. The remainder of the allegation is, first, that Mr Kives and Mr Baum knew or were wilfully blind to the fact that the K5 Transaction and Mount Olympus Transaction did not provide, and had virtually no prospect of providing, Alameda Research Ltd with "*reasonably equivalent value*" i.e. to the monies transferred as part of those transactions. In my opinion, this does not support a case of dishonesty against Mr Kives and Mr Baum (or either of them).

56. In particular:

   (1) There is no allegation, and nothing to suggest, that Mr Kives or Mr Baun even knew that Alameda Research Ltd was involved in the transactions.

   (2) In any case, the question of whether or not "*reasonably equivalent value*" was provided or was likely to be provided by the transactions was a commercial judgment.

(3) In my opinion, the Complaint does not establish facts to show that Mr Kives and Mr Baum subjectively knew or suspected that "*reasonably equivalent value*" would not be provided under the Transactions.

(4) But, even if the Complaint did plead such facts, it does not in my opinion demonstrate an arguable case that was by, the objective standards of ordinary, decent people, dishonest.

(5) This is because it is not dishonest for a party to enter into a commercial transaction where it considers that it is getting a "*good deal*" and that the value of what it is receiving is more than the value for what is providing. In the world of commerce, myriad commercial transactions are entered into on this basis. This is not least because different parties have different perceptions of value.

(6) If the Plaintiffs' contention was correct, then any case where there was a disparity between the value of what was being provided under a contract and what was being received would give rise to a claim for dishonest assistance. However, that is clearly not the case.

(7) In this respect, I am not aware of any existing English or BVI law case which has upheld a dishonest assistance case on such a fact pattern i.e. where it is said that a contractual counterparty knew or suspected that the other party to the contract was not receiving reasonably equivalent value under the contract to that which it was providing.

57. Paragraph 173 of the Complaint also alleges that Mr Kives and Mr Baum knew, should have known, or were wilfully blind to the fact that Bankman-Fried personally benefited from the K5 Transaction and Mount Olympus Transaction. As I understand it, this refers to the fact that SGN Albany Capital LLC ("**SGN**"), which it is said was more than 90% owned by FTX Insiders (as defined) received the economic benefit of the transactions: Complaint, paragraph 50.

58. However, the Complaint does not disclose any basis for concluding that this was dishonest by, the objective standards of ordinary, decent people, dishonest. The Complaint itself pleads that Alameda Research Ltd itself was owned by FTX Insiders so, on the pleaded Complaint, the position is that one entity owned by FTX Insiders provided the funding but another entity also owned by FTX Insiders received the economic benefit. There is, however, no basis or reason why thinking that an ordinary, decent person would think that was necessarily odd or unusual, let alone dishonest. An ordinary, decent person might well think that it was a matter for the FTX side, including Mr Bankman-Fried, as to how value to be received under the Transactions was to be allocated between different entities.

59. Further, the Complaint does not in any event plead any allegation of knowledge on the part of Mr Kives or Mr Baum as to the breakdown of the ownership of SGN.

60. For these reasons, the Complaint also does not, in my opinion, disclose a properly arguable case of dishonesty against Mr Kives and Mr Baum as a matter of BVI law.

## F. ILLEGALITY DEFENCE

61. I am also asked to consider whether the K5 Defendants have any legal defence to the BVI Dishonest Assistance Claim as a matter of BVI law.

62. As to this, like English law, BVI law recognises a defence of illegality or *ex turpi causa non oritur actio*. This defence is a long standing part of the common law: see *Holman v Johnson* (1775) 1 Cowp 341 ("*No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act.*").

63. The law relating to the illegality defence was authoritatively restated by the UK Supreme Court in *Patel v Mirza* [2017] AC 467. The Supreme Court emphasised the essential rationale underpinning the doctrine of illegality, which is that it would be contrary to the public interest to enforce a claim if to do so would be harmful to the integrity of the legal system or certain aspects of public morality. In order to ascertain whether the illegality defence is engaged, it is necessary for the court to have regard to a "*trio of considerations*" in assessing whether the public interest would be harmed in that way:

> "*(a) to consider the underlying purpose of the prohibition which has been transgressed and whether that purpose will be enhanced by the denial of the claim, (b) to consider any other relevant public policy on which the denial of the claim may have an impact and (c) to consider whether denial of the claim would be a proportionate response to the illegality, bearing in mind that punishment is a matter for the criminal courts. Within that framework, various factors may be relevant, but it would be a mistake to suggest that the court is free to decide a case in an undisciplined way. The public interest is best served by a principled and transparent assessment of the considerations identified, rather by than the application of a formal approach capable of producing results which may appear arbitrary, unjust or disproportionate*".

> *Patel v Mirza* at [120].

64. There are additional considerations which are relevant where the relevant illegal conduct has been undertaken by an agent of a company, such as a director. Where a company had been the victim of wrongdoing by its directors, or of which the directors had notice, then the wrongdoing or knowledge of the directors cannot be attributed to the company as a defence to a claim brought against the directors by the company's liquidator: *Bilta v Nazir* [2016] AC 1. This is because it is considered that it would be unjust if a claim for breach of a director or employee's duty could be defeated by attributing to the company the very misconduct by which the director or employee had damaged it.

65. However, the same does not necessarily apply where the claim is by the company against a third party (as in the present case). Where there are no innocent shareholders or directors in the relevant company, then the illegality defence may be available: *Stone & Rolls Ltd v Moore Stephens* [2009] 1 AC 1391; *Bilta v Nazir* at [26] and [80]. However, in the case of such a company, the illegality defence will not apply automatically; rather, it is necessary to consider the context and purpose for which the conduct of the relevant individual is to be attributed to the company: *Singularis Holdings v Daiwa Capital Markets Europe Ltd* [2020] AC 1189 at [34].

66. In the present case, Alameda Research Ltd is a wholly owned subsidiary of Alameda Research LLC, a Delaware limited liability company. That company is owned 90% by Mr Bankman-Fried and 10% by Zixiao "Gary" Wang: Complaint, paragraph 16. Mr Wang was a co-founder of FTX and its former Chief Technology Officer and held ownership stakes in various FTX Group companies: Complaint, paragraph 39. He is described as an "FTX Insider" in the Complaint: Complaint, paragraph 40.

67. In addition, Mr Bankman-Fried was the sole chairman and sole director of Alameda Research Ltd until 6 September 2022. It is said that Mr Bankman-Fried controlled Alameda Research Ltd and indeed that he "treated the legal entities that he controlled as a slush fund operated with a near-total disregard for corporate formalities": Complaint, paragraph 9. Put shortly, the overall thrust of the allegations in the Complaint is that Alameda Research Ltd was owned and controlled by Mr Bankman-Fried and was essentially his vehicle.

68. In my opinion, Almeda Research Ltd is therefore, on the pleaded Complaint, the type of company to which the illegality defence may apply as a result of the conduct of its agent and director (Mr Bankman-Fried) being attributed to the company. It is not a company which has innocent directors or shareholders.

69. If the pleaded allegations in the Complaint are correct, Mr Bankman-Fried used funds from Alameda Research Ltd to benefit himself through SGN. However, Mr Bankman-Fried was the sole director, controller and (together with one other FTX Insider) owner of Alameda Research Ltd. In these circumstances, it is difficult to see why the policy of the law would require Mr Bankman-Fried's knowledge and conduct not to be attributed to Alameda Research Ltd so as not to enable Alameda Research Ltd to recover from third parties to the relevant transactions.

70. This is particularly so where, as here, there is no reason to think, and no pleaded basis for considering, that the relative allocation of value between different FTX entities such as Alameda Research Ltd and SGN would have been of particular concern to Mr Kives and Mr Baum. As noted above, there is in any event no allegation that Mr Kives or Mr Baum knew the nature of the ownership of SGN and thus how value was being allocated on the opposite side of the transaction.

71. Further, applying the approach in *Patel v Mirza*, denying Alameda Research Ltd's claim is a proportionate response to its illegal conduct, and enhances the relevant purpose of the law, in circumstances where it was Alameda Research Ltd itself, through Mr Bankman-Fried, who was responsible for the illegality.

72. For all these reasons, on the basis of the pleaded Complaint, I consider that the BVI Court would conclude that this is a case where Mr Bankman-Fried's knowledge and conduct is to be attributed to Alameda Research Ltd and, as a result, Alameda Research Ltd is barred by its own illegality from now recovering from Mr Kives or Mr Baum.

**G.    CONCLUSIONS**

73. In conclusion, I consider that the BVI Dishonest Assistance Claim would be liable to be struck out and dismissed on the pleadings as a matter of BVI law since:

    (1)    The pleaded Complaint does not disclose a case of assistance by Mr Kives or Mr Baum in the relevant alleged breaches of duty by Mr Bankman-Fried; and/or

    (2)    The pleaded Complaint does not disclose a properly arguable case of dishonesty by Mr Kives or Mr Baum in allegedly assisting the alleged breaches of duty; and/or

    (3)    On the pleaded Complaint, the defence of illegality would apply to bar the claim.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

_____
**TOM SMITH KC**
**South Square**
3-4 South Square
Gray's Inn
London WC1R 5HP
11 September 2023