# <u>EXHIBIT 1</u>

**Dismissal Brief**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>FTX TRADING LTD, *et al.*,[1]<br><br>      Debtors. | Chapter 11<br><br>Case No. 22-11068 (JTD)<br><br>(Jointly Administered) |
| ALAMEDA RESEARCH LTD. and<br>CLIFTON BAY INVESTMENTS LLC f/k/a<br>ALAMEDA RESEARCH VENTURES LLC,<br><br>      Plaintiffs,<br><br>v.<br><br>MICHAEL KIVES, BRYAN BAUM, K5<br>GLOBAL HOLDINGS LLC, K5 GLOBAL<br>TECHNOLOGY LLC, MBK CAPITAL LP<br>SERIES T, K5 GROWTH CO-INVEST I GP<br>LLC, K5 GLOBAL GROWTH FUND I GP<br>LLC, K5 GLOBAL VENTURES LLC,<br>MOUNT OLYMPUS CAPITAL LP,<br>MOUNT OLYMPUS CAPITAL LLC, K5<br>GLOBAL GROWTH FUND II LP, K5<br>GLOBAL GROWTH FUND II GP LLC,<br>K5X FUND I LP, K5X FUND I LLC, and<br>SGN ALBANY LLC,<br><br>      Defendants. | Adv. Pro. No. 23-50411 (JTD) |

## MEMORANDUM OF LAW IN SUPPORT OF THE K5 DEFENDANTS'
## MOTION TO DISMISS PLAINTIFFS' COMPLAINT

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................1

THE COMPLAINT'S ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS...............4

    A.    Kives And Baum Launch K5 Global And Quickly Achieve Success .....................4

    B.    Kives And Baum Agree Effectively To Sell A Third Of Their Existing Business To SBF ................................................................................................4

    C.    SBF Forms SGN And The Transaction Closes..................................................6

        1.    SBF Forms SGN As A "Shell" Entity For The K5 Transaction................6

        2.    The Executed Transaction.......................................................................7

        3.    The Capital Contributions.......................................................................9

    D.    FTX And Its Affiliates, But Not SGN, File For Bankruptcy...............................9

    E.    Plaintiffs File Inconsistent Sworn Statements Of Assets And Liabilities; Alameda Research Is Consistently Solvent ........................................................10

    F.    Plaintiffs' Causes Of Action ...............................................................................11

LEGAL STANDARD.....................................................................................................12

ARGUMENT .................................................................................................................13

    A.    Plaintiffs' Claims For Fraudulent Transfer (Counts 1-8) And Preferential Transfer (Count 9) Should Be Dismissed .................................................13

        1.    The Avoidance Claims Fail Because Each Plaintiff Has Not Pleaded The Statutory Predicates For Asserting Avoidance Claims.........14

            a.    Allegations Regarding Non-Plaintiff Debtors Are Irrelevant........14

            b.    Alameda Research Cannot Avoid The Transfers Because It Is Solvent And Avoidance Would Not Benefit Its Creditors.........15

            c.    Alameda Ventures' Avoidance Claims Should Be Dismissed Because It Alleges That It Never Owned An Interest In The Transferred Funds.................................................16

        2.    Plaintiffs' Constructive Fraudulent Transfer Claims (Counts 3-4 And 7-8) Fail For The Additional Reason That Plaintiffs Have Not Pled, And Cannot Plead, Insolvency At The Time Of The Transfers ................................................................................................19

        3.    Plaintiffs' Claims For Actual Fraudulent Transfer (Counts 1-2 And 5-6) Fail Because Plaintiffs Have Not Plausibly Alleged An Actual Intent To Hinder, Delay, Or Defraud Creditors.......................................21

        4.    Alameda Research's Claim For Preferential Transfer Of The $100 Million Capital Contribution (Count 9) Fails ...........................................26

            a.    Plaintiffs Fail To Allege The $100 Million Payment Was Made On Account Of An Antecedent Debt.................................27

            b.    The Preference Claim Fails Because Alameda Research Fails To Allege Mount Olympus Was Its Creditor For The $100 Million Payment.................................................................28

c.      The Preference Claim Fails Because Alameda Research's
                Sworn Schedules Rebut The Presumption That It Was
                Insolvent At The Time Of The Transfer ........................................30

        d.      Alameda Research Failed To Satisfy The Due Diligence
                Requirement Before Bringing The Preference Claim....................30

B.      Plaintiffs' Property Recovery And Disallowance Claims Should Be
        Dismissed ................................................................................................................31

        1.      Plaintiffs' Property Recovery Claims (Counts 10-11) Fail Because
                The Transfers Are Not Avoidable..............................................................31

        2.      Plaintiffs' Disallowance Claim Under Section 502(d) Of The
                Bankruptcy Code (Count 16) Fails ...........................................................31

C.      Plaintiffs' Claims For Aiding And Abetting Breach Of Fiduciary Duty
        (Count 13) And Dishonest Assistance (Count 14) Fail For Several Reasons........31

        1.      Alameda Ventures Has Not Stated A Claim For Aiding And
                Abetting Breach Of Fiduciary Duty...........................................................32

                a.      Alameda Ventures Has Not Pled Facts Showing That Kives
                        And Baum Knowingly Participated In A Breach Of
                        Fiduciary Duty ..............................................................................32

                b.      Alameda Ventures' Claim For Aiding And Abetting Is Also
                        Barred By The In Pari Delicto Doctrine .......................................36

        2.      Alameda Research Has Not Stated A Claim For Dishonest
                Assistance Under BVI Law .......................................................................38

                a.      Alameda Research Has Not Pled Facts Sufficient To
                        Establish That Kives Or Baum Acted Dishonestly.......................38

                b.      Alameda Research's Claim For Dishonest Assistance Is
                        Also Barred By The Ex Turpi Causa Doctrine .............................41

RESERVATION OF RIGHTS ................................................................................................42

CONCLUSION........................................................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adelphia Recovery Tr. v. Bank of Am., N.A.*,
390 B.R. 80 (S.D.N.Y. 2008) *aff'd*, 379 F. App'x 10 (2d Cir. 2010)..........................14, 16, 19

*In re AlphaStar Ins. Grp. Ltd.*,
383 B.R. 231 (Bankr. S.D.N.Y. 2008) ..........................................................................38, 41, 42

*Am. Int'l Grp., Inc. v. Greenberg*,
976 A.2d 872 (Del. Ch. 2009)...............................................................................................36, 37

*In re Aphton Corp.*,
423 B.R. 76 (Bankr. D. Del. 2010) ...............................................................................................31

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................................................12

*In re Bake-Line Grp., LLC*,
359 B.R. 566 (Bankr. D. Del. 2007) .............................................................................................28

*Bear, Stearns Sec. Corp. v. Gredd*,
275 B.R. 190 (S.D.N.Y. 2002)................................................................................................16, 17

*Begier v. I.R.S.*,
496 U.S. 53 (1990).........................................................................................................................17

*Bell Atl. Corp. v. Twombly*,
550 U.S. 540 (2007).......................................................................................................................12

*Binks v. DSL.net, Inc.*,
C.A. No. 2823-VCN, 2010 WL 1713629 (Del. Ch. Apr. 29, 2010)........................................33

*In re Broadstripe, LLC*,
444 B.R. 51 (Bankr. D. Del. 2010) ..............................................................................................36

*Buck v. Hampton Twp. Sch. Dist.*,
452 F.3d 256 (3d Cir. 2006)......................................................................................................5, 12

*In re Center City Healthcare, LLC*,
641 B.R. 793 (Bankr. D. Del. 2022) ............................................................................................30

*In re Chase & Sanborn Corp.*,
813 F. 2d 1177 (11th Cir. 1987) ..................................................................................................18

*In re CRC Parent Corp.*,
  Adv. No. 12-50702 (MFW), 2013 WL 781603 (Bankr. D. Del. Mar. 1, 2013) .....................20

*In re Cred Inc.*,
  650 B.R. 803 (Bankr. D. Del. 2023) ............................................................................... *passim*

*In re Cybergenics Corp.*,
  226 F.3d 237 (3d Cir. 2000)...........................................................................................15, 16

*In re Demitrus*,
  586 B.R. 88 (Bankr. D. Conn. 2018) ...................................................................................17

*In re Draw Another Circle*,
  602 B.R. 878 (Bankr. D. Del. 2019) ....................................................................................34

*In re DSI Renal Holdings, LLC*,
  Adv. No. 14-50356 (KBO), 2020 WL 7054390 (Bankr. D. Del. Dec. 2, 2020)...............33, 34

*In re Energy Future Holdings Corp.*,
  531 B.R. 499 (Bankr. D. Del. 2015) ....................................................................................18

*In re Essar Steel Minn. LLC*,
  Adv. No. 18-50555, 2020 WL 6820953 (Bankr. D. Del. Oct. 15, 2020) .........................25, 26

*In re F-Squared Inv. Mgmt., LLC*,
  Adv. No. 17-50716 (LSS), 2019 WL 4261168 (Bankr. D. Del. Sept. 6, 2019) .....................20

*In re FBI Wind Down, Inc.*,
  581 B.R. 116 (Bankr. D. Del. 2018) ....................................................................................17

*In re Fedders N. Am., Inc.*,
  405 B.R. 527 (Bankr. D. Del. 2009) ....................................................................................24

*In re First Jersey Secs., Inc.*,
  180 F.3d 504 (3d Cir. 1999)...............................................................................................27

*In re FTX Trading Ltd., et al.*,
  Case No. 22-11068 (JTD) (Bankr. D. Del.)..........................................................................10

*In re Glob. Link Telecom Corp.*,
  327 B.R. 711 (Bankr. D. Del. 2005) ....................................................................................20

*Granfinanciera, S.A. v. Nordberg*,
  492 U.S. 33 (1989)..............................................................................................................42

*In re Groff*,
  Adv. No. 11-00284-8-RDD, 2011 WL 6140744 (Bankr. E.D.N.C. Dec. 9, 2011) .....12, 21, 30

*In re Gutpelet*,
137 F.3d 748 (3d Cir. 1998).................................................................................18

*In re Hechinger Inv. Co. of Del., Inc.*,
No. 01-3170(PBL), 2004 WL 3113718 (Bankr. D. Del. Dec. 14, 2004)................................27

*In re Hertzler Halstead Hosp.*,
334 B.R. 276 (Bankr. D. Kan. 2005) .......................................................................29

*In re HH Liquidation, LLC*,
590 B.R. 211 (Bankr. D. Del. 2018) ...........................................................14, 15, 22

*In re Insys Therapeutics, Inc.*,
Adv. No. 21-50359 (JTD), 2021 WL 5016127 (Bankr. D. Del. Oct. 28, 2021).....................19

*In re J&M Sales, Inc.*,
Adv. No. 20-50775 (JTD), 2021 Bankr. LEXIS 2268 (Bankr. D. Del. Aug. 20, 2021)..........24

*In re Lewis*,
574 B.R. 536 (Bankr. E.D. Pa. 2017) ...............................................................16, 18

*In re Liquid Holdings Grp., Inc.*,
Adv. No. 17-50662 (KG), 2018 WL 2759301 (Bankr. D. Del. June 6, 2018) ......15, 19, 33, 37

*In re Live Well Fin., Inc.*,
No. 19-11317 (LSS), 2023 WL 4025816 (Bankr. D. Del. June 14, 2023) ............................20

*Lockton v. Rogers*,
C.A. No. 2021-0058-SG, 2022 WL 604011 (Del. Ch. Mar. 1, 2022) ...................................33

*Malpiede v. Townson*,
780 A.2d 1075 (Del. 2001) ...................................................................33, 34, 35

*In re Maxus Energy Corp.*,
641 B.R. 467 (Bankr. D. Del. 2022) .......................................................................16

*Mele v. Fed. Reserve Bank of N.Y.*,
359 F.3d 251 (3d Cir. 2004).................................................................................5

*Meyers v. Heffernan*,
740 F. Supp. 2d 637 (D. Del. 2010)........................................................................12

*In re Montreal, Maine & Atl. Rwy., Ltd.*,
888 F.3d 1 (1st Cir. 2018)...................................................................................18

*In re Mulkanoor*,
595 B.R. 795 (Bankr. N.D. Ill. 2018) .....................................................................29

*In re NewPage Corp.*,
   569 B.R. 593 (D. Del. 2017) .......................................................................................27, 28

*In re NewStarcom Holdings, Inc.*,
   547 B.R. 106 (Bankr. D. Del. 2016) ...................................................................................33

*In re Nortel Networks, Inc.*,
   469 B.R. 478 (Bankr. D. Del. 2012) ..............................................................................37, 38

*In re NSC Wholesale Holdings LLC*,
   637 B.R. 71 (Bankr. D. Del. 2022) .....................................................................................12

*In re Oakland Physicians Med. Ctr., L.L.C.*,
   596 B.R. 587 (Bankr. E.D. Mich. 2019), *aff'd* 2021 WL 4077546 (6th Cir. Sept. 8,
   2021) ....................................................................................................................................28

*In re Oakwood Homes Corp.*,
   325 B.R. 696 (Bankr. D. Del. 2005) ...................................................................................12

*PBGC v. White Consol. Indus.*,
   998 F.2d 1192 (3d Cir. 1993) ...............................................................................................5

*In re PennySaver USA Pub., LLC*,
   602 B.R. 256 (Bankr. D. Del. 2019) .......................................................................19, 21, 23

*In re Phila. Newspapers, LLC*,
   468 B.R. 712 (Bankr. E.D. Pa. 2012) ..................................................................................27

*Pinkney v. Meadville, Pa.*,
   No. 21-1051, 2022 WL 1616972 (3d Cir. May 23, 2022) .....................................................5

*In re Pinktoe Tarantula Ltd.*,
   Adv. No. 20-50597 (LSS), 2023 WL 2960894 (Bankr. D. Del. Apr. 14, 2023) ...................30

*In re Refco, Inc. Sec. Litig.*,
   No. 07MDLNO1902JSR, 2010 WL 11712926 (S.D.N.Y. Aug. 26, 2010), *adopted by*,
   2010 WL 5129011 (S.D.N.Y. Dec. 14, 2010) .......................................................................16

*In re Rollaguard Security, LLC*,
   570 B.R. 859 (Bankr. S.D. Fla. 2017) .................................................................................22

*In re Ryan*,
   472 B.R. 714 (E.D. Va. 2012) ..............................................................................................13

*In re Sharp Int'l Corp.*,
   403 F.3d 43 (2d Cir. 2005) ...................................................................................................22

*In re Southmark Corp.*,
138 B.R. 831 (Bankr. N.D. Tex. 1992), *aff'd* 993 F.2d 117 (5th Cir. 1993) ...........................29

*In re Sportco Holdings, Inc*.,
Adv. No. 20-50554 (JKS), 2021 WL 4823513 (Bankr. D. Del. Oct. 14, 2021) .....................24

*Stern v. Marshall*,
564 U.S. 462 (2011) ........................................................................................................42

*In re Syntax-Brillian Corp.*,
573 F. App'x 154 (3d Cir. 2014) .......................................................................................34

*Teachers' Ret. Sys. of La. v. Aidinoff*,
900 A.2d 654 (Del. Ch. 2006)...........................................................................................37

*In re The Brown Schs.*,
368 B.R. 394 (Bankr. D. Del. 2007) ..................................................................................31

*In re THQ Inc.*,
No. 12-13398 (MFW), 2016 WL 1599798 (Bankr. D. Del. Apr. 18, 2016)...........................28

*In re Tribune Co. Fraudulent Conveyance Litig.*,
10 F.4th 147 (2d Cir. 2021) ..............................................................................................28

*In re Trinsium Grp.*,
460 B.R. 379 (Bankr. S.D.N.Y. 2011) ...............................................................................19

*In re U.S. Glove, Inc.*,
No. 21-10172-T11, 2021 WL 2405399 (Bankr. D.N.M. June 11, 2021) ..............................16

*In re USDigital, Inc.*,
443 B.R. 22 (D. Del. 2011) ....................................................................................... *passim*

*In re Venoco LLC*,
998 F.3d 94 (3d Cir. 2021)................................................................................................28

*In re Xura, Inc. S'holder Litig.*,
C.A. No. 12698-VCS, 2019 WL 3063599 (Del. Ch. July 12, 2019)......................................35

*Zazzali v. Hirschler Fleischer, P.C.*,
482 B.R. 495 (D. Del. 2012)...............................................................................21, 24, 36, 37

# STATUTES

11 U.S.C.
    § 101(10)(A) ...................................................................................................29
    § 101(12) ........................................................................................................28
    §§ 547, 548, 550 ...........................................................................................13
    § 547(b) ..........................................................................................................30
    § 547(b)(1) .....................................................................................................28
    § 547(b)(1)–(3) ..............................................................................................27
    § 548(a)(1)(A) ................................................................................................21
    § 548(a)(1)(B) ................................................................................................19

Bankruptcy Code
    § 502(d) ...................................................................................................12, 31
    § 544 .......................................................................................................12, 16
    § 547 .............................................................................................26, 29, 30
    § 548 .......................................................................................17, 19, 22, 23
    § 550 ..............................................................................................................11

Del. Code Ann. Title 6
    § 1304(a)(1) ...................................................................................................21
    § 1304(a)(2) ...................................................................................................19
    § 1305..............................................................................................................19

# RULES

Fed. R. Bankr. P. 7012 .................................................................................................1

Fed. R. Civ. P. 12(b)(6).........................................................................................1, 12

Local Rule 7012-1.......................................................................................................42

# FOREIGN AUTHORITIES

*Bilta v Nazir*
    [2016] AC 1 at [26] ......................................................................................41

*FM Cap. Partners Ltd. v Marino*
    [2018] EWHC 1768 (Comm) at [82] ......................................................38, 39

*Heinl v Jyske Bank (Gibraltar) Ltd*
    [1999] Lloyd's Rep Bank 511......................................................................39

*Holman v Johnson*
    (1775) 1 Cowp 341 ......................................................................................41

*Ivey v Genting Casinos (UK) t/a Crockfords*
    [2018] AC 391 at [74].................................................................................38

*Patel v Mirza*
    [2017] AC 467 ....................................................................................................41

*Royal Brunei Airlines v Tan*
    [1995] 2 AC 378 at [382]..............................................................................38, 39

*Stone & Rolls Ltd v Moore Stephens*
    [2009] 1 AC 1391 at [1404]................................................................................41

*Three Rivers DC v Governor and Co. of the Bank of England*
    [2003] 2 AC 1 at [184].......................................................................................38

*Ultraframe (UK) Ltd v Fielding*
    [2005] EWHC 1638 (Ch) at [1505] ...................................................................38

## OTHER AUTHORITIES

Michael Sheetz, *Elon Musk's SpaceX Near $150 Billion*, CNBC (July 13, 2023),
    https://www.cnbc.com/2023/07/13/elon-musk-spacex-near-150-billion-valuation.html ..........9

Pub. L. 116-54....................................................................................................30

REDACTED VERSION

Defendants Michael Kives, Bryan Baum, K5 Global Holdings, LLC, K5 Global Technology, LLC, MBK Capital, LP - Series T, K5 Global Growth Co-Invest I GP, LLC, K5 Global Growth Fund I GP, LLC, K5 Global Ventures, LLC, Mount Olympus Capital, LP, Mount Olympus Capital, LLC, K5 Global Growth Fund II, LP, K5 Global Growth Fund II GP, LLC, K5X Fund I, LP, and K5X Fund I, LLC (collectively, the "K5 Defendants") file this memorandum of law in support of their concurrently filed motion (the "Motion"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7012 of the Federal Rules of Bankruptcy Procedure, to dismiss all claims asserted against the K5 Defendants in the Complaint, filed on June 22, 2023 (the "Complaint") by Alameda Research Ltd. ("Alameda Research") and Clifton Bay Investments LLC f/k/a Alameda Research Ventures LLC ("Alameda Ventures"; together with Alameda Research, the "Plaintiffs").

## INTRODUCTION

Within four years of its founding, and before any deal was reached with Sam Bankman-Fried ("SBF"), Defendants Michael Kives and Bryan Baum had already turned K5 Global into a successful and fast-growing venture capital firm, with nearly $700 million under management and multiple incubated companies.[2]  In March 2022, Kives and Baum agreed effectively to sell one-third of their existing business to SBF or his affiliate, and SBF agreed that either he or an affiliate would commit to investing $3 billion in a newly formed investment fund on a preferred basis—at a time when SBF was widely perceived to be a respected and extraordinarily wealthy financial

---

[2] For ease of reference only, the venture capital business as a whole is referred to herein as "K5 Global."   K5 Global in fact consists of a number of entities that are not all organized in parent/subsidiary relationships, although they are all managed or advised directly or indirectly by Kives and Baum, along with an appropriate management team.

REDACTED VERSION

investor and entrepreneur.  When FTX collapsed and accusations of fraud were levied against SBF and other FTX insiders, Kives and Baum were as surprised and dismayed as everyone else.

After various FTX entities filed bankruptcy petitions, Kives, Baum, and the other K5 Defendants made clear to Plaintiffs that they would assist in maximizing the value of the investments for the benefit of their estates, and to assist in monetizing the investments if desired and appropriate.  Despite those overtures, and after a single meeting between the parties' representatives, Plaintiffs without warning launched this unnecessary and premature litigation against the K5 Defendants.

Recent events underscore that this lawsuit is a waste of all parties' resources.  Most of Plaintiffs' claims rest on the proposition that Plaintiffs received little or no value from their investments because a different entity—SGN Albany Capital LLC ("SGN")—supposedly received the benefit.  But the premise that SGN and Plaintiffs are meaningfully separate appears to be a fiction.  Plaintiffs' own Complaint admits that "SBF treated the legal entities that he controlled"— among them Plaintiffs and SGN—"as a slush fund operated with a near-total disregard for corporate formalities."  Compl. ¶ 9.  Plaintiffs likewise plead that SGN is controlled by the same FTX insiders as Plaintiffs, except insofar as one of the Plaintiffs itself owns a piece.

Without involving Kives, Baum, or the other K5 Defendants, Plaintiffs could have simply taken action in the bankruptcy proceedings to confirm formally their ownership over their own investments.  Plaintiffs were well aware that the K5 Defendants would not have opposed it.  Instead, however, Plaintiffs purported to sue *SGN*—in effect, *to sue themselves*—to "recover" their investments while at the same time alleging they received nothing from the K5 Defendants.  To no one's surprise, SGN promptly defaulted, underscoring that SGN is not a meaningfully separate

entity.  As a result, a fundamental premise underlying Plaintiffs' lawsuit—that they do not enjoy the value of their investments with or in the K5 Defendants—will be shattered at the outset.

Perhaps because this lawsuit appears to be largely an elaborate stratagem for Plaintiffs to claim ownership of their investments from "SGN," Plaintiffs' Complaint entirely fails to state viable claims against the K5 Defendants.  Indeed, Plaintiffs' avoidance claims (Counts 1-9) all fail because Plaintiff Alameda Research swears it is solvent, which bars its avoidance claims, and because Plaintiff Alameda Ventures never owned the transferred money according to Plaintiffs' allegations that SBF merely routed the funds through Alameda Ventures' bank account.

Plaintiffs' claims additionally and independently fail because the Complaint fails to allege the necessary facts to satisfy the elements of those claims.  Neither Plaintiff pleads a single fact establishing that it was insolvent at the time of the allegedly fraudulent transfers, which dooms Plaintiffs' constructive fraud claims.  Plaintiff Alameda Research's preference claim fails as a matter of law for additional reasons, including that it failed to plead any facts suggesting that a K5 Defendant was a creditor of Alameda Research, let alone that it was obligated to make any payment at the time it supposedly transferred the funds.  Plaintiffs' actual fraudulent transfer claims similarly fail because the Complaint does not plead with particularity a "badge of fraud" that suggests actual fraudulent intent.  Last, Plaintiffs' claims against Kives and Baum for aiding and abetting breach of fiduciary duty (under Delaware law) and dishonest assistance (under British Virgin Islands ("BVI") law) are frivolous.  Plaintiffs plead *no facts* whatsoever to suggest that Kives or Baum assisted SBF in any breach of his fiduciary duties, much less possessed the necessary mental state to do so.

There is little doubt that Plaintiffs' claims would fail on the merits.  The assets Plaintiffs received were well worth the amounts invested and paid.  And Plaintiffs' attempt to make Kives

and Baum complicit in SBF's wrongdoing has no basis in fact. But for present purposes, all that matters is that Plaintiffs have failed to meet even their most basic pleading burdens to state claims upon which relief may be granted. Accordingly, the K5 Defendants respectfully request that the Court dismiss Plaintiffs' claims against them.

## THE COMPLAINT'S ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS

### A.    Kives And Baum Launch K5 Global And Quickly Achieve Success

In 2018, after a successful career at Creative Artists Agency, Michael Kives founded his own venture capital fund called "K5 Global." *See* Compl. ¶ 57. Shortly thereafter, Bryan Baum— an entrepreneur with a strong track record of growing businesses—joined Kives as K5 Global's second managing member. *See id*. ¶¶ 20, 59. By March 2022—before any investments by SBF or any SBF-affiliated entity—Plaintiffs acknowledge that K5 Global already had grown to nearly $700 million in assets under management. *Id.* ¶ 83.

### B.    Kives And Baum Agree Effectively To Sell A Third Of Their Existing Business To SBF

The Complaint alleges that by March 2022, SBF was "so impressed by Kives and Baum and their 'infinite connections,'" that he began working toward an association with K5 Global. *See id*. ¶¶ 2, 61–62. Indeed, it is not difficult to see how SBF and K5 Global understood in short order how a business relationship could be mutually beneficial. K5 Global was growing at a rapid pace, with Kives' and Baum's track record and vast network giving K5 Global access to valuable investment opportunities unavailable to public—and most private—investors. *See id.* ¶¶ 2, 60–61, 87. At the same time, SBF was reported to be worth in excess of $20 billion, with an inestimable cachet in the financial world to match. *See, e.g.*, K5 Defs.' Request for Judicial Notice ("RJN") at ¶ 5, Ex. E. at 10 (Debtors' Chief Executive Officer John J. Ray III's First Interim Report, stating "[a]t its peak, the FTX Group . . . controlled tens of billions of dollars of assets across its various

companies.")]; *id.* ¶ 1, Ex. A (*Wall Street Journal* article reporting that "FTX Trading Ltd. . . . raised just over $420 million in the new round" with "[t]he backing of high profile investors," including Sequoia Capital, BlackRock, and Iconiq Growth).

On March 7, 2022, Kives and Baum entered into a term sheet with SBF (the "Term Sheet"), believing that they were partnering with one of the world's most respected and sophisticated businessmen. Compl. ¶ 62. Pursuant to the Term Sheet, Kives and Baum agreed to sell a one-third stake in every one of their entities then serving as general partner, managing member, or similar capacity ("GPs") with respect to various investment vehicles, as well as a one-third stake in certain investment holding companies, and to create a new fund primarily for SBF to manage his $3 billion capital commitment, ███████████████████ and give SBF a one-third interest in the GP of the new fund. *See* Decl. of Michael J. Reiss ("Reiss Decl.") ¶ 2, Ex. 1 at 1 (Term Sheet).[3] In exchange for Kives' and Baum's agreement to sell one-third of their burgeoning and valuable business, and to manage the large prospective investments ██████████████ SBF agreed to pay $125 million to each of them, to commit to investing (as a limited partner in the new fund) the $3 billion over three years, and to contribute $50 million cash and $250 million in stock to a K5 Global GP in which SBF would have a one-third stake. *Id.* at 1–2. The Term

---

[3] The exhibits to the Reiss Declaration are deal documents for the K5 Transaction (defined below), and are referenced and relied upon throughout the Complaint. *See, e.g.*, Compl. ¶¶ 3, 7, 50, 62–79, 80, 82–84. In ruling on a motion to dismiss, the Court may look to documents "incorporated by reference or integral to the claim[s] [in the complaint]." *See Pinkney v. Meadville, Pa.*, No. 21-1051, 2022 WL 1616972, at *2 (3d Cir. May 23, 2022) (citing *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006)). The Court may consider any "authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Id.* (quoting *PBGC v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993)); *see also Mele v. Fed. Reserve Bank of N.Y.*, 359 F.3d 251, 256 n.5 (3d Cir. 2004) ("[A] document integral to or explicitly relied upon in the complaint may be considered without converting" the motion to dismiss into one for summary judgment.) (internal quotation omitted). The Court may therefore properly consider the exhibits to the Reiss Declaration in connection with this Motion.

Sheet further provided that SBF's investments would be made either by him or through his affiliate.[4] *Id.* at 1.

Plaintiffs allege that SBF caused Alameda Research to misappropriate money from the "FTX Group" and then, on March 8, 2022, caused Alameda Research to wire $300 million to Alameda Ventures, which he then directed that same day to wire the money to K5 Global Holdings, LLC (the "$300 Million Transfer"). *See* Compl. ¶ 80. According to Plaintiffs, Alameda Ventures' sole relevance to this lawsuit is that SBF routed money through its account for a few hours before wiring it to K5 Global Holdings, LLC. The Complaint does not allege that any K5 Defendant knew, or could have known, that money was misappropriated from the "FTX Group" or which entity or person actually sent the funds to K5 Global Holdings, LLC. According to the Complaint, K5 Global Holdings, LLC later made transfers totaling $250 million to Kives and Baum and the remaining $50 million to K5 Global Technology, LLC. *Id.*, Ex. A.

### C.    SBF Forms SGN And The Transaction Closes

While the Term Sheet was signed on March 7, 2022, it took nearly 12 weeks—until the end of May 2022—for the parties and their respective counsel to negotiate, finalize, and execute documents for the transaction. *Id.* ¶ 67.

#### 1.    SBF Forms SGN As A "Shell" Entity For The K5 Transaction

Ten days prior to closing the deal, on May 16, 2022, SBF's side of the transaction (which was represented by Fenwick & West LLP) created a new entity—SGN—for the "purpose of engaging in the K5 . . . and Mt. Olympus Transaction[s]." *Id.* ¶ 35. The Complaint alleges that SGN was owned: (1) 60.5% by SBF; (2) 21.17% by Zixiao "Gary" Wang, a co-founder of FTX

---

[4] There is no suggestion in the Complaint that SBF would not have cut the best economic deal possible for himself, or that he was somehow incapable of figuring out the economics of the deal.

and its former Chief Technology Officer; (3) 10% by Nishad Singh, FTX's former Director of Engineering; and (4) 8.33% by Plaintiff Alameda Research.  *Id.*

Notably, the Complaint does not allege that SGN ever had a written operating agreement, that information regarding SGN's ownership was ever conveyed to the K5 Defendants, or that SGN followed corporate formalities.  Instead, Plaintiffs allege that SGN was a "shell" entity and that "Bankman-Fried treated the legal entities that he controlled"—including Plaintiffs and SGN— "as a slush fund operated with a near-total disregard for corporate formalities."  *Id.* ¶¶ 8–9.

### 2.    The Executed Transaction

Memorialized across several agreements, the agreed terms of the finalized transaction (the "K5 Transaction"), as summarized below, were largely consistent with the Term Sheet.

| What SGN/Plaintiffs Received[5] | What The K5 Defendants Received |
|---|---|
| • **A one-third stake in K5 Global's then-existing GPs and certain investment holding companies**<br> ○ K5 Global Holdings, LLC<br> ○ MBK Capital, LP – Series T<br> ○ K5 Global Technology, LLC<br> ○ K5 Global Growth Co-Invest I GP, LLC<br> ○ K5 Global Growth Fund I GP, LLC<br> ○ K5 Global Ventures, LLC<br><br>• **The right to invest in new K5 Global investment funds**<br> ○ SGN became a limited partner in the newly formed limited partnership—Mount Olympus Capital, LP ("Mount Olympus")—which would feed into two new investment funds: K5X Fund I, LP and K5 Global Growth Fund II, LP | • **Kives and Baum***<br> ○ A cash payment of $125 million each for all the value conveyed<br>*Neither Kives nor Baum received any transaction fee in the deal<br><br>• **K5 Global Technology, LLC****<br> ○ A capital contribution of $50 million in cash<br> ○ A capital contribution of US and foreign FTX stock (that was never actually delivered)[6]<br>**SGN received a one-third stake in this entity |

---

[5] As noted above, while not integral to this Motion, the premise that SGN and Plaintiffs are meaningfully separate appears to be a fiction.

[6] The stock was never delivered and only a fraction of the capital SGN committed to contribute to the new funds was actually contributed.  Worse, Kives and Baum parted with a significant portion of their business to a partner who ended up being, by all recent accounts, a charlatan.



See Compl. ¶¶ 63–80, 82–84; Reiss Decl. ¶¶ 3–13, Exs. 2–12 (Transaction documents; LLC Operating Agreements; Subscription Agreement; and LP Agreements).

What SGN received in the K5 Transaction can be understood only by looking at it as a whole.[7] As just one example, SGN stood to gain in the new K5 Global investment funds by both (1) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *and* (2) owning a one-third stake in the GPs for those funds (thereby reducing Kives' and Baum's cumulative stake in the carried interest from 100% to 66.7%, with SGN receiving the remainder). In other words, if the new funds were profitable, SGN would make money as the limited partner (through Mount Olympus) and receive a split of profits (carried interest) equal to what Kives and Baum received, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮.

Plaintiffs' myopic portrayal of the K5 Transaction in the Complaint is a blatant attempt to make it seem like SGN received less than reasonably equivalent value. *See id.* ¶¶ 71–79, 81. Plaintiffs allege that for the $300 million paid, SGN received one-third stakes in only K5 Global Holdings, LLC ($35.5 million), MBK Capital, LP - Series T ($214.5 million), and K5 Global

---

[7] Plaintiffs' attempt to bisect the K5 Transaction into two transactions—the "K5 Transaction" and the "Mount Olympus Transaction"—is fundamentally flawed. Compl. ¶ 13. There was really only one transaction. As the Complaint acknowledges, Plaintiffs' "two" transactions were actually elements of an integrated agreement set forth on *one* Term Sheet. *Id.* ¶ 62.

Technology, LLC ($50 million, plus about $250 million in undelivered stock).  *See id.* ¶¶ 71, 74, 78.  But of course that ignores the one-third stake SGN received in the other GPs (see chart above) and ████████████████████████████████████████████████████████████████████.

### 3.    The Capital Contributions

Plaintiffs allege that between May and September 2022, Alameda Research funded three capital contributions to Mount Olympus on behalf of SGN, totaling $400 million: (1) $200 million on May 26, 2022; (2) $100 million on June 7, 2022; and (3) $100 million on September 20, 2022 (collectively, the "$400 Million Aggregate Transfers," and together with the $300 Million Transfer, the "Transfers").  *Id.* Ex. B.  The Complaint does not allege that Mount Olympus ever made a capital call to SGN, much less a capital call that would have obligated *Alameda Research* to pay these capital contributions.

In total, SGN invested only $400 million of its $3 billion commitment.  According to the Complaint, Kives and Baum used their "infinite connections" to invest a majority of the $400 million in two successful and private companies founded by Elon Musk:  SpaceX ($189.7 million invested) and The Boring Company ($23 million invested).[8]  *Id.* ¶ 87.

### D.    FTX And Its Affiliates, But Not SGN, File For Bankruptcy

In early November 2022, the FTX exchange suddenly collapsed.  On November 11, 2022, two months after Alameda Research funded the last of the $400 Million Aggregate Transfers, FTX, Alameda Research, and other affiliated entities controlled by SBF—with the curious

---

[8] Although irrelevant to this Motion, Plaintiffs' allegations impugning the contacts Kives and Baum have and suggesting that there was something wrong with making a substantial investment in SpaceX are unintelligible.  Contacts are a stock in trade for venture capitalists.  Notably, investment in SpaceX was not open to everyone, and SpaceX has had two "up rounds" since the investment.  It is now reported to be worth over $150 billion and is one of the most valuable private companies in the world.  Michael Sheetz, *Elon Musk's SpaceX Near $150 Billion*, CNBC (July 13, 2023), https://www.cnbc.com/2023/07/13/elon-musk-spacex-near-150-billion-valuation.html.

exception of SGN—filed for chapter 11 relief in this Court. *See In re FTX Trading Ltd., et al.*, Case No. 22-11068 (JTD) (Bankr. D. Del.).

Plaintiffs do not allege that SGN is substantively any different from Plaintiffs in the way it was controlled. In fact, the purported ownership and management is nearly identical to Plaintiffs, with SBF owning more than 50% and the other FTX insiders owning a minority stake. *Compare, e.g.*, Compl. ¶ 35 (alleging that SGN is 60.5% owned by SBF, 21.17% owned by Wang, 10% owned by Singh, and 8.33% owned by Alameda Research), *with id.* ¶ 17 (alleging that Plaintiff Alameda Ventures is 67% owned by SBF, 23% owned by Wang, and 10% owned by Singh).

### E. Plaintiffs File Inconsistent Sworn Statements Of Assets And Liabilities; Alameda Research Is Consistently Solvent

Plaintiffs' allegations regarding insolvency merely recite statutory requirements without elaboration. *See* Compl. ¶¶ 101, 113, 118, 134, 141, 150. However, Plaintiffs' sworn Summaries of Assets and Liabilities for Non-Individuals (Official Form206Sum) ("SOALs"), certifying assets and liabilities as of the petition date, have contradicted those recitations. As of the filing of the Complaint, Plaintiff Alameda Ventures attested that, as of the petition date, it had $995,874,809.74 in determined assets and $0 in determined liabilities, and Plaintiff Alameda Research attested that it had $1,117,704,972.25 in determined assets, with only $298,445.86 in determined liabilities. *See* RJN at ¶¶ 6–7, Ex. F at 27 (Mar. 15, 2023 Alameda Research SOAL); Ex. G at 27 (Mar. 15, 2023 Alameda Ventures SOAL). On July 31, 2023, more than a month after the Complaint was filed, Plaintiffs filed unredacted versions of their March 15, 2023 SOALs, which of course consisted of the same amounts of assets and liabilities. *See id.* ¶¶ 8–9, Ex. H at 29 (July 31, 2023 Alameda Research SOAL); Ex. I at 29 (July 31, 2023 Alameda Ventures SOAL).

On August 31, 2023, shortly before this Motion was due, Plaintiffs filed updated SOALs, but this time significantly altered the determined assets and liabilities for each Plaintiff, largely as

the result of a newly identified $1.46 billion intercompany receivable supposedly owed by one Plaintiff, Alameda Ventures, to the other, Alameda Research.[9]  Nonetheless, and regardless of these recent machinations, Plaintiff Alameda Research continues to attest to its solvency, with $9,581,882,669.53 in determined assets and $9,562,203,055.66 in determined liabilities—making it solvent by nearly $20 million.  *See id.* ¶ 10, Ex. J at 29 (Aug. 31, 2023 Alameda Research SOAL).   Plaintiff Alameda Ventures, on the other hand, now swears to insolvency by approximately $500 million (with its determined liabilities of $1,543,089,018.58 exceeding its determined assets of $1,045,553,839.38), based primarily on the purported $1.46 billion intercompany obligation to its co-Plaintiff, Alameda Research.[10]  *See id.* ¶ 11, Ex. K at 29, 49 (Aug. 31, 2023 Alameda Ventures SOAL).

F.    **Plaintiffs' Causes Of Action**

On June 22, 2023, Plaintiffs filed the instant Complaint alleging the following claims against the K5 Defendants: (i) under the Bankruptcy Code and Delaware law, that the Transfers were made with actual and constructive fraudulent intent (Counts 1-8); (ii) that the September 2022 $100 million capital contribution was a preferential transfer (Count 9); (iii) that the Transfers are recoverable under Bankruptcy Code § 550 (Counts 10-11); (iv) that Kives and Baum aided and abetted, or provided dishonest assistance to, SBF to breach his fiduciary duties (Counts 13-14);

---

[9] Plaintiff Alameda Research also mysteriously "lost" over thirty pages of cryptocurrency between July 31 and August 31, 2023.  *Compare* RJN Ex. H at 46–75, *with id.*, Ex. J at 45–46.  And Plaintiffs compound the confusion inherent in the evolving SOALs by treating crypto assets as "undetermined" in value, while they and their co-Debtors attribute *billions* of dollars of value to crypto assets in their "case updates."  *Compare id.*, Ex. J at 45–46, *with id.*, Ex. M at 2 (Debtors' "Case Update," representing that Debtors have recovered $3.8 billion in "Crypto Assets").

[10] Assuming this Court enters Plaintiffs' proposed order declaring that Plaintiffs both own SGN's significant investments "joint and severally," as requested in Plaintiffs' proposed order, then hundreds of millions of dollars in value that do not currently appear as an asset on Plaintiffs' SOALs will be added to the Plaintiffs' estates.

and (v) restating Section 502(d) of the Bankruptcy Code, viz., that any claims of the K5 Defendants

(of which there are none) be disallowed until any avoided transfers are returned (Count 16).

## **LEGAL STANDARD**

To survive a motion made pursuant to Federal Rule of Civil Procedure 12(b)(6), "the

complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is

plausible on its face.'" *In re Cred Inc.*, 650 B.R. 803, 812 (Bankr. D. Del. 2023) (quoting *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 540, 570 (2007)). "'Threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice.'" *Id.* at 813 (quoting *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009)). Accordingly, "where the well-pleaded facts do not permit the

court to infer more than the mere possibility of misconduct," the complaint does not state a claim

and should be dismissed. *In re USDigital, Inc.*, 443 B.R. 22, 35 (D. Del. 2011).

Fraudulent transfer claims are subject to the heightened pleading requirements of Rule 9(b).

*In re Oakwood Homes Corp.*, 325 B.R. 696, 698 (Bankr. D. Del. 2005) ("There is no question that

Rule 9(b) applies to adversary proceedings in bankruptcy which include a claim for relief under

§§ 544 or 548, *whether it is based upon actual or constructive fraud*." (emphasis added)).

Rule 9(b) requires plaintiffs to inject "precision and some measure of substantiation" into their

allegations of fraud. *In re NSC Wholesale Holdings LLC*, 637 B.R. 71, 80 (Bankr. D. Del. 2022).

The Court may consider "matters incorporated by reference or integral to the claim, items

subject to judicial notice, matters of public record, orders, [and] items appearing in the record of

the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (internal quotes

omitted). Accordingly, the Court may consider Debtors' filings in the main bankruptcy action,

including Plaintiffs' SOALs. *See Meyers v. Heffernan*, 740 F. Supp. 2d 637, 640 n.4 (D. Del.

2010); *see also In re Groff*, Adv. No. 11-00284-8-RDD, 2011 WL 6140744, at *3 (Bankr.

E.D.N.C. Dec. 9, 2011) (relying on debtors' schedules to hold plaintiffs failed to adequately plead

insolvency); *In re Ryan*, 472 B.R. 714, 728 (E.D. Va. 2012) ("[T]he Court is duty bound to take judicial notice of its own records . . . [and] may exercise its discretion to take judicial notice of the [debtor's] schedules in an adversary proceeding arising from the same bankruptcy case.").

## ARGUMENT[11]

### A.   Plaintiffs' Claims For Fraudulent Transfer (Counts 1-8) And Preferential Transfer (Count 9) Should Be Dismissed

Plaintiffs' avoidance claims fail at the outset.  Plaintiff Alameda Research's avoidance claims all fail because Alameda Research swears that it is solvent—*i.e.*, that it has sufficient assets to satisfy the claims of its creditors—and avoidance claims fail as a matter of law unless they are *for the benefit of creditors*.  *See infra* pp. 14–16; RJN Ex. J at 29.  Plaintiff Alameda Ventures' avoidance claims likewise fail because Alameda Ventures alleges only that SBF routed the $300 million through its bank account for a matter of hours, an allegation that is insufficient to plead that it had a property interest in the transferred $300 million.  *See infra* pp. 16–18.

The avoidance claims also fail for several additional reasons.  Plaintiffs have not adequately alleged that they were insolvent *at the time of the Transfers* and therefore have failed to plead sufficiently their constructive fraudulent transfer claims.  Plaintiffs' actual fraudulent

---

[11] To "safeguard defendants against spurious charges of immoral and fraudulent behavior," Plaintiffs are required to allege sufficient detail in their fraud-based claims to provide the K5 Defendants with "notice of the precise misconduct with which they are charged." *In re USDigital, Inc.*, 443 B.R. at 33.  Plaintiffs' Complaint, however, is a model of ambiguity.  Among other things, the Complaint does not specify which K5 Defendant is an initial transferee (if any), which Plaintiff purportedly misappropriated "FTX Group" funds, or which Debtor was the original source of the money paid to the K5 Defendants.  The Complaint's vague references to FTX customers and aggrieved creditors of an unspecified source of funds is also fatal to Plaintiffs' avoidance claims, which require Plaintiffs to establish that *they*, and not some other Debtor, owned "an interest" in the property that was transferred.  *See* 11 U.S.C. §§ 547, 548, 550; *infra* pp. 16–18.  Plaintiffs' vague and impermissible group pleading is a defect that plagues the entire Complaint, renders Plaintiffs' allegations insufficient to meet the *Iqbal*/*Twombly* or Rule 9(b) pleading standards, and more generally makes it impossible to ascertain whether Plaintiffs are alleging that some Debtor entity itself, and perhaps even one of the Plaintiffs, is the initial transferee of the funds at issue.

transfer claims fail because Plaintiffs have not plausibly alleged fraudulent intent or the requisite badges of fraud.  And finally, Plaintiff Alameda Research's preference claim fails for a host of reasons, including that it has not alleged an antecedent debt required it to make the alleged preferential transfer, or that Mount Olympus was its creditor.

1.    **The Avoidance Claims Fail Because Each Plaintiff Has Not Pleaded The Statutory Predicates For Asserting Avoidance Claims**

a.    *Allegations Regarding Non-Plaintiff Debtors Are Irrelevant*

In assessing avoidance claims in a multi-debtor case, courts must consider only the facts alleged in respect of the specific transferor.  *See In re HH Liquidation, LLC*, 590 B.R. 211, 261 (Bankr. D. Del. 2018) ("Fraudulent transfer is a statutory remedy that allows creditors to avoid transfers and return property *to a debtor that originally owned it*." (emphasis added)); *see also id.* at 261–271 (separately analyzing fraudulent transfer claims of "Holdings" debtors and "OpCo" debtors); *Adelphia Recovery Tr. v. Bank of Am., N.A.*, 390 B.R. 80, 92–98 (S.D.N.Y. 2008) *aff'd*, 379 F. App'x 10 (2d Cir. 2010) (distinguishing between transferor "Obligor Debtors" and non-transferor "Parent Debtors" in dismissing avoidance claims).

In this case, Plaintiffs make limited allegations about themselves, instead offering a broad narrative about the "Debtors" collectively and the "FTX Group," and consistently conflating Plaintiffs with the Debtors, the "Group," and the "fraud."  *See* Compl. ¶¶ 47–56 (alleging that SBF used Alameda Research LLC, Plaintiff Alameda Research's parent company, to obtain funds for the Transfers as part of "FTX Insiders'" fraud on FTX customers); *id.* ¶¶ 93–100 (alleging that K5 Global and FTX were effectively "merged" and that Kives and Baum attempted to find someone to bail out "the FTX Group"); *id.* ¶¶ 49, 80, 90, (alleging harm to "Plaintiffs, Debtors, and creditors, including customers"); *id.* ¶ 98 (alleging that Kives and Baum benefitted at the expense of "Plaintiffs and their affiliated Debtors"); *id.* ¶¶ 105, 109, 114, 119, 124, 129, 136, 143, 154

(requesting recovery on each of the avoidance actions "for the benefit of the Debtors' bankruptcy estates"). These allegations, and the thoroughgoing attempt to conflate the transactions at issue with a fraud upon the Debtors and FTX customers, are irrelevant. While these cases may be jointly administered, that does not equate the "Debtors" with the "Plaintiffs," and Plaintiffs must—but cannot—plead their own claims as transferors.

> **b.      *Alameda Research Cannot Avoid The Transfers Because It Is Solvent And Avoidance Would Not Benefit Its Creditors***

"Fraudulent transfer claims may not be brought where they offer no benefit to creditors of the transferor's estate." *In re HH Liquidation, LLC*, 590 B.R. at 263. "This rule precludes recovery actions when the transferor is solvent and the transferor's creditors are all being paid in full." *Id.* at 262, 264 ("Many courts have held that fraudulent transfer claims are improper where, as here, the creditors of the transferor are being paid in full." (collecting cases)). Importantly, a "transfer cannot be avoided as a fraudulent transfer or preference . . . when doing so would not benefit any *creditor of the particular debtor that incurred the obligation or made the transfer*." *Id.* at 262 (emphasis added) ("[T]he Bankruptcy Code's avoidance provisions can only be asserted to benefit a creditor of the debtor in question. . . . ." (citations omitted)).[12]

Plaintiff Alameda Research has sworn consistently under penalty of perjury that its determined assets exceed its determined liabilities by at least tens of millions of dollars.[13] *See supra* pp. 10-11; RJN Exs. F, H, J. Accordingly, any recovery on its claims would benefit only

---

[12] A debtor's authority "to avoid a transfer using a creditor's fraudulent transfer action does not mean that the fraudulent transfer action is actually an asset of the debtor in possession[.]" *In re Cybergenics Corp.*, 226 F.3d 237, 243 (3d Cir. 2000).

[13] Both Delaware and federal law generally consider a debtor to be insolvent "if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation." *In re Liquid Holdings Grp., Inc.*, Adv. No. 17-50662 (KG), 2018 WL 2759301, at *19 & n.36 (Bankr. D. Del. June 6, 2018).

equity holders—here, "FTX Insiders"—or creditors of a different entity.   Because Alameda

Research cannot show that avoidance would benefit its creditors, settled law bars its avoidance

claims.  *See, e.g.*, *In re Lewis*, 574 B.R. 536, 539 (Bankr. E.D. Pa. 2017) ("[W]e often overlook

first principles.  At its core, fraudulent transfer law is a debt-collection device and not a revenue

generating tool." (citation omitted)); *Adelphia Recovery Tr.*, 390 B.R. at 94 ("[T]he Bankruptcy

Code's avoidance provisions can only be asserted to benefit a creditor of the debtor in question");

*In re U.S. Glove, Inc.*, No. 21-10172-T11, 2021 WL 2405399, at *7 (Bankr. D.N.M. June 11, 2021)

(same); *In re Refco, Inc. Sec. Litig.*, No. 07MDLNO1902JSR, 2010 WL 11712926, at *5 (S.D.N.Y.

Aug. 26, 2010), *adopted by*, 2010 WL 5129011 (S.D.N.Y. Dec. 14, 2010) ("[F]ederal courts do in

fact dismiss fraudulent transfer claims based on their own assessment of whether there is a

legitimate creditor" who would benefit from avoidance.).

> Alameda Research's avoidance claims (Counts 1-9) therefore fail as a matter of law.[14]

> **c.**     ***Alameda Ventures' Avoidance Claims Should Be Dismissed Because It Alleges That It Never Owned An Interest In The Transferred Funds***

The Bankruptcy Code limits avoidance claims to transfers of "an interest of the debtor in

property," and therefore prohibits avoidance unless "such property interest would have been

available to at least one of the debtor's creditors."  *Bear, Stearns Sec. Corp. v. Gredd*, 275 B.R.

---

[14]  Additionally, plaintiffs asserting fraudulent transfer claims under state law, pursuant to Bankruptcy Code Section 544, must allege the existence of an unsecured "triggering creditor" who could have brought the claim at the time of the alleged transfers.  *In re Cybergenics Corp.*, 226 F.3d at 243 ("The avoidance power provided in section 544(b) is distinct from others because a trustee or debtor in possession can use this power only if there is an unsecured creditor of the debtor that actually has the requisite nonbankruptcy cause of action."); *In re Maxus Energy Corp.*, 641 B.R. 467, 543 (Bankr. D. Del. 2022) (a claim brought under Section 544(b) requires plaintiff to allege existence of a "triggering creditor").  The Complaint's failure to identify *any* creditor, much less a "triggering creditor," is independently fatal to Plaintiffs' fraudulent transfer claims under Delaware law (Counts 5-8).

190, 195 (S.D.N.Y. 2002) (debtor has an interest in the transferred property if it "would have been part of the [debtor's] estate had it not been transferred before the commencement of bankruptcy proceedings" (quoting *Begier v. I.R.S.*, 496 U.S. 53, 58 (1990)); *In re FBI Wind Down, Inc.*, 581 B.R. 116, 147 (Bankr. D. Del. 2018) ("Pursuant to § 548, a trustee may avoid fraudulent transfers that improperly deplete a debtor's assets or dilute claims against those assets."); *In re Demitrus*, 586 B.R. 88, 94 (Bankr. D. Conn. 2018) ("Requiring that transfers subject to avoidance could have been available to creditors comports with the spirit and purpose of fraudulent transfer provisions . . ."). This statutory requirement recognizes that "creditors must actually be harmed in order to avoid a fraudulent transfer." *Bear, Stearns Sec. Corp.*, 275 B.R. at 195, 198–99 (compiling cases and dismissing fraudulent transfer claim because trustee failed to plead the debtor owned an interest in the transferred property).

The Complaint does not allege that any portion of the $300 Million Transfer diminished Alameda Ventures' assets or that any of its creditors would be entitled to the transferred funds. In fact, Alameda Ventures' factual relevance in the Complaint is confined to a single sentence in paragraph 80:

> On March 8, 2022—the day after the Term Sheet was executed and before SGN Albany even existed—Bankman-Fried caused Alameda Research Ltd. to wire $300 million to Alameda Ventures, and he directed Alameda Ventures the same day to wire the $300 million received from Alameda Research Ltd. to K5 Global . . .

Plaintiffs assert that SBF controlled both Plaintiffs, and that he routed the money through Alameda Ventures for a matter of hours. Alameda Ventures' fraudulent transfer claims must therefore fail because Plaintiffs' allegations are plainly insufficient to establish that Alameda Ventures owned an interest in the $300 million, or that its creditors were harmed by the $300 Million Transfer.

REDACTED VERSION

In *In re Chase & Sanborn Corp.*, the Eleventh Circuit considered whether a controlling principal's two-day transfer to a debtor was sufficient to establish that the money was property of the debtor's estate.  813 F. 2d 1177, 1181 (11th Cir. 1987).  The court found that "the actual connection between the funds and the debtor was quite tangential" and that a "two-day layover" of the principal-controlled funds was insufficient to establish the funds were property of the estate. *Id*. at 1182.  The court thus held "the transfer is not avoidable," and that to "conclude otherwise would confer on the creditors a windfall[.]"  *Id*.; *cf. In re Gutpelet*, 137 F.3d 748, 752 (3d Cir. 1998) (noting that the debtor holding "title to [the money] for five months" is "hardly tangential," unlike the "two-day layover" in *Chase*); *see also In re Montreal, Maine & Atl. Rwy., Ltd.*, 888 F.3d 1, 10 (1st Cir. 2018) (affirming dismissal of fraudulent transfer claim because "debtor was a mere transfer station along the road to payment . . . [and t]hus, it lacked a cognizable property interest in" the transferred funds (internal quotation omitted)); *In re Lewis*, 574 B.R. at 540 (dismissing fraudulent transfer claim where debtor never held an interest in transferred funds, as "[p]ermitting the Trustee to proceed with this litigation would enable fraudulent transfer avoidance statutes to be used improperly as revenue generating tools").

Here, Plaintiffs allege that SBF controlled both Plaintiffs and that SBF routed the money through Plaintiff Alameda Ventures for a matter of hours before directing the wire to K5 Global Holdings, LLC—less time than the two days in *Chase*.  Alameda Ventures' alleged "tangential" connection to the funds is therefore insufficient to satisfy the statutory predicate to avoid transfers. All of Alameda Ventures' avoidance claims should therefore be dismissed.[15]

---

[15] Assuming *arguendo* that Alameda Ventures is a proper Plaintiff, Plaintiffs may explain the inconsistency of their Complaint with their SOALs by asserting (a) that the SOALs are preliminary and subject to (20 pages of) notes and caveats; and (b) in any event, the SOALs now demonstrate the insolvency of Alameda Ventures.  With regard to the first argument, if the Plaintiffs are uncertain whether they are or will be solvent, then the present dispute is not ripe. *See In re Energy*

**2.      Plaintiffs' Constructive Fraudulent Transfer Claims (Counts 3-4 And 7-8) Fail For The Additional Reason That Plaintiffs Have Not Pled, And Cannot Plead, Insolvency At The Time Of The Transfers**

A plaintiff cannot maintain a constructive fraudulent transfer claim under the Bankruptcy Code or Delaware law unless the transferor was "insolvent" at the time of the transfer, became insolvent as a result of the transfer, or the transfer would have left the transferor without the ability to pay its debts.[16]  *See* 11 U.S.C § 548(a)(1)(B); Del. Code Ann. tit. 6 §§ 1304(a)(2), 1305; *In re USDigital, Inc.*, 443 B.R. at 38.  Notably, "there is no presumption of insolvency" for a fraudulent transfer claim.  *In re Insys Therapeutics, Inc.*, Adv. No. 21-50359 (JTD), 2021 WL 5016127, at *5 (Bankr. D. Del. Oct. 28, 2021).  Accordingly, a plaintiff must do much more than simply recite the statutory requirements.  *Id.* (dismissing fraudulent transfer claim where "the complaint merely recites the language of [Section 548]").  Specifically, there must be "financial data or analysis provided so that the court can infer the company's liabilities exceeded its assets at the time the transfers in question took place."  *In re Liquid Holdings Grp., Inc.*, Adv. No. 17-50662 (KG), 2018 WL 2759301, at *19 (Bankr. D. Del. June 6, 2018) (quoting *In re Trinsium Grp.*, 460 B.R. 379, 392 (Bankr. S.D.N.Y. 2011)).

---

*Future Holdings Corp.*, 531 B.R. 499, 514 (Bankr. D. Del. 2015) (dispute not ripe where solvency and other contingencies presumed but not established).  With regard to the second, the insolvency of Alameda Ventures is premised on intercompany claims that the Debtors propose to "cancel, release, otherwise settle in full" with no distributions pursuant to a "Global Settlement."  *See* RJN ¶ 14, Ex. N at 27 (Debtors' July 31, 2023 Draft Plan of Reorganization – Term Sheet).  Elimination of the intercompany claims would render Alameda Ventures solvent, thus barring its avoidance claims.  *See Adelphia Recovery Tr.*, 390 B.R. at 95–97 (where confirmed plan resolves intercompany claims, such claims cannot be relied upon for purposes of establishing standing).

[16] The elements for a constructive fraudulent transfer claim under Bankruptcy Code Section 548 are virtually identical to the elements for constructive fraudulent transfer under Delaware law.  *In re PennySaver USA Pub., LLC*, 602 B.R. 256, 265 (Bankr. D. Del. 2019) ("Delaware [has] adopted the UFTA, rendering the elements for the State and Federal law claims essentially the same . . .").

Here, Plaintiffs' failure to plead insolvency at the times of the Transfers is fatal to their constructive fraudulent transfer claims. Indeed, courts routinely dismiss constructive fraudulent transfer claims where the complaint fails to set forth facts about the transferor's finances that, if proven, would establish the transferor was insolvent at the time of the purportedly fraudulent transfer. *See, e.g., In re USDigital, Inc.*, 443 B.R. at 39 (dismissing constructive fraudulent transfer claim because "Trustee has failed to provide any support to the factual allegations that [debtor] was insolvent or was rendered insolvent" at the time of the transfer); *In re CRC Parent Corp.*, Adv. No. 12-50702 (MFW), 2013 WL 781603, at *5 (Bankr. D. Del. Mar. 1, 2013) (dismissing constructive fraudulent transfer claim because complaint was devoid of ultimate facts to support insolvency); *In re Glob. Link Telecom Corp.*, 327 B.R. 711, 718 (Bankr. D. Del. 2005) (dismissing constructive fraudulent transfer claim because the complaint "present[ed] no information on the Debtors' financial status" beyond reciting the "statutory elements"); *In re Live Well Fin., Inc.*, No. 19-11317 (LSS), 2023 WL 4025816, at *8 (Bankr. D. Del. June 14, 2023) ("Merely alleging that [debtor] . . . had unreasonably small capital . . .[or] incurred, intended to incur, or believed it would incur debts beyond its ability to repay, without any facts to support such assertions, will not defeat a motion to dismiss."); *In re F-Squared Inv. Mgmt., LLC*, Adv. No. 17-50716 (LSS), 2019 WL 4261168, at *16 (Bankr. D. Del. Sept. 6, 2019) ("Because I can draw no reasonable inferences as to assets or the magnitude of liabilities relative to assets from the facts alleged in the Complaints . . . I cannot reasonably infer insolvency.").

Here, Plaintiffs have failed to allege *any* facts, much less sufficient facts, to support Plaintiffs' claim that they were insolvent at the time of the Transfers. In fact, the Complaint is entirely devoid of any factual allegations describing Plaintiffs' financial condition at any point in time. Instead, Plaintiffs offer only conclusory and perfunctory statements that track the statutory

requirements for insolvency almost verbatim—the precise type of pleading that courts routinely reject as inadequate.  *See, e.g.*, Compl. ¶ 101(v) ("Plaintiffs were insolvent when, or became insolvent shortly after, the transfers were made[.]"); *id.* ¶¶ 113, 118, 134, 141 (reciting statutory requirements for insolvency).  Plaintiffs' threadbare recitals and conclusory statements of insolvency as of the time of the transaction are insufficient to state a claim for constructive fraudulent transfer, and particularly so in light of Plaintiff Alameda Research's sworn solvency as of the petition date.  *See In re Cred Inc.*, 650 B.R. at 813, 835–36 (recitals and conclusory statements are insufficient); *In re Groff*, 2011 WL 6140744, at *3 (dismissing avoidance claims because, in part, plaintiffs' schedules showed they were solvent as of the petition date).  Accordingly, Counts 3, 4, 7, and 8 must be dismissed.

### 3.     Plaintiffs' Claims For Actual Fraudulent Transfer (Counts 1-2 And 5-6) Fail Because Plaintiffs Have Not Plausibly Alleged An Actual Intent To Hinder, Delay, Or Defraud Creditors

In addition to and independent of the reasons provided above, *see supra* pp. 14–18, Plaintiffs' actual fraudulent transfer claims (Counts 1-2 and 5-6) fail because Plaintiffs have not come close to pleading facts from which the Court could infer that the transferor had an "actual intent to hinder, delay or defraud" Plaintiffs' creditors, much less allege those facts "with particularity," as required by "the elevated pleading standards" of Rule 9(b).  *In re Cred, Inc.*, 650 B.R. at 834; *see also Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 495, 520 (D. Del. 2012) (complaint failed to state actual fraudulent transfer claim where it failed to "allege with any specificity facts or other supporting information which would establish the fraudulent nature of [the alleged] transactions"); 11 U.S.C. § 548(a)(1)(A); Del. Code Ann. tit. 6 § 1304(a)(1).[17]

---

[17] Again, "Delaware's Section 1304(a)(1) imposes the same requirements as Bankruptcy Code § 548(a)(1)(A).  The pleading requirements for both the state and federal claims are identical." *In re PennySaver USA Publ'g, LLC*, 602 B.R. at 270; *In re Cred Inc.*, 650 B.R. at 833 n.97 ("The

To begin with, Plaintiffs must allege an actual intent to hinder, delay, or defraud their respective creditors. *In re H.H. Liquidation*, *LLC*, 590 B.R. at 265 ("The statutory text is clear: 11 U.S.C. § 548 only allows courts to avoid transfers made with an intent to defraud the *transferor's* creditors." (emphasis added)). Plaintiffs do not assert any allegations with respect to their creditors. Indeed, Plaintiffs do not identify any of their creditors, much less allege that they were hindered, delayed, or defrauded. Accordingly, Plaintiffs have failed to plead facts regarding key elements of their claims, and there is immediate cause to dismiss Plaintiffs' actual fraudulent transfer claims.[18]

Were this deficiency alone not sufficient to dismiss Plaintiffs' actual fraudulent transfer claims (it is), the claims would nevertheless fail because Plaintiffs do not allege fraudulent intent in connection with the Transfers. Plaintiffs rely on allegations regarding SBF's bad acts as a general matter to state a claim against the K5 Defendants in particular. But "just because a debtor is involved in a fraudulent scheme does not mean that every transfer made by that debtor is made with fraudulent intent"; rather, "*the plaintiff must show that the alleged fraudulent intent is related to the transfers sought to be avoided.*" *In re Rollaguard Security, LLC*, 570 B.R. 859, 878–79 (Bankr. S.D. Fla. 2017) (emphasis added) (quoting *In re Sharp Int'l Corp.*, 403 F.3d 43, 56–57 (2d Cir. 2005)) (obtaining funds by fraud does not mean subsequent transfer of those funds is

---

standards for actual fraudulent transfer under the Bankruptcy Code and Delaware law are not materially different for purposes of this Motion [to dismiss].").

[18] Plaintiffs' fraudulent transfer claims exemplify the Complaint's impermissible and pervasive group pleading that fails to satisfy the *Twombly/Iqbal* pleading standard, much less Rule 9(b)'s elevated pleading standard that fraudulent transfer claims must satisfy. *See supra*, n.11. Although the Complaint alleges that K5 Global Holdings, LLC and Mount Olympus were the only transferees to whom Plaintiffs made the allegedly fraudulent transfers, Plaintiffs' claims for fraudulent transfer (Counts 1-8) include a host of other K5 Defendants that are not alleged to have ever received money purportedly originating from Plaintiffs.

fraudulent)).  Thus, Plaintiffs' general allegations regarding bad acts are meaningless in the context of Plaintiffs' actual fraudulent transfer claims against the K5 Defendants specifically.

Courts evaluating whether a plaintiff has sufficiently pled "actual" fraudulent intent look for allegations that can evidence fraudulent intent—referred to as "badges of fraud"—including: "[1] the relationship between the debtor and the transferee; [2] consideration for the conveyance; [3] insolvency or indebtedness of the debtors; [4] how much of the debtor's estate was transferred; [5] reservation of benefits, control or dominion by the debtor over the property transferred; and [6] secrecy or concealment of the transaction."  *In re Cred Inc.*, 650 B.R. at 834; *see also In re PennySaver USA Publ'g, LLC*, 602 B.R. at 270 (noting that Delaware's statutory badges of fraud "are incorporated through case law into § 548" and "[t]hus, in evaluating the actual fraud allegations, this Court need only evaluate the elements of § 548 as the elements for the state transfer claims are substantially the same").  Conclusory statements regarding the existence of badges of fraud are insufficient; factual allegations to support these statements are required.  *In re Cred Inc.*, 650 B.R. at 834 (dismissing actual fraudulent transfer claim where "only conclusory statements" were offered rather than "[f]acts to support" existence of badges of fraud).

Here, Plaintiffs vaguely allege that the K5 Defendants "are the initial, immediate, or mediate transferees" (*see* Compl. ¶ 157) and that SGN is merely a "mediate transferee" (*id.* ¶ 164), with SBF somehow having such a "close relationship" with the K5 Defendants that they allegedly would participate in the purported fraudulent transfer (*id.* ¶¶ 93–98).  Of course, the K5 Defendants indisputably were non-insider third parties at the time of the K5 Transaction, and thus negotiated an arm's-length deal in which both sides were incentivized to achieve the best deal possible. Unsurprisingly then, Plaintiffs have failed to plead any badge of fraud; and even if they had adequately pled one or two badges of fraud, that still would be insufficient to state a claim.  *See,*

*e.g.*, *In re J&M Sales, Inc.*, Adv. No. 20-50775 (JTD), 2021 Bankr. LEXIS 2268, at *95 (Bankr. D. Del. Aug. 20, 2021) ("[T]he Complaint] can only be read to allege at most two badges of fraud . . . (I) inadequate consideration and (II) the insolvency of the debtors.  These two alleged badges of fraud, . . . however, are insufficient to support a claim for actual fraudulent conveyance."); *In re Sportco Holdings, Inc*., Adv. No. 20-50554 (JKS), 2021 WL 4823513, at *15 (Bankr. D. Del. Oct. 14, 2021) (pleading "lack of consideration" badge of fraud is "insufficient as circumstantial evidence of intent to defraud"); *Zazzali*, 482 B.R. at 520 (holding that only one badge of fraud "is insufficient as a matter of law" to state a claim).

       1.    **There was no special relationship between Plaintiffs and the K5 Defendants**. A special relationship between the debtor and transferee exists where the debtor (or an insider) retains control of the funds post-transfer (*i.e.*, is on both sides of the transaction) or where the transfer is not negotiated at arm's length.  *See In re Cred Inc.*, 650 B.R. at 834 (finding this badge of fraud not present where there were "no facts alleged that support the conclusion that [debtor's CEO] negotiated on both sides of the  . . .transaction"); *In re Fedders N. Am., Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009) (dismissing actual fraudulent transfer claim where complaint indicated "arm's length relationship" between defendant and debtor).

       The Complaint alleges no such relationship between Plaintiffs and any K5 Defendant.  In fact, Plaintiffs do not allege any facts challenging that SBF—who was considered one of the most sophisticated financial investors in the world—had every incentive to negotiate the best deal he could for SGN, Plaintiffs, and/or himself, even if Plaintiffs had misappropriated funds.[19] Accordingly, Plaintiffs have failed to plead this badge of fraud.

---

[19] Notably, the Complaint does not allege the transferees were Plaintiffs' insiders, and instead generally pleads only that the principals of the transferees somehow possessed an "insider

**2.  *The Transfers were supported by substantial consideration.***  Plaintiffs do not dispute

that Kives and Baum gave up a one-third interest in their GPs and certain investment holding

companies (*see supra* pp. 4–9), or that ███████████████████████████████████████

███████████████████████████████. Thus, there can be no legitimate dispute that the

K5 Defendants provided substantial consideration as part of the K5 Transaction.  *See In re Cred*

*Inc.*, 650 B.R. at 834–35 (holding debtors failed to plead a lack of consideration where complaint

admitted the counterparty performed the services required by the contract).

Plaintiffs instead allege that Plaintiff Alameda Research paid the money for SGN's benefit,

and that Alameda Research owned only 8.33% of SGN.  *See* Compl. ¶¶ 35, 80–81.  In other words,

Plaintiffs contend that one SBF-controlled entity (Plaintiff Alameda Research) invested in K5

Global for the benefit of another SBF-controlled entity (SGN), both of which exhibited a "near-

total disregard for corporate formalities" (*see id*. ¶ 9), but that Plaintiffs somehow did not receive

the value.  Plaintiffs' transparent attempt to distance themselves from SGN's significant

investments is insufficient to allege the Transfers were not supported by fair consideration.  *In re*

*Essar Steel Minn. LLC*, Adv. No. 18-50555, 2020 WL 6820953, at *3 (Bankr. D. Del. Oct. 15,

2020) (holding "there could be no fraudulent transfer claims" where complaint acknowledged the

transferor and the transferee was effectively "a single enterprise").[20]

**3.  *Plaintiffs were solvent at the time of the Transfers.***  As discussed above, Plaintiffs

have not sufficiently pled that they are or ever have been insolvent.  *See supra* pp. 10–11, 19-21.

To the contrary, their prior sworn SOALs showed that Plaintiffs believed both Plaintiffs were

---

perspective" on the "FTX Group"—which Plaintiffs define as all Debtors in the chapter 11 cases.
*See* Compl. ¶ 99; *id.* ¶38 n.6.

[20] In any event, Plaintiffs will likely have a court order soon confirming that Plaintiffs are the
owners of SGN's substantial investments.

solvent just months after the Transfers, and Plaintiff Alameda Research's current SOAL still shows that it was solvent as of the petition date. *Id.* Indeed, Plaintiffs have not identified any specific point in time when they believe they became insolvent, much less allege a "temporal proximity" between their insolvency and the Transfers, which precludes them from establishing this badge of fraud. *See In re Cred Inc.*, 650 B.R. at 835.

*4. **Plaintiffs do not allege how much of the estate was transferred.*** Plaintiffs have failed to allege this badge, as the Complaint contains no facts regarding what percentage of the Plaintiffs' estates the Transfers constituted.

*5. **Plaintiffs did not retain control over the funds.*** Plaintiffs have not alleged this badge of fraud, as the Complaint contains no allegations that Plaintiffs continued to control or dominate the funds conveyed in the Transfers.

*6. **Plaintiffs have not adequately alleged the transaction was concealed.*** Plaintiffs conclusorily allege that "[n]umerous material facts relating to those transfers were concealed," but fail to allege what material facts were purportedly concealed, who concealed those facts, how they were concealed, when they were concealed, or from whom they were concealed. Compl. ¶ 101(ii).

In summary, Plaintiffs' Complaint falls well short of satisfying Plaintiffs' heightened burden to plead facts with particularity that would allow this Court to infer actual intent to defraud Plaintiffs' creditors. Plaintiffs' actual fraudulent transfer claims should therefore be dismissed.

### 4. Alameda Research's Claim For Preferential Transfer Of The $100 Million Capital Contribution (Count 9) Fails

Alameda Research's preference claim pursuant to Bankruptcy Code Section 547 is a futile attempt to fit a square peg in a round hole. To establish that a transfer was a preference, a plaintiff must plead facts demonstrating, among other things, that the transfer was made: "(1) to or for the

benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; and (3) made while the debtor was insolvent."  11 U.S.C. § 547(b)(1)–(3).

Plaintiffs' claim that the September 20, 2022 $100 million capital contribution to Mount Olympus constituted a preferential transfer fails because: (1) the Subscription Agreement alone does not constitute a "debt," much less an "antecedent debt," particularly where Plaintiffs do not allege there was a capital call that obligated Alameda Research to make the alleged preferential transfer; (2) Plaintiffs do not allege that any K5 Defendant was a creditor of Alameda Research at the time of the contribution; and (3) Alameda Research's sworn statements regarding its assets rebut any presumption that it was insolvent at the time of the capital contribution.

### a.    *Plaintiffs Fail To Allege The $100 Million Payment Was Made On Account Of An Antecedent Debt*

Preference claims fail unless there is a legal obligation to pay that arises prior to the payment.  "The Third Circuit has said that for a debt to be antecedent, 'the debt must have been incurred before the transfer was made.'"  *In re NewPage Corp.,* 569 B.R. 593, 599 (D. Del. 2017) (quoting *In re First Jersey Secs., Inc.*, 180 F.3d 504, 510 (3d Cir. 1999)).  "In order to determine when a debt was incurred—and whether it was 'incurred before the transfer was made'—courts look to 'when the debtor becomes legally obligated to pay.'"  *Id.* (quoting *In re Phila. Newspapers, LLC*, 468 B.R. 712, 722 (Bankr. E.D. Pa. 2012)).  "[A]n antecedent debt owed by the debtor occurs when a right to payment arises."  *Id.* (quoting *First Jersey*, 180 F.3d at 511).  Accordingly, "[i]t is well established that advance payments are prima facie not preferences because the transfer from the debtor to the creditor is not for or on account of an antecedent debt."  *In re Hechinger Inv. Co. of Del., Inc.*, No. 01-3170 (PBL), 2004 WL 3113718, at *2 (Bankr. D. Del. Dec. 14, 2004).

At the outset, the Complaint fails to allege the existence of any "debt" to support its preference claim, as SGN's subscription agreement with Mount Olympus, without a capital call,

does not give rise to a "claim" against SGN. *See* 11 U.S.C. 101(12) (defining debt as "liability on a claim"). Under both the subscription agreement and the Mount Olympus partnership agreement, SGN is obligated to fund capital only if there were a capital call, and the Complaint does not allege that Mount Olympus ever issued a capital call that created a legal obligation to fund the $100 million, much less a legal obligation by Alameda Research. *See* Reiss Decl. Exs. 7–8; *In re Tribune Co. Fraudulent Conveyance Litig.*, 10 F.4th 147, 173 (2d Cir. 2021) (contractual obligation that is not due until later triggering event is not antecedent debt); *In re NewPage Corp.*, 569 B.R. at 599 (a "payment in advance" does not qualify as a payment on account of an antecedent debt).[21] Count 9 must be dismissed because Plaintiffs have failed to allege an antecedent debt.

> **b.      *The Preference Claim Fails Because Alameda Research Fails To Allege Mount Olympus Was Its Creditor For The $100 Million Payment***

A preference claim fails unless the transfer was made "to or for the benefit of a creditor." 11 U.S.C. § 547(b)(1); *see also In re Venoco LLC*, 998 F.3d 94, 103 n.7 (3d Cir. 2021) (preferential transfers are "payments made by the debtor *to a creditor* within a short time before the bankruptcy filing that improve (hence 'prefer') the creditor's recovery from what it would otherwise receive in the bankruptcy." (emphasis added)). This statutory requirement obligates a plaintiff to allege a "relationship between the debtor and the creditor or an obligation consensually entered into or required by law." *In re Bake-Line Grp., LLC*, 359 B.R. 566, 577 (Bankr. D. Del. 2007). "In a case with multiple debtors, as here, the Complaint must sufficiently allege which debtor owed the antecedent debt and that the same debtor made the preferential transfer." *In re THQ Inc.*, No. 12-

---

[21] Even if Plaintiffs had alleged that Mount Olympus made a capital call that obligated Alameda Research to make a capital contribution, a capital contribution is not a payment "made on account of an antecedent debt." *In re Oakland Physicians Med. Ctr., L.L.C.*, 596 B.R. 587, 624 (Bankr. E.D. Mich. 2019), *aff'd* 2021 WL 4077546 (6th Cir. Sept. 8, 2021) ("[T]he Advances were capital contributions and, therefore, the transfers were not on account of an antecedent debt").

13398 (MFW), 2016 WL 1599798, at *3 (Bankr. D. Del. Apr. 18, 2016) ("[W]here the obligation which is satisfied is not owed by the debtor, there is no transfer which is subject to recovery under [Section] 547(b)")).[22]

Plaintiffs do not allege *any* facts supporting their conclusory statement that the "Mount Olympus Transaction Defendants were creditors of Plaintiff Alameda Research . . . or, alternatively, all or some of these Defendants received the [$100 million] for the benefit of a creditor or creditors of Plaintiffs."[23] Compl. ¶ 148. This allegation is woefully insufficient to support a preference claim. Indeed, Plaintiffs do not allege to which entity the money was owed, why Alameda Research was obligated to pay any money, or when any money was due.[24] On this basis alone, Alameda Research's preference claim fails. *See In re Southmark Corp.*, 138 B.R. 831, 833 (Bankr. N.D. Tex. 1992), *aff'd* 993 F.2d 117 (5th Cir. 1993) (dismissing preference claim because defendant "was not a creditor based on a claim underlying the transfer challenged under § 547"); 11 U.S.C. § 101(10)(A) (defining creditor as "[an] entity that has a claim against the debtor that arose at the time of or before the [debtor's] order for relief").

---

[22] *See also In re Mulkanoor*, 595 B.R. 795, 817 (Bankr. N.D. Ill. 2018) (plaintiff unable to recover alleged preferential transfers to defendants because he was "not liable on the note" between plaintiff's wife and defendants, *i.e.*, defendants were not *his* creditors); *In re Hertzler Halstead Hosp.*, 334 B.R. 276, 286 (Bankr. D. Kan. 2005) ("The [debtor] was in no manner indebted to [defendant 1]. [Defendant 2] made the short-term payroll advances to the [debtor]. [Defendant 1] has no claim against the [debtor]. [Defendant 1] cannot, therefore, be considered a creditor. Thus, the payments to [defendant 1] are not avoidable as preferences under § 547(b).").

[23] As further evidence of Plaintiffs' impermissible group pleading, the Complaint defines the "Mount Olympus Transaction Defendants," *i.e.*, the purported creditors of the alleged preferential transfer, to include *seven different K5 Defendants*. *See* Compl. ¶ 34; *see also supra*, n.11.

[24] Any allegation that the money was paid "for the benefit of a creditor" would not make sense, as Plaintiffs allege the money was paid on behalf of SGN, and according to the Complaint, SGN owed money to Plaintiffs, not the other way around. *See* Compl. ¶¶ 89-92; *id.* ¶¶ 175-80 (claiming SGN was unjustly enriched at Plaintiffs' expense).

   **c.**      ***The Preference Claim Fails Because Alameda Research's Sworn Schedules Rebut The Presumption That It Was Insolvent At The Time Of The Transfer***

Preference claims are dismissed where, like here, a plaintiff fails to plead facts establishing that it was insolvent at the time of the transfer *and* its SOALs demonstrate that it was solvent as of the petition date. *See supra* pp. 10-11, 19-21; *In re Groff*, 2011 WL 6140744, at *3 (dismissing preference claim where plaintiffs included conclusory allegations of insolvency at the time of the relevant transfer and plaintiffs' schedules showed they were solvent as of the petition date).

   **d.**      ***Alameda Research Failed To Satisfy The Due Diligence Requirement Before Bringing The Preference Claim***

Pursuant to recent amendments to Section 547, Plaintiffs' preference claim is barred unless it is "based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses under subsection (c) . . ." 11 U.S.C. § 547(b) (as amended by the Small Bus. Reorganization Act, Pub. L. 116-54, effective Feb. 19, 2020). This Court recently held that "the due diligence requirement is an element of a preference claim." *In re Pinktoe Tarantula Ltd.*, Adv. No. 20-50597 (LSS), 2023 WL 2960894, at *5 (Bankr. D. Del. Apr. 14, 2023) (dismissing preference claim for failure to plead due diligence).

Plaintiffs again merely recite the statutory language to plead they satisfied this requirement. Compl. ¶ 153. However, Plaintiffs' lack of diligence before filing this rushed Complaint is evident from the several errors riddled throughout (including getting SGN's name wrong—it is "SGN Albany ***Capital*** LLC"), the lack of clarity surrounding the source of the funds at issue, and a host of other flaws. Plaintiffs' recitation of the due diligence element, without facts, is insufficient to satisfy the statute. *See In re Center City Healthcare, LLC*, 641 B.R. 793, 802 (Bankr. D. Del. 2022) (factual allegations including demand letter "inviting an exchange of information regarding any potential defenses with respect to the Transfers" satisfied due diligence requirement).

**B.**     **Plaintiffs' Property Recovery And Disallowance Claims Should Be Dismissed**

    **1.**     **Plaintiffs' Property Recovery Claims (Counts 10-11) Fail Because The Transfers Are Not Avoidable**

When an avoidance claim is dismissed, the corresponding claim for recovery must also be dismissed.  *See In re Aphton Corp.*, 423 B.R. 76, 92 (Bankr. D. Del. 2010) (dismissing claim for property recovery "because the [fraudulent transfer] claim . . . has been dismissed"); *In re USDigital, Inc.*, 443 B.R. at 40 ("The claims under section 550 . . . fail because the transfers at issue are unavoidable.").  Because the Complaint fails to allege a claim for fraudulent or preferential transfer, Plaintiffs' corresponding claims for property recovery should be dismissed.

    **2.**     **Plaintiffs' Disallowance Claim Under Section 502(d) Of The Bankruptcy Code (Count 16) Fails**

Section 502(d) of the Bankruptcy Code requires disallowance of any claim of an entity which is a transferee of an avoidable transfer, or from which property is recoverable on account of an avoidable transfer.  Plaintiffs' Sixteenth Count simply restates Section 502(d) without pleading which K5 Defendant's claim Plaintiffs believe should be disallowed—perhaps because the K5 Defendants have not asserted any claims.  As the K5 Defendants have not filed a proof of claim against Plaintiffs, this claim must be dismissed.  *See In re The Brown Schs.*, 368 B.R. 394, 414 (Bankr. D. Del. 2007) ("Because there is no filed proof of claim against the estate to be disallowed or subordinated, this request for relief is futile.  Consequently, the Court will dismiss this count . . .").  Regardless, Plaintiffs would not be entitled to disallowance because they cannot avoid the Transfers.  *See supra* pp. 13-30.  Accordingly, Count 16 must be dismissed.

**C.**     **Plaintiffs' Claims For Aiding And Abetting Breach Of Fiduciary Duty (Count 13) And Dishonest Assistance (Count 14) Fail For Several Reasons**

Plaintiffs' claims for aiding and abetting breach of fiduciary duty under Delaware law and its BVI analogue—"dishonest assistance"—require Plaintiffs to plead facts establishing that

(1) SBF breached his fiduciary duties to Plaintiffs by making the Transfers; (2) Kives and Baum participated in those Transfers; and (3) Kives and Baum *participated while knowing those Transfers constituted a breach of SBF's fiduciary duties*.

However, Plaintiffs do not allege a single fact to suggest Kives or Baum participated in, or knew anything about, the mechanics of the Transfers, including whether the money originated with Plaintiffs or whether Plaintiffs retained an economic interest in the investments (and if so, how much). In any event, the accusation that Kives or Baum "knew" that SBF was breaching his fiduciary duties when the entire world—presumably including FTX's former General Counsel and Sullivan & Cromwell LLP partner, until recently, Ryne Miller—believed SBF was a sophisticated and trusted financier is, frankly, absurd. *See* RJN ¶¶ 2–4, Exs. B–D (*Forbes*, *Reuters*, and *New York Times* articles discussing SBF's "record fortune"); *see id.* Ex. A (publicly reporting that FTX's "high profile investors" included Sequoia Capital, BlackRock, and Iconiq Growth).

Counts 13 and 14 are also barred by the doctrine of unclean hands, which courts regularly apply to dismiss similar claims in which the plaintiff was effectively dominated by a principal who is alleged to have breached his fiduciary duties. Here, the Complaint acknowledges that Plaintiffs were controlled by SBF—his alleged wrongdoing thus precludes Plaintiffs from maintaining a claim against Kives and Baum for purportedly assisting in that wrongdoing.

### 1.    Alameda Ventures Has Not Stated A Claim For Aiding And Abetting Breach Of Fiduciary Duty

#### a.    *Alameda Ventures Has Not Pled Facts Showing That Kives And Baum Knowingly Participated In A Breach Of Fiduciary Duty*

Count 13 alleges that Kives and Baum assisted SBF in breaching his fiduciary duties to Alameda Ventures—the entity through which SBF allegedly routed the $300 Million Transfer. Because Alameda Ventures' allegations are grounded in allegedly fraudulent conduct, this claim must satisfy the more exacting Rule 9(b) pleading standard. *See In re Liquid Holdings Grp., Inc.*,

2018 WL 2759301, at *15.  However, the allegations fall short even of Rule 8(a)'s pleading standard, as Alameda Ventures has not alleged a single, non-conclusory fact to support its baseless accusation that Kives and Baum aided and abetted SBF's alleged breach of his fiduciary duties.

To establish a claim for aiding and abetting a breach of fiduciary duty under Delaware law, a plaintiff must allege:  "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach."  *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).  The critical third element—"knowing participation"—"requires a showing that the defendant both (1) ***participated*** in the breach and (2) ***knew*** at the time that the conduct assisted constituted a breach of fiduciary duty."  *In re NewStarcom Holdings, Inc.*, 547 B.R. 106, 119 (Bankr. D. Del. 2016) (emphases added).  "[P]articipation must take the form of substantial assistance to the primary violator," which "by definition, implies active participation or affirmative action."  *In re Cred, Inc.*, 650 B.R. at 828 (first quoting *Lockton v. Rogers*, C.A. No. 2021-0058-SG, 2022 WL 604011, at *16 (Del. Ch. Mar. 1, 2022), then quoting *In re DSI Renal Holdings, LLC*, Adv. No. 14-50356 (KBO), 2020 WL 7054390, at *6 (Bankr. D. Del. Dec. 2, 2020)).

Participation is not "knowing"—that is, done with the requisite scienter—unless "the aider and abettor had actual or constructive knowledge that their conduct was legally improper."  *Id.* at 822 (citation omitted); *see Binks v. DSL.net, Inc.*, C.A. No. 2823-VCN, 2010 WL 1713629, at *10–11 (Del. Ch. Apr. 29, 2010) (dismissing aiding and abetting claim, holding "[t]he standard for an aiding and abetting claim is a stringent one, one that turns on proof of scienter of the alleged abettor [and ] . . . evidence of arm's-length negotiation with fiduciaries . . . precludes a showing that the defendants knowingly participated in the breach by the fiduciaries").  "Actual knowledge requires that the alleged aider and abettor act knowingly, intentionally, or with reckless

indifference . . . whereas constructive knowledge may be found only if a fiduciary breaches its duty in an inherently wrongful manner by engaging in conduct so egregious so as to put a third party on notice of a breach." *In re DSI Renal Holdings, LLC*, 2020 WL 7054390, at *6. Conclusory allegations that a defendant "knew or should have known" of an underlying breach of fiduciary duty are not sufficient to plead a claim of aiding and abetting. *In re Draw Another Circle*, 602 B.R. 878, 904 (Bankr. D. Del. 2019) ("'Should have known' is not enough to plead a claim for aiding and abetting"). And "purportedly suspicious circumstances . . . coupled with bald assertions of knowledge" are likewise "insufficient to survive [a] motion to dismiss." *In re Syntax-Brillian Corp.*, 573 F. App'x 154, 163 (3d Cir. 2014); *In re Cred, Inc.*, 650 B.R. at 823 ("The presence of suspicious circumstances alone is not enough.").

Here, Plaintiffs allege only ***one sentence*** describing SBF's alleged breach of fiduciary duty to Alameda Ventures: "Bankman-Fried caused Alameda Research Ltd. to wire $300 million to Alameda Ventures, and he directed Alameda Ventures the same day to wire the $300 million received from Alameda Research Ltd. to K5 Global." Compl. ¶ 80.[25] Plaintiffs thus rely entirely on the conclusory allegation that Kives and Baum "knew that the K5 Transaction did not provide and had virtually no prospect of providing [Alameda Ventures] with reasonably equivalent value, and that SBF personally benefited from the K5 Transaction." *Id*. ¶ 168. But that allegation falls exceedingly short of pleading that Kives or Baum ***knew about*** SBF's purported breach of fiduciary duty to Alameda Ventures. For example, among other things, the Complaint does not allege that Kives or Baum knew: (i) that Alameda Ventures existed; (ii) that the funds were wired from

---

[25] Importantly, this sole factual allegation is insufficient to allege, as Plaintiffs must, that Alameda Ventures' transfer of funds was a breach of SBF's duties *to Alameda Ventures* or that the alleged breach caused harm *to Alameda Ventures*, because Plaintiffs fail to allege that Alameda Ventures ever owned a property interest in the $300 million that was simply routed through its account. *See, supra* pp. 16-18; *Malpiede*, 780 A.2d at 1096. On this basis alone, the claim fails.

Alameda Ventures; (iii) that SBF transferred funds from Alameda Research to Alameda Ventures; or (iv) how SBF breached his fiduciary duties to Alameda Ventures by moving funds into and out of its account.

The Complaint also does not explain how Kives or Baum purportedly **_participated_** in any alleged breach of fiduciary duty, or what assistance SBF needed to route funds through bank accounts he controlled.   The notion that Kives or Baum could aid and abet SBF's purported breaches of his fiduciary duties _when they were on the opposite side of a transaction_ that was negotiated at arm's length is nonsensical and incorrect as a matter of law.  _See Malpiede_, 780 A.2d at 1097 (attempts to reduce the sale price through arm's-length negotiations cannot give rise to liability for aiding and abetting); _In re Xura, Inc. S'holder Litig._, C.A. No. 12698-VCS, 2019 WL 3063599, at *3 (Del. Ch. July 12, 2019) (dismissing aiding and abetting claim against counterparty to transaction, holding "it is not enough to allege that [the alleged abettor] drove a hard bargain"). Alameda Ventures' failure to allege that Kives or Baum had any role in its management, or the practical ability to cause it to act at all, is thus independently fatal to Alameda Ventures' aiding and abetting claim.  _See Malpiede_, 780 A.2d at 1097 (dismissing aiding and abetting claim because complaint failed to allege the purported abettor "participated in the board's decisions, conspired with the board, or otherwise caused the board to make the decisions at issue").

In _In re Cred_, this Court recently dismissed an aiding and abetting claim even though that complaint pled at least _some_ facts supporting scienter.  _See In re Cred, Inc._, 650 B.R. at 823–30. There, a liquidating trust pleaded "an abundance of allegations regarding all the ways that [the debtor] was being mismanaged," and further alleged that defendants "knew of [the debtor's] unreasonably risky business model, its calamitous financial condition, and of the falsity of the marketing materials." _Id._ at 823.  Yet this Court dismissed the aiding and abetting claim, holding

that the liquidating trust's allegations "d[id] nothing to establish that [defendant] knew of a breach of fiduciary duty" because the allegations did not establish that: "1) [defendant] knew of the problems at [the debtor]; and 2) knowledge of the problems would have necessarily led [defendant] to conclude that [the debtor's] executives were breaching their fiduciary duties." *Id.* In reaching this conclusion, this Court rejected "the Trust's argument that [defendant's] knowledge of [debtor's] purportedly risky business model must equate to knowledge of a breach of fiduciary duty," and concluded that "[i]t is not necessarily a breach of fiduciary duty to enter into a risky business transaction." *Id.* at 824. Indeed, even the fact that certain executives of the defendants were allegedly put on notice of "red flags" was "not enough to establish the required knowledge to state a claim for aiding and abetting a breach of fiduciary duty." *Id.* at 827.

Plaintiffs' allegations here likewise fail to "establish the required knowledge to state a claim for aiding and abetting a breach of fiduciary duty." *Id.* Plaintiffs' allegations fall woefully short of pleading the required elements for an aiding and abetting claim and must be dismissed.

### b.    *Alameda Ventures' Claim For Aiding And Abetting Is Also Barred By The* In Pari Delicto *Doctrine*

In any event, the doctrine of *in pari delicto* bars Alameda Ventures' aiding and abetting claim. *In pari delicto* bars a plaintiff from asserting a claim "if the plaintiff participated in the wrongdoing that was a substantial cause of the alleged damages." *Zazzali*, 482 B.R. at 512 (citing *Am. Int'l Grp., Inc. v. Greenberg* ("*AIG*"), 976 A.2d 872, 883 (Del. Ch. 2009)); *In re Broadstripe, LLC*, 444 B.R. 51, 110 n.143 (Bankr. D. Del. 2010) ("The *in pari delicto* doctrine prohibits a party who participates in wrongful conduct from recovering against another alleged non-insider participant."). "To bar a claim on *in pari delicto* grounds, a court must only determine that the parties bore 'substantially equal responsibility' for a wrongful scheme." *In re Nortel Networks, Inc.*, 469 B.R. 478, 508 (Bankr. D. Del. 2012) (citing *AIG*, 976 A.2d at 883).

REDACTED VERSION

A motion to dismiss should be granted where, as here, the applicability of the *in pari delicto* defense is evident from the face of the complaint. *See AIG*, 976 A.2d at 897 (dismissing aiding and abetting claim based on *in pari delicto* defense); *In re Liquid Holdings Grp., Inc*., 2018 WL 2759301, at *16–17 (same); *Zazzali*, 482 B.R. at 512 n.16 ("The Trustee's assertion that the Court cannot apply the doctrine of *in pari delicto* on a motion to dismiss is without merit."). Courts apply this doctrine to dismiss claims for aiding and abetting breach of fiduciary duty brought on behalf of the wronged entity when the complaint pleads that the entity itself participated in the illegal activity. *See, e.g.*, *AIG*, 976 A.2d at 883 (dismissing aiding and abetting claim because "[t]here is also no question that the Complaint pleads facts demonstrating that [plaintiff] bears 'substantially equal responsibility' for the illegal schemes with its co-conspirators").

Here, Alameda Ventures' aiding and abetting claim rests on allegations that SBF—as the "managing member of Alameda Ventures"—owed fiduciary duties under Delaware law. Compl. ¶ 166. Pursuant to established Delaware law, SBF's actions and knowledge are imputed to Alameda Ventures. *See AIG*, 976 A.2d at 887 n.40; *id.* at 886 n.37 ("[I]t is the general rule that knowledge of an officer or director of a corporation will be imputed to the corporation." (quoting *Teachers' Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 671 n.23 (Del. Ch. 2006)). The Complaint thus makes clear that Alameda Ventures (through SBF's imputed acts) is primarily responsible for causing the allegedly fraudulent Transfers to occur. Compl. ¶ 49 ("By causing Plaintiffs to take money from FTX.com and spend it on the FTX Insiders' pet projects, the FTX Insiders defrauded Plaintiffs, Debtors, and creditors, including customers."); *Id.* ¶¶ 80, 166–67. Under the doctrine of *in pari delicto*, Alameda Ventures' unclean hands bar its aiding and abetting claim.

2.    **Alameda Research Has Not Stated A Claim For Dishonest Assistance Under BVI Law**

    a.    *Alameda Research Has Not Pled Facts Sufficient To Establish That Kives Or Baum Acted Dishonestly*

Alameda Research's claim against Kives and Baum for dishonest assistance under BVI law fails for similar reasons.  *See generally In re AlphaStar Ins. Grp. Ltd.*, 383 B.R. 231, 274 (Bankr. S.D.N.Y. 2008) (explaining that "dishonest assistance" is similar to a state law claim for aiding and abetting breach of fiduciary duty).

To state a claim for dishonest assistance under BVI law, a plaintiff must plead facts from which a court can infer that: (1) fiduciary duties were owed to the plaintiff; (2) those fiduciary duties were breached; (3) the defendant "assisted in, induced or procured the breach," and the assistance "played more than a minimal role in the breach being carried out"; and (4) the defendant "acted dishonestly in providing the assistance."  *See* Decl. of Tom Smith KC ("Smith Decl.") ¶¶ 27, 30 (citing *Royal Brunei Airlines v Tan* [1995] 2 AC 378 at 382; *FM Cap. Partners Ltd. v Marino* [2018] EWHC 1768 (Comm) at [82])); *In re Nortel Networks, Inc.*, 469 B.R. at 511.

To establish that a defendant acted "dishonestly," a plaintiff must plead facts demonstrating the defendant's assistance was both subjectively *and* objectively dishonest.  Smith Decl. ¶¶ 31–32 (citing *Ivey v Genting Casinos (UK) t/a Crockfords* [2018] AC 391 at [74]).  The subjective element considers the defendant's actual state of mind at the time of the assistance.  *Id.* ¶¶ 32, 34 (citing *Ultraframe (UK) Ltd v Fielding* [2005] EWHC 1638 (Ch) at [1505]).  To show that the defendant possessed the requisite mental state to act dishonestly, a plaintiff must plead more than negligence; a plaintiff is required to plead facts showing that the defendant knew it was "assisting the fiduciary to do something he or she is not entitled to do."  *Id.* ¶ 37 (citing *Three Rivers DC v Governor and Co. of the Bank of England* [2003] 2 AC 1 at [184] (noting "facts, matters and circumstances which are consistent with negligence do not" establish the requisite dishonesty)).

Alleging that the defendant should have suspected wrongdoing is insufficient. *Id.* ¶ 34(3) (citing *Heinl v Jyske Bank (Gibraltar) Ltd* [1999] Lloyd's Rep Bank 511). As for the objective element, a plaintiff must allege facts sufficient to establish that the assistance violated standards of "an ordinary honest person in the circumstances of the defendant" based on the "circumstances known to the defendant at the time," including the defendant's "experience and the reason why they acted as they did." *Id.* ¶ 33 (citing *Royal Brunei Airlines v Tan* at p. 391; *FM Cap. Partners* at [82(vi)]).

As detailed in the concurrently filed declaration of Tom Smith—a distinguished barrister and expert on BVI law[26]—the Complaint does not come close to stating a claim for dishonest assistance under BVI law for at least three independent reasons.

***First***, the Complaint is devoid of facts that would establish "assistance" at all—*i.e.*, that Kives or Baum "assisted in, induced or procured" SBF's alleged breach of fiduciary duties to Alameda Research. Specifically, Plaintiffs do not allege *any* facts about how Kives and Baum allegedly assisted in effecting the Transfers.[27] In fact, the Complaint does not even explain what "assistance" SBF needed to effectuate the Transfers. *See id.* ¶¶ 41–50. Although the Complaint alleges that K5 Global Holdings, LLC later transferred a portion of the funds that it received to Kives and Baum for a stake in their business, that subsequent transfer obviously did not involve SBF, and thus could not serve as a basis for any alleged breach of SBF's fiduciary duties.

***Second***, the Complaint does not plead facts that could establish Kives and Baum acted with subjective "dishonesty." The Complaint once again relies exclusively on legal conclusions— namely, that Kives and Baum "knew, should have known, or were wilfully blind to the fact that

---

[26] Mr. Smith was appointed to the King's Counsel, a distinction bestowed on barristers recognized as leaders in their area of law with a higher level of legal expertise. *See* Smith Decl. ¶ 6.

[27] Notwithstanding the sensational and unwarranted attacks on Kives' and Baum's character, the Complaint musters only the feeble allegation that Kives and Baum knew they negotiated a good deal to support Plaintiffs' frivolous aiding and abetting and dishonest assistance claims.

the K5 Transaction and Mount Olympus Transaction did not provide and had virtually no prospect of providing Alameda Research [] with reasonably equivalent value, and that Bankman-Fried personally benefited from the K5 Transaction and Mount Olympus Transaction." Compl. ¶ 173. As Mr. Smith's Declaration explains, even if that were true, Plaintiffs' allegation that Kives and Baum "should have known" certain facts about the Transfers is "clearly inapt" to show subjective dishonesty under BVI law. Smith Decl. ¶ 54. Moreover, Plaintiffs' accusations that Kives and Baum "knew" or were "willfully blind" to the purported fact that the alleged Transfers were made at an undervalue lack the necessary foundational facts. *Id.* ¶ 55. Tellingly, Plaintiffs do not allege that Kives or Baum even knew Alameda Research was involved in the Transfers, that the funds originated with Alameda Research, or what stake Alameda Research had in SGN.[28]  *Id.*

 ***Third***, Alameda Research fails to plead that Kives or Baum acted outside of the "objective standards of ordinary, decent people." Kives and Baum were *opposite* the person who was widely considered one of the most sophisticated businessmen of this century. The notion that they could be liable for negotiating the best deal they could for themselves and K5 Global is nonsensical and unsupported by case law. *See* Smith Decl. ¶ 56(7) ("I am not aware of any existing English or BVI law case which has upheld a dishonest assistance case . . .where it is said that a contractual counterparty knew or suspected that the other party to the contract was not receiving reasonably equivalent value under the contract to that which it was providing."). Simply put, it cannot be "objectively dishonest" for a party to enter into an allegedly favorable commercial agreement— *i.e.*, a deal in which it places a greater value on what it received than what it has given up.

 Plaintiffs have accordingly failed to state a claim for dishonest assistance under BVI law.

---

[28] In fact, the Complaint suggests the funds belonged to FTX.com. *See* Compl. ¶¶ 47–56 ("Bankman-Fried Defrauded Investors and Customers of FTX.com").

**b.**    ***Alameda Research's Claim For Dishonest Assistance Is Also Barred By The* Ex Turpi Causa *Doctrine***

Even if Alameda Research's conclusory allegations were sufficient to state a claim for dishonest assistance, it would be barred by the BVI doctrine of *ex turpi causa non oritur actio*, *i.e.*, "from a dishonorable cause an action does not arise." *Cf. In re AlphaStar Ins. Grp. Ltd.*, 383 B.R. at 274 ("If the allegations establish *ex turpi causa* as a matter of law, the claim may be dismissed at the pleading stage."). This equitable doctrine bars causes of action in which a plaintiff is forced to plead or rely on his own misconduct. Smith Decl. ¶¶ 62–63 (citing *Patel v Mirza* [2017] AC 467; *Holman v Johnson* (1775) 1 Cowp 341 ("No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act.")). BVI courts apply this doctrine to bar claims brought by corporations where the persons directing the company's "mind and will" act unlawfully. *Id.* ¶¶ 64–65 (citing *Bilta v Nazir* [2016] AC 1 at [26] and [80]); *see also id.*, Ex. 1 (*Stone & Rolls Ltd v Moore Stephens* [2009] 1 AC 1391 at [1404]).

Here, Alameda Research's dishonest assistance claim is predicated on allegations that SBF—the "chairman and the sole member of the board of directors for Alameda Research"— breached his fiduciary duties to Alameda Research. Compl. ¶ 171. Nowhere in the Complaint does Alameda Research allege that its management was ignorant of the alleged breaches of fiduciary duty. To the contrary, the Complaint claims that SBF "controlled Alameda Research Ltd. through his 90% ownership stake in Alameda Research LLC." *See id.* ¶ 36. SBF's alleged breaches of fiduciary duty are thus imputed to Alameda Research and *ex turpi causa* precludes Alameda Research's BVI common law claim for dishonest assistance. *See* Smith Decl. ¶ 72 ("I consider that the BVI Court would more likely than not conclude that this is a case where Mr Bankman Fried's knowledge and conduct is to be attributed to Alameda Research and, as a result, Alameda Research is barred by its own illegality from now recovering from Mr Kives or

Mr Baum."); *see also In re Alphastar Ins. Grp. Ltd.*, 383 B.R. at 274–75 (applying *ex turpi causa* doctrine to dismiss dishonest assistance claim where directors sanctioned the wrongful conduct).

Accordingly, even assuming the Complaint stated a viable claim for dishonest assistance, Alameda Research's claim for dishonest assistance would be barred by the *ex turpi causa* doctrine.

## RESERVATION OF RIGHTS

This Motion is predicated, as it must be, on the facts as pleaded in the Complaint, documents incorporated by reference, and/or documents of which the Court may take judicial notice. The K5 Defendants reserve all rights and defenses, including those in the alternative to those relied on herein, and make no waiver, implicit or otherwise, by the assertions herein.

As set forth more fully in the K5 Defendants' Motion to Withdraw the Reference, and pursuant to Delaware Bankruptcy Local Rule 7012-1, the K5 Defendants do not consent to the entry of final orders or judgments by the Court. Pursuant to the Supreme Court's decisions in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) and *Stern v. Marshall*, 564 U.S. 462 (2011), this Court lacks constitutional authority to issue final orders when a debtor (or its successor-in-interest) asserts claims for fraudulent or preferential transfer against a defendant that has not filed a claim in the underlying bankruptcy case.

The K5 Defendants demand a jury trial.

## CONCLUSION

For the foregoing reasons, the Complaint fails to state a claim against the K5 Defendants. The K5 Defendants respectfully request that the Court grant the Motion and dismiss all Counts alleged against them, *i.e.*, all Counts except Counts 12 and 15.

REDACTED VERSION

Dated:  September 11, 2023
Wilmington, Delaware

Respectfully submitted,

**POTTER ANDERSON & CORROON LLP**

*/s/ Jeremy W. Ryan*
Jeremy W. Ryan (No. 4057)
Kevin R. Shannon (No. 3137)
Andrew L. Brown (No. 6766)
1313 N. Market Street, 6th Floor
Wilmington, DE 19801-6108
Telephone: (302) 984-6108
Facsimile: (302) 658-1192
E-mail: jryan@potteranderson.com
        kshannon@potteranderson.com
        abrown@potteranderson.com

-and-

**LATHAM & WATKINS LLP**
James E. Brandt (admitted *pro hac vice*)
Suzanne Uhland (admitted *pro hac vice*)
Hugh Murtagh (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: james.brandt@lw.com
        suzzanne.uhland@lw.com
        hugh.murtagh@lw.com

Michael J. Reiss (admitted *pro hac vice*)
355 S. Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
Email: michael.reiss@lw.com

Michael E. Bern (admitted *pro hac vice*)
555 11th St. NW
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
Email: michael.bern@lw.com

*Attorneys for K5 Defendants Michael Kives, Bryan Baum, K5 Global Holdings, LLC, K5 Global Technology, LLC, MBK Capital, LP - Series T, K5 Global Growth Co-Invest I GP, LLC, K5 Global Growth Fund I GP, LLC, K5 Global Ventures, LLC, Mount Olympus Capital, LP, Mount Olympus Capital, LLC, K5 Global Growth Fund II, LP, K5 Global Growth Fund II GP, LLC, K5X Fund I, LP, and K5X Fund I, LLC*