## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| ALAMEDA RESEARCH LTD. AND CLIFTON BAY INVESTMENTS LLC F/K/A ALAMEDA RESEARCH VENTURES LLC, | |
| Plaintiffs, | |
| - against - | |
| MICHAEL KIVES, BRYAN BAUM, K5 GLOBAL HOLDINGS LLC, K5 GLOBAL TECHNOLOGY LLC, MBK CAPITAL LP SERIES T, K5 GROWTH CO-INVEST I GP LLC, K5 GLOBAL GROWTH FUND I GP LLC, K5 GLOBAL VENTURES LLC, MOUNT OLYMPUS CAPITAL LP, MOUNT OLYMPUS CAPITAL LLC, K5 GLOBAL GROWTH FUND II LP, K5 GLOBAL GROWTH FUND II GP LLC, K5X FUND I LP, K5X FUND I LLC, AND SGN ALBANY LLC, | Adv. Pro. No. 23-50411 (JTD) |
| Defendants. | |

### PLAINTIFFS' MEMORANDUM OF LAW IN
### OPPOSITION TO K5 DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND .............................................................................................................. 4

LEGAL STANDARD ...................................................................................................... 9

ARGUMENT ................................................................................................................. 10

I.  THE COMPLAINT ADEQUATELY PLEADS FRAUDULENT TRANSFERS
UNDER FEDERAL AND STATE LAW ........................................................... 10

    A.  The Fraudulent K5 Transfers Are Recoverable and Will Benefit Creditors .............. 10

    B.  Plaintiff Alameda Research Ventures Has a Property Interest in the Fraudulent K5
Transfer ................................................................................................................. 15

    C.  The Complaint Adequately Pleads Insolvency at the Time of the Transactions and
Therefore States a Claim for Constructive Fraudulent Transfers Under Federal and
State Law ............................................................................................................... 17

    D.  The Complaint Adequately Pleads Intentional Fraudulent Transfer Under Federal and
State Law ............................................................................................................... 21

II.  THE COMPLAINT ADEQUATELY PLEADS A PREFERENTIAL TRANSFER
UNDER FEDERAL LAW ................................................................................... 27

III.  THE COMPLAINT ADEQUATELY PLEADS PROPERTY RECOVERY ............... 30

IV.  THE COMPLAINT ADEQUATELY PLEADS AIDING AND ABETTING BREACH
OF FIDUCIARY DUTY UNDER DELAWARE LAW AND DISHONEST
ASSISTANCE UNDER BRITISH VIRGIN ISLANDS LAW ......................... 31

    A.  The Complaint Adequately Alleges Aiding and Abetting Breach of Fiduciary Duty
Under Delaware Law ............................................................................................. 31

    B.  The Complaint Adequately Alleges Dishonest Assistance Under British Virgin
Islands Law ........................................................................................................... 37

V.  THE COURT SHOULD GRANT PLAINTIFFS LEAVE TO AMEND THE
COMPLAINT IF IT GRANTS THE K5 DEFENDANTS' MOTION ......................... 40

CONCLUSION ............................................................................................................. 42

# TABLE OF AUTHORITIES

*Page(s)*

*In re Adams Golf, Inc. Sec. Litig.*,
  381 F.3d 267 (3d Cir. 2004) ................................................................................................40

*Adelphia Recovery Tr.* v. *Bank of Am., N.A.*,
  390 B.R. 80 (S.D.N.Y. 2008) ..............................................................................................14

*In re AlphaStar Ins. Grp. Ltd.*,
  383 B.R. 231 (Bankr. S.D.N.Y. 2008) .................................................................................40

*In re Amdura Corp.*,
  75 F.3d 1447 (10th Cir. 1996) .............................................................................................15

*In re Am. Int'l Grp., Inc.*,
  976 A.2d 872 (Del. Ch. 2009) ..............................................................................................36

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2000) ...............................................................................................................9

*Black* v. *Montgomery Cty.*,
  835 F.3d 358 (3d Cir. 2016) ..................................................................................................9

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ..............................................................................................19

*In re Centaur*,
  2013 WL 4479074 (Bankr. D. Del. Aug. 19, 2013) ............................................................20

*In re Chase & Sanborn Corp.*,
  813 F.2d 1177 (11th Cir. 1987) ...........................................................................................16

*In re Com. Fin. Servs., Inc.*,
  322 B.R. 440 (Bankr. N.D. Okla. 2003) ..............................................................................31

*In re Cred Inc.*,
  650 B.R. 803 (Bankr. D. Del. 2023) ..............................................................................17, 35

*Crumpton* v. *McGarrity*,
  2012 WL 4466527 (M.D. Fla. Sept. 27, 2012) ....................................................................28

*In re D'Arata*,
  587 B.R. 819 (Bankr. S.D.N.Y. 2018) .................................................................................12

*In re Daily Bread Winddown, LLC*,
  2022 Bankr. LEXIS 3078 (Bankr. D. Del. Nov. 1, 2022) ...................................................42

-ii-

*In re DBSI, Inc.*,
    447 B.R. 243 (Bankr. D. Del. 2011) ...............................................................10, 19

*In re Direct Response Media, Inc.*,
    466 B.R. 626 (Bankr. D. Del. 2012) ...............................................................20, 26

*Drivetrain, LLC* v. *X. Com., Inc.*,
    2023 WL 1804627 (Bankr. D. Del. Feb. 7, 2023) .....................................22, 23, 24

*In re DSI Renal Holdings, LLC*,
    574 B.R. 446 (Bankr. D. Del. 2017) ......................................24, 25, 27, 31, 33

*In re DVI, Inc.*,
    2008 WL 4239120 (Bankr. D. Del. Sept. 16, 2008) ...........................................10

*In re Energy Coop., Inc.*,
    832 F.2d 997 (7th Cir. 1987) .........................................................................28

*In re FBI Wind Down, Inc.*,
    581 B.R. 387 (Bankr. D. Del. 2018) ...............................................................2, 15, 33

*In re Fedders*,
    405 B.R. 527 (Bankr. D. Del. 2009) ...............................................................31, 32, 33

*Firefighters' Pension Sys. of City. of Kan. City* v. *Presidio, Inc.*,
    251 A.3d 212 (Del. Ch. 2021) .........................................................................33, 34

*In re First Jersey Sec., Inc.*,
    180 F.3d 504 (3d Cir. 1999)............................................................................28

*Flora* v. *Cty. of Luzerne*,
    776 F.3d 169 (3d Cir. 2015) ...........................................................................4

*Foman* v. *Davis*,
    371 U.S. 178 (1962)........................................................................................40, 41

*In re Frontier Ins. Grp., Inc.*,
    585 B.R. 685 (Bankr. S.D.N.Y. 2018)............................................................12

*In re Fruehauf Trailer Corp.*,
    250 B.R. 168 (D. Del. 2000)...........................................................................33

*In re Glencoe Acquisition, Inc.*,
    2015 WL3777972 (Bankr. D. Del. June 16, 2015)........................................18

*Global Network Commc'ns, Inc.* v. *City of N.Y.*,
    458 F.3d 150 (2d Cir. 2006)............................................................................9

*In re Green Field Energy Servs., Inc.*,
  554 B.R. 315 (Bankr. D. Del. 2016) ....................................................37

*In re Green Field Energy Servs., Inc.*,
  2015 WL 5146161 (Bankr. D. Del. Aug. 31, 2015) ..............................18

*In re Gutpelet*,
  137 F.3d 748 (3d Cir. 1998).................................................................17

*In re HH Liquidation, LLC*,
  590 B.R. 211 (Bankr. D. Del. 2018) ....................................................14

*HTC Corp.* v. *IPCOM GMBH & Co., KG*,
  2009 WL 5908010 (D.D.C. 2009), .......................................................38

*In re J & M Sales, Inc.*,
  2021 Bankr. LEXIS 2268 (Bankr. D. Del. Aug. 20, 2021) ..................24

*Jackson Nat'l Life Ins. Co.* v. *Kennedy*,
  741 A.2d 377 (Del. Ch. 1999)......................................................... 35-36

*Jean-Pierre* v. *Schwers*,
  682 F. App'x 145 (3d Cir. 2017) .........................................................30

*Kane* v. *Chester Cty. Dep't of Child., Youth & Fams.*,
  10 F. Supp. 3d 671 (E.D. Pa. 2014) ..............................................2, 9, 17

*In re Lewis*,
  574 B.R. 536 (Bankr. E.D. Pa. 2017) .............................................14, 17

*In re Lids Corp.*,
  281 B.R. 535 (Bankr. D. Del. 2002) ...............................................11, 12

*In re Live Well Fin., Inc.*,
  2023 WL 3995900 (Bankr. D. Del. June 13, 2023).................24-25, 26-27

*In re Meadows*,
  396 B.R. 485 (B.A.P. 6th Cir. 2008).....................................................15

*In re Midway Games Inc.*,
  428 B.R. 303 (Bankr. D. Del. 2010) ....................................................21

*In re Millennium Lab Holdings II, LLC*,
  2019 WL 1005657 (Bankr. D. Del. Feb. 28, 2019) ..............................22

*Miller* v. *Mott*,
  2023 WL 6467368 (Bankr. D. Del. Oct. 4, 2023) ................10, 12, 18, 30

*In re Neighbors Legacy Holdings, Inc.*,
   645 B.R. 864 (S.D. Tex. 2022) ...............................................................18

*New Enterprise Assocs. 14, LP* v. *Rich*,
   292 A.3d 112 (Del. Ch. 2023)...............................................................33

*In re NWL Holdings, Inc.*,
   2013 WL 2436667 (Bankr. D. Del. June 4, 2013)..........................29, 30

*In re Oakland Physicians Med. Ctr., LLC*
   596 B.R. 587 (Bankr. E.D. Mich. 2019) ...............................................29

*In re Our Alchemy, LLC*,
   2019 WL 4447545 (Bankr. D. Del. Sept. 16, 2019) .............................18

*In re Our Alchemy, LLC*,
   642 B.R. 155 (Bankr. D. Del. 2022).....................................................42

*In re PennySaver USA Publ'g, LLC*,
   602 B.R. 256 (Bankr. D. Del. 2019) ........................................... *passim*

*In re Pinktoe Tarantula Ltd.*,
   2023 WL 2960894 (Bankr. D. Del. Apr. 14, 2023) ..............................30

*In re Pitt Penn Holding Co., Inc.*,
   2011 WL 4352373 (Bankr. D. Del. Sept. 16, 2011) .............................22

*In re Qimonda Richmond, LLC*,
   467 B.R. 318 (Bankr. D. Del. 2012) .....................................................26

*Robinson* v. *Beckles*,
   2012 WL 13206064 (D. Del. Mar. 20, 2012) ......................................40

*In re Rollaguard Sec., LLC*,
   570 B.R. 859 (Bankr. S.D. Fla. 2017) ..................................................24

*In re Rosenblum*,
   545 B.R. 846 (Bankr. E.D. Pa. 2016) ...................................................18

*In re Rural Metro Corp.*,
   88 A.3d 54 (Del. Ch. 2014)...................................................................35

*In re Seaboard Hotel Member Assocs., LLC*,
   2021 Bankr. LEXIS 1564 (Bankr. D. Del. June 10, 2021)...................37

*In re Solutions Liquidation LLC*,
   608 B.R. 384 (Bankr. D. Del. 2019) ............................................. 32-33

*In re Southmark Corp.*,
   49 F.3d 1111 (5th Cir. 1995) ...................................................................15

*In re SpA*,
   645 B.R. 48 (Bankr. D. Del. 2022) .................................................... 37-38

*In re Student Fin. Corp.*,
   335 B.R. 539 (D. Del. 2005) .......................................................... 4, 9-10

*Teachers' Ret. Sys. of La.* v. *Aidinoff*,
   900 A.2d 654 (Del. Ch. 2006) ...................................................................36

*In re Trans World Airlines, Inc.*,
   134 F.3d 188 (3d Cir. 1998) ......................................................................10

*Triton Constr. Co., Inc.* v. *Eastern Shore Elec. Servs., Inc.*,
   2009 WL 1387115 (Del. Ch. May 18, 2009) ............................................33

*In re Tropicana Ent., LLC*,
   520 B.R. 455 (Bankr. D. Del. 2014) .........................................................18

*In re USA Diversified Prods., Inc.*,
   100 F.3d 53 (7th Cir. 1996) ......................................................................15

*In re U.S. Glove, Inc.*,
   2021 WL 2405399 (Bankr. D.N.M. June 11, 2021) .................................14

*In re W.J. Bradley Mort. Capital, LLC*,
   598 B.R. 150 (Bankr. D. Del. 2019) .................................................... 31-32

*Wells Fargo & Co.* v. *First Interstate Bancorp*,
   1996 WL 32169 (Del. Ch. Jan. 18, 1996) ................................................33

*In re Winstar Commc'ns, Inc.*,
   348 B.R. 234 (Bankr. D. Del. 2005) .........................................................11

*In re Zohar III, Corp.*,
   631 B.R. 133 (Bankr. D. Del. 2021) .........................................................24

**Statutes**

11 U.S.C. § 101 ........................................................................................11

11 U.S.C. § 547 ........................................................................................29

11 U.S.C. § 548 ...................................................................................17, 22

Del. Code Ann. tit. 6 § 1301 ....................................................................12

Del. Code Ann. tit. 6 § 1302 ..........................................................................................................11

Del. Code Ann. tit. 6 § 1304 ..........................................................................................................22

Del. Code Ann. tit. 6 § 1305 ..........................................................................................................18

## GLOSSARY

| | |
|---|---|
| **Alameda Ventures** | Plaintiff Clifton Bay Investments LLC f/k/a Alameda Research Ventures LLC. |
| **Chapter 11 Cases** | The jointly administered Chapter 11 cases filed by FTX Trading Ltd. and its affiliated entities pending before the United States Bankruptcy Court for the District of Delaware under lead Case No. 22-11068. |
| **Complaint** | The complaint filed in the above-captioned action [Adv. D.I. 1]. |
| **Debtors** | The above-captioned debtors and debtors-in-possession |
| **FTX Group** | The collection of four silos of Debtor and non-Debtor entities described in footnote 6 of the Complaint. |
| **FTX Insiders** | (1) Samuel Bankman-Fried, co-founder of, *inter alia*, Plaintiff Alameda Research Ltd. and Debtor FTX Trading, Ltd.; (2) Caroline Ellison, former co-CEO of Alameda Research LLC; (3) Nishad Singh, former director of engineering of, *inter alia*, Debtor FTX Trading, Ltd.; and (4) Zixiao "Gary" Wang, co-founder and former chief technology officer of, *inter alia*, Debtor FTX Trading, Ltd. |
| **K5 Defendants** | Michael Kives; Bryan Baum; K5 Global Holdings, LLC; K5 Global Technology, LLC; MBK Capital LP - Series T ; K5 Global Growth Co-Invest I GP, LLC; K5 Global Growth Fund I GP, LLC; K5 Global Ventures, LLC; Mount Olympus Capital, LP; Mount Olympus Capital, LLC; K5 Global Growth Fund II, LP; K5 Global Growth Fund II GP, LLC; K5X Fund I, LP; and K5X Fund I, LLC. |
| **K5 Global** | Defendant K5 Global Holdings, LLC. |
| **K5 Technology** | Defendant K5 Global Technology, LLC. |
| **K5 Transaction** | The transaction described in paragraphs 67-79 of the Complaint. |
| **K5 Transfer** | The transfer of $300 million from Alameda Research Ltd. to Alameda Ventures, and from Alameda Ventures to K5 Global, as described in paragraph 80 of the Complaint. |
| **MBK Capital** | Defendant MBK Capital LP - Series T. |

| | |
|---|---|
| **Motion** | *K5 Defendants' Motion to Dismiss Plaintiffs' Complaint* [Adv. D.I. 33]. |
| **Mount Olympus** | Defendant Mount Olympus Capital, LP. |
| **Mount Olympus Transaction** | The transaction described in paragraphs 82-88 of the Complaint. |
| **Plaintiffs** | Alameda Research Ltd. and Clifton Bay Investments LLC f/k/a Alameda Research Ventures LLC. |
| **SGN Albany** | Defendant SGN Albany Capital LLC. |
| **Term Sheet** | The term sheet executed on March 7, 2022, as described in paragraph 62 of the Complaint. |
| **Transactions** | The K5 Transaction and Mount Olympus Transaction, collectively. |

## PRELIMINARY STATEMENT

On November 2, 2023, Samuel Bankman-Fried, co-founder of Debtor FTX Trading, Ltd. and majority owner of the Debtors, was convicted of seven counts of fraud and conspiracy for orchestrating one of the largest frauds in history. Until November 2022, Bankman-Fried and other FTX Insiders misappropriated billions of dollars of customer deposits from the FTX Group's exchanges. They commingled these customer deposits with other FTX Group funds and used those funds to purchase lavish homes and private jets; to expand their personal wealth and sphere of influence through, among other things, political and "charitable" contributions; and to make "investments" wholly unrelated to the operations of the FTX Group. Those "investments" included the two transactions at issue here—the K5 Transaction and the Mount Olympus Transaction—which were part and parcel of the FTX Insiders' fraud.

Through these Transactions, Bankman-Fried caused Plaintiffs to transfer $700 million in misappropriated FTX Group assets to Defendants Michael Kives and Bryan Baum—who have never demonstrated their ability to prudently manage investment funds and whose primary business skill appears to be cultivating a network of rich and powerful people—and to entities under their control. But although FTX Group assets were used to pay for those interests, the interests largely did not belong to the FTX Group. Instead, the Transactions were structured by Bankman-Fried to vest those interests in a shell company, SGN Albany, which was owned almost entirely by Bankman-Fried, Gary Wang, and Nishad Singh. Put simply, Bankman-Fried was using misappropriated funds to buy access to what he viewed as an elite club.

Worse still, Bankman-Fried grossly overpaid for SGN Albany's interests in Kives' and Baum's companies. As the Complaint alleges, there is no evidence to suggest that the interests SGN Albany acquired were worth anywhere near the $700 million that Kives, Baum, and their companies actually received—notwithstanding their unsupported characterizations of "their

burgeoning and valuable business." (Mot. at 15.) The K5 Defendants' Motion fails for multiple reasons and should be denied.

First, the K5 Defendants contend that neither Alameda Research Ltd. nor Alameda Ventures can avoid the Transactions under **any** theory of recovery because (i) Alameda Research Ltd. is solvent and, thus, no creditors would benefit from avoidance and (ii) Alameda Ventures has no property interest in the hundreds of millions of dollars that Bankman-Fried caused Alameda Ventures to hand over to K5 Global. The K5 Defendants are wrong on both counts. The Complaint is replete with allegations that Alameda Research Ltd. is insolvent, and those allegations are supported by sworn statements of the FTX Insiders themselves, including the former co-CEO of Alameda Research Ltd.'s parent company. With respect to Alameda Ventures, there is no dispute that funds used to pay K5 Global came from that entity's account, and it is settled law that accounts held in the name of a debtor, and the funds contained therein, are "presumptively considered property of the debtor's estate." *In re FBI Wind Down, Inc.*, 581 B.R. 387, 400 (Bankr. D. Del. 2018).

Second, the K5 Defendants argue that Plaintiffs do not plead that they were insolvent at the time of the Transactions and, therefore, have not adequately pleaded constructive fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B). This argument fails not only because the Complaint adequately alleges that Plaintiffs were insolvent at the time of the Transactions, but also because there is ample information in the public record on which this Court may rely[2]—including sworn testimony from Singh and Caroline Ellison—that Plaintiffs were insolvent at all relevant times.

---

[2] On a motion to dismiss, a court may "rel[y] on . . . matters of public record, including other judicial proceedings." *Kane* v. *Chester Cty. Dep't of Child., Youth & Fams.*, 10 F. Supp. 3d 671, 680 (E.D. Pa. 2014) (citing *Sands* v. *McCormick*, 502 F.3d 263, 268 (3d Cir. 2007)).

*Third*, the K5 Defendants argue that Plaintiffs' intentional fraudulent transfer claims fail because Plaintiffs' allegations are insufficient to plead fraudulent intent. This argument does not merit serious consideration. The Complaint describes in detail how Bankman-Fried and other FTX Insiders—three of whom pleaded guilty to numerous counts of fraud before their ringleader Bankman-Fried was convicted—misappropriated funds from the FTX Group exchanges, and how Bankman-Fried used $700 million of those funds to buy the friendship of Kives and Baum and to benefit himself. The Complaint thus alleges fraudulent intent directly ***and*** by identifying numerous badges of fraud from which this Court may infer fraudulent intent, including that Kives and Baum were considered "part of [Bankman-Fried's] team." (Compl. ¶ 97.) Indeed, although Kives and Baum have attempted to distance themselves from Bankman-Fried since the discovery of his massive fraud—of which the Transactions were a part—they were closely intertwined with FTX. They participated in internal FTX communications systems, and Baum had a room reserved in the luxury apartments that Bankman-Fried purchased in the Bahamas. As Bankman-Fried wrote in an internal FTX document shared with Baum, "SBF is aligned with Bryan and K5, and treats $1 to it as $1 to FTX even though we only own 33%, because whatever, we can always true up cash if needed, but also, who cares." (Compl. ¶¶ 9, 96.) "There are logistical, PR, regulatory, etc[.] reasons to not just merge K5 100% into FTX but I and Br[y]an will both act how we would if they were merged." (*Id.*) Baum responded enthusiastically: "Agree with all. FTX FTW!" (*Id.*)

*Fourth*, the K5 Defendants attack Plaintiffs' preference claim to recover $100 million that Mount Olympus received in September 2022 because, they argue, the transfer was made on account of an antecedent debt not owed by Plaintiffs but by SGN Albany (Mot. at 37-38). But this is at odds with another argument the K5 Defendants make elsewhere in the Motion,

whereby—desperate to argue that they gave fair value to the Debtors as part of the transactions (they did not)—they contend that SGN Albany is indistinguishable from Plaintiffs, and that Plaintiffs have "sue[d] themselves" by bringing this action (*id.* at 12).  The K5 Defendants cannot have it both ways.

*Fifth*, the remainder of the Motion argues that Plaintiffs' two claims for (i) aiding and abetting breach of fiduciary duty and (ii) dishonest assistance, an analogous claim under British Virgin Islands law, should be dismissed.  But this is nothing more than an attempt by Kives and Baum to avoid personal responsibility for inducing Bankman-Fried to give them $700 million based on no due diligence, and in a way that they knew benefited Bankman-Fried personally.  Kives and Baum knew that no reasonable and prudent businessperson, operating in good faith, would have entered into the Transactions or structured them as Bankman-Fried did.

Although the K5 Defendants repeatedly contest the Complaints' allegations (*e.g.*, Mot. at 18 (reasonably equivalent value); 25-26, 31 (solvency); 27 (property interest of Alameda Ventures)), "the court may not resolve" "factual disputes" at this stage.  *Flora* v. *Cty. of Luzerne*, 776 F.3d 169, 175 (3d Cir. 2015); *In re Student Fin. Corp.*, 335 B.R. 539, 546 (D. Del. 2005) (stating the "purpose of a motion to dismiss is . . . not to resolve disputed facts or decide the merits of the case").  Plaintiffs have more than adequately alleged that the Transactions were part of the FTX Insiders' fraudulent scheme.  The Motion should be denied.

## **BACKGROUND**

The FTX Insiders now all have admitted—or, in ringleader Bankman-Fried's case, has been found by a jury of his peers to have engaged in—a massive criminal fraud on the FTX Group and its customers, which enabled them to spend lavishly for their personal benefit, including on purported "investments."  (Compl. ¶¶ 48, 51, 52.)  The Transactions here were two such "investments."  (*Id.* ¶¶ 48-50.)  The story of the K5 Transaction and the Mount Olympus

Transaction began on February 11, 2022, when Defendant Michael Kives (co-owner, with Defendant Bryan Baum, of Defendant K5 Global) hosted a dinner party attended by some of the most powerful people in politics, business, and entertainment. (*Id.* ¶ 1.) Bankman-Fried attended at Kives' invitation. (*See id.*) Bankman-Fried was bowled over by the chance to associate with such luminaries, and he wanted more. Two days after Kives' party, Bankman-Fried wrote in a personal note that Kives and Baum were "something of a one-stop shop for relationships that we should utilize," that they could provide "infinite connections" and "[p]olitical relationships," and that they and FTX entities could "work[] together on electoral politics." (*Id.* ¶ 2.) In exchange, Bankman-Fried wrote, Kives and Baum wanted FTX "to consider endorsements with their friends" (*i.e.*, give Kives' and Baum's friends cash), "us to work with them on Democratic politics" (*i.e.*, give powerful politicians cash), and "[m]aybe us to invest in them or some stuff, idk" (*i.e.*, give Kives and Baum themselves cash). (*Id.*)

On March 7, 2022—*less than a month after their first meeting*—Bankman-Fried, Kives, and Baum executed the Term Sheet that outlined the transfer of $3.3 billion in cash—plus $250 million in equity in FTX Group entities—to the K5 Defendants over three years. (*Id.* ¶¶ 63, 65.) *First*, the Term Sheet set forth the terms of the K5 Transaction. According to the Term Sheet, Bankman-Fried would pay K5 Global $300 million in cash and $250 million of shares in FTX Group entities and, in exchange, a to-be-determined entity associated with Bankman-Fried (which ultimately would be SGN Albany) would receive an interest in K5 Global's various funds and special purpose vehicles.[3] (*Id.* ¶¶ 63, 71.) SGN Albany is a Delaware limited liability company that was formed on May 16, 2022 for the purpose of engaging in the Transactions. (*Id.* ¶ 35.) It is owned by Bankman-Fried (60.5% interest); Zixiao "Gary" Wang, co-founder and former Chief

---

[3]    The Term Sheet also provided for $25 million in payments to non-profits "with the details to be worked out later." (Compl. ¶ 63.)

Technology Officer of FTX Trading, Ltd. (21.17%); Nishad Singh, former Director of Engineering of FTX Trading, Ltd. (10%); and Alameda Research Ltd. (8.33%).  (*Id.*)  The result of the K5 Transaction was that Bankman-Fried, Wang, and Singh gained the lion's share of the interests SGN Albany received in K5 Global and its affiliated entities—at no cost to them—while Plaintiffs, which Bankman-Fried caused to finance the K5 Transaction using commingled funds, received a pittance.

*Second*, the March 7, 2022 Term Sheet set forth the terms of the Mount Olympus Transaction.  According to the Term Sheet, Bankman-Fried, Kives, and Baum would create a new entity, Defendant Mount Olympus, which would place funds transferred by Bankman-Fried into a portfolio controlled by Kives and Baum.  (*Id.* ¶ 64.)  In the Term Sheet, Bankman-Fried, Kives, and Baum agreed that Mount Olympus would start with an initial capital contribution of $200 million "from SBF" (*i.e.*, Bankman-Fried), and "would target a total annual contribution of $1 billion 'for at least the first three years.'"  (*Id.* ¶ 65.)

On March 8, 2022, before he formed SGN Albany and without having conducted any due diligence, Bankman-Fried caused Alameda Research Ltd. to wire $300 million to Alameda Ventures.  (*Id.* ¶¶ 71, 75, 78, 80.)  The same day, Bankman-Fried directed Alameda Ventures to wire that amount to K5 Global to pay for the K5 Transaction.  (*Id.* ¶¶ 67, 80.)  Plaintiffs Alameda Research Ltd. and Alameda Ventures did not receive anywhere near reasonably equivalent value for the K5 Transfer.  (*Id.* ¶ 81.)  Indeed, Alameda Ventures received nothing at all.  With respect to K5 Global, Plaintiffs have identified no information to substantiate the valuation of that entity implied by the $35.5 million "investment" it received, and Bankman-Fried, on behalf of SGN Albany, "overpaid more than 200-fold" for its stake in MBK Capital.  (*Id.* ¶¶ 71, 74.)  And K5

Technology would have needed to produce astronomical returns to recoup the $300 million valuation implied by that "investment." (*Id.* ¶ 78.)

Then, beginning on May 26, 2022, Bankman-Fried caused Alameda Research Ltd. to wire a total of $400 million to Mount Olympus as part of the Mount Olympus Transaction: (i) $200 million on May 26, 2022; (ii) $100 million on June 7, 2022; and (iii) $100 million on September 20, 2022. (*Id.* ¶ 89.) Of this amount, Mount Olympus transferred $375 million to Defendant K5X Fund I LP and $25 million to Defendant K5 Global Growth Fund II LP. (*Id.* ¶ 89.) As an 8.33% owner of SGN Albany (*id.* ¶ 35), Alameda Research Ltd. did not receive anything approaching reasonably equivalent value in exchange for the $400 million it transferred to Mount Olympus.

Bankman-Fried knew the Transactions were fraudulent. The Term Sheet "shocked" Singh, who testified that he was "very concerned that a move like this was . . . maybe not worth it on its own right." (Ex. B[4] (Transcript of Bankman-Fried Trial, October 16, 2023) at 1328:13, 1329:13-16.) Singh's "concern" was, of course, justified. Plaintiffs are aware of nothing to support Kives and Baum's "investment track record or to demonstrate their ability to prudently manage . . . investment funds," much less "a multi-billion dollar investment fund of the size contemplated by the Mount Olympus Transaction." (Compl. ¶ 85.)

Bankman-Fried's fraud was discovered before he could drain FTX Group funds of an additional $600 million to reach the $1 billion annual contribution promised to Kives and Baum. (*See* Compl. ¶ 65.) Until the Debtors filed the Chapter 11 Cases in November 2022, however, it was clear that Bankman-Fried, and Kives and Baum were more than business partners working at arm's length. Baum and Bankman-Fried viewed K5 Global as merged with FTX itself. In August

---

[4] Citations to "Ex. _" refer to exhibits to the accompanying *Declaration of Christopher J. Dunne in Support of Plaintiffs' Memorandum of Law in Opposition to the Motion*, dated November 10, 2023.

2022, Bankman-Fried wrote—and Baum agreed—that "SBF is aligned with Bryan and K5, and treats $1 to it as $1 to FTX even though we only own 33%, because whatever, we can always true up cash if needed, but also who cares," and "There are logistical, PR, regulatory, etc[.] reasons to not just merge K5 100% into FTX but I and Br[y]an will both act how we would if they were merged."  (*Id.* ¶¶ 9, 96.)

Since then, all of the FTX Insiders except Bankman-Fried have pleaded guilty to crimes perpetrated through the very practices that facilitated the K5 Transaction and Mount Olympus Transaction.  (*Id.* ¶¶ 51-52, 54.)[5]  On November 2, 2023, Bankman-Fried was convicted of wire fraud, conspiracy to commit wire fraud, conspiracy to commit securities fraud, conspiracy to commit commodities fraud, and conspiracy to commit money laundering.  Min. Entry, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Nov. 1, 2023).

On June 22, 2023, Plaintiffs filed the Complaint against the K5 Defendants and SGN Albany seeking, among other relief, to avoid and recover $700 million from the K5 Defendants.  Plaintiffs also assert claims against Defendants Kives and Baum for aiding and abetting breaches of fiduciary duty under Delaware state law and dishonest assistance under the law of the British Virgin Islands, and against SGN Albany for property recovery under section 550 of the Bankruptcy Code and for unjust enrichment.[6]  At every step, the K5 Defendants have

---

[5]  On December 19, 2022, Wang, Singh, and Ellison pleaded guilty to multiple felonies in connection with the fraud on the FTX Group, including wire fraud, conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud (Wang, Singh, Ellison); conspiracy to commit money laundering (Singh, Ellison); and conspiracy to make unlawful political contributions and defraud the Federal Election Commission (Singh).  (Compl. ¶ 51; Min. Entries, *United States* v. *Bankman Fried*, 22-cr-00673 (S.D.N.Y. Dec. 19, 2022) (Wang, Ellison); Min. Entry, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. Feb. 28, 2023) (Singh).)

[6]  On September 26, 2023, the Court granted Plaintiffs' *Motion for Default Judgment Against Defendant SGN Albany* [Adv. D.I. 23], thereby awarding Plaintiffs all of SGN Albany's (i) rights and interests in certain of the K5 Defendants that SGN Albany acquired as a result of the K5 Transaction, and any proceeds thereof; and (ii) rights and interests in Mount Olympus Capital LP that SGN Albany acquired as a result of the Mount Olympus Transaction, and any proceeds thereof.  *See Judgment by Default* [Adv. D.I. 48].

attempted to delay Plaintiffs' recovery of misappropriated FTX Group funds, including by (i) filing a motion to withdraw the reference [Adv. D.I. 17]; (ii) filing a motion to stay this case pending confirmation of the Debtors' Chapter 11 plan [Adv. D.I. 38]; and (iii) filing this Motion.[7] The K5 Defendants should not be allowed to continue to hide the facts underlying these Transactions and to withhold $700 million in funds received from one of the most egregious convicted fraudsters ever.

## **LEGAL STANDARD**

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Black* v. *Montgomery Cty.*, 835 F.3d 358, 364 (3d Cir. 2016); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2000) (plaintiff must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" (citing *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 556 (2007))).

For purposes of Rule 12(b)(6), "the court relies on the complaint, exhibits attached to the complaint, and matters of public record, including other judicial proceedings." *Kane* v. *Chester Cty. Dep't of Child., Youth & Fams.*, 10 F. Supp. 3d 671, 680 (E.D. Pa. 2014) (citing *Sands* v. *McCormick*, 502 F.3d 263, 268 (3d Cir. 2007)). It is not permissible on a Rule 12(b)(6) motion to rely on material outside the complaint to "make a finding of fact that controvert[s] the plaintiff's own factual assertions set out in its complaint." *Global Network Commc'ns, Inc.* v. *City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006); *see also In re Student Fin. Corp.*, 335 B.R. at 546

---

[7]   The *K5 Defendants' Motion to Withdraw the Reference* is fully briefed and is pending before the District Court for the District of Delaware. *See Kives* v. *Alameda Research Ltd.*, No. 1:23-cv-00915-GBW (D. Del.), ECF Nos. 2, 4, 5. The *K5 Defendants' Motion to Stay Adversary Proceeding Pending Confirmation of Debtors' Chapter 11 Plan* is fully briefed and pending before this Court. [*See* Adv. D.I. 38, 47, 53.]

(stating the "purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case").  Nor should a 12(b)(6) motion be granted based on an affirmative defense predicated on disputed facts.  *See In re DVI, Inc.*, 2008 WL 4239120, at *11 (Bankr. D. Del. Sept. 16, 2008).

## **ARGUMENT**

I. **THE COMPLAINT ADEQUATELY PLEADS FRAUDULENT TRANSFERS UNDER FEDERAL AND STATE LAW.**

A. **The Fraudulent K5 Transfers Are Recoverable and Will Benefit Creditors.**

Citing Alameda Research Ltd.'s Schedules of Assets and Liabilities filed in the Chapter 11 Cases (the "Schedules"), the K5 Defendants argue that Alameda Research Ltd. is solvent and, therefore, may not pursue fraudulent transfer claims because doing so would not benefit any creditor.  As a preliminary matter, it is axiomatic that "[w]hether a company is insolvent under the Bankruptcy Code is considered a mixed question of law and fact" not to be decided on a motion to dismiss.[8]  *In re Trans World Airlines, Inc.*, 134 F.3d 188, 193 (3d Cir. 1998); *In re PennySaver USA Publ'g, LLC*, 602 B.R. 256, 270 (Bankr. D. Del. 2019) ("Insolvency is best left to discovery to determine and should not generally be decided on a motion to dismiss."); *In re DBSI, Inc.*, 447 B.R. 243, 248 (Bankr. D. Del. 2011) ("[I]nsolvency is generally a factual determination not appropriate for resolution in a motion to dismiss.").  "Whether a debtor was insolvent at a point in time is 'highly fact-specific and should be based on seasonable appraisals or expert testimony.'"  *Miller* v. *Mott*, 2023 WL 6467368, at *6 (Bankr. D. Del. Oct. 4, 2023) (quoting *In re PennySaver USA Publ'g, LLC*, 587 B.R. 445, 459 (D. Del. 2018)).  But in any event, the K5 Defendants' argument fails for several reasons.

---

[8]   Not surprisingly, then, the K5 Defendants cite to no case in which a court granted a motion to dismiss on the basis of the debtors' present solvency.

*First*, the financial information contained in Alameda Research Ltd.'s Schedules does not refute Plaintiffs' allegations that Alameda Research Ltd. was insolvent—either now or at the time of the Transactions (*e.g.*, Compl. ¶¶ 101, 113, 118). Under the Bankruptcy Code and Delaware fraudulent transfer law, a corporation is insolvent if "the sum of such entity's debts is greater than all of such entity's property, at a fair valuation," with certain exclusions. 11 U.S.C. § 101(32)(A); *accord* Del. Code Ann. tit. 6 § 1302 ("A debtor is insolvent if the sum of the debtor's debt is greater than all of the debtor's assets, at a fair valuation."). "This test of insolvency . . . compares the 'fair value' of all of the debtor's assets with the face or 'stated' value of its liabilities on the relevant date." *In re Winstar Commc'ns, Inc.*, 348 B.R. 234, 274 (Bankr. D. Del. 2005). With respect to assets, "fair value" means that assets are valued "at the sale price a willing and prudent seller would accept from a willing and prudent buyer if the assets were offered in a fair market for a reasonable period of time." *In re Lids Corp.*, 281 B.R. 535, 541 (Bankr. D. Del. 2002). Put differently, insolvency "is based on a fair valuation and not based on Generally Accepted Accounting Principles." *Id.* at 540.

Alameda Research Ltd.'s calculation of assets and liabilities in the Schedules differs from the treatment of assets and liabilities for purposes of a solvency analysis. Specifically, the Schedules generally list assets at "net book values as of the Petition Date."[9] With respect to liabilities, the Schedules "exclude items identified as 'unknown,' 'disputed,' 'contingent,' 'unliquidated,' 'undetermined' and 'N/A'" and explicitly note that as a result, "ultimate liabilities may differ ***materially*** from those stated in the Schedules and Statements."[10] Such liabilities may be included in a solvency analysis. *See* 11 U.S.C. §§ 101(5), (12) (defining "debt" as "liability on

---

[9]    Alameda Research Ltd. March 15, 2023 Schedules, at 8; Alameda Research Ltd. July 31, 2023 Schedules, at 10; Alameda Research Ltd. Aug. 31, 2023 Schedules, at 9.

[10]    Alameda Research Ltd. March 15, 2023 Schedules, at 7 (emphasis added); Alameda Research Ltd. July 31, 2023 Schedules, at 9; Alameda Research Ltd. Aug. 31, 2023 Schedules, at 8.

a claim," which, in turn, is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, *unliquidated*, fixed, *contingent*, matured, unmatured, *disputed*, undisputed, secured, or unsecured") (emphasis added); *accord* 6 Del. Code §§ 1301(3), (5) (same). In other words, the Schedules cannot be relied upon to conduct a solvency analysis consistent with the Bankruptcy Code. *See In re Lids Corp.*, 281 B.R. at 548 ("[W]hile it is well-established that GAAP may be relevant in [a Bankruptcy Code] solvency analysis, GAAP is not determinative. Therefore, the [Schedules of Assets and Liabilities] cited by [the defendant] do not prove that [the debtor] was solvent as" of a particular date.); *Miller*, 2023 WL 6467368, at *6 (declining to consider debtors' schedules of liabilities and assets and stating that a motion to dismiss "is not the occasion to introduce new facts to establish a defense to the complaint's allegations").

  *Second*, contrary to the K5 Defendants' assertions, Alameda Research Ltd. did not "sw[ear] consistently under penalty of perjury" in the Schedules that it was solvent. (Mot. at 25.) The purpose of the Schedules "is to list the types of assets that a debtor has in its possession," *In re D'Arata*, 587 B.R. 819, 821 (Bankr. S.D.N.Y. 2018), and "to give interested parties sufficient information to decide whether they want to engage in further inquiry," *In re Frontier Ins. Grp., Inc.*, 585 B.R. 685, 701-02 (Bankr. S.D.N.Y. 2018) (quoting 4 *Collier on Bankruptcy* 521.06[1] (16th ed. 2017)). Thus, the global notes attached to each of the Schedules contain myriad disclaimers and qualifications that warn the reader against drawing any conclusion as to Alameda Research Ltd.'s financial condition, including:

> [T]o the extent that a Debtor shows more assets than liabilities, ***nothing in the Schedules or Statement shall constitute an admission that the Debtors were solvent as of the Petition Date or at any time before the Petition Date***. . . . For the avoidance of doubt, ***nothing contained in the Schedules and Statements is***

*indicative of the Debtors' enterprise value or solvency*.  The Debtors reserve all rights with respect to these issues.[11]

Each of the global notes further states:

[N]either these Notes nor the Schedules and Statements shall be deemed a waiver of any such claims, causes of actions, preference or avoidance actions or in any way prejudice or impair the assertion of such claims, or in any way act as an admission of any fact or liability or the character thereof.[12]

Moreover, Alameda Research Ltd.'s Schedules make clear that they "***should not be relied upon by any persons for information relating to current or future financial conditions***, events or performance of any of the Debtors."[13]  The challenges posed by the state of the FTX Group's financial records are now well documented.  *See*, *e.g.*, *First Interim Report of John J. Ray III to the Independent Directors* ("First Interim Report"), at 14 [D.I. 1242-1] ("[T]he FTX Group lacked fundamental financial and accounting controls.  Reconstruction of the Debtors' balance sheets is an ongoing, bottom-up exercise that continues to require significant effort by professionals."); *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* ("First Day Decl."), at 24 [D.I. 24] ("[T]he main companies in the Alameda Silo and the Ventures Silo did not keep complete books and records of their investments and activities.").[14]  And there have been weeks of testimony in federal district court as to Alameda Research LLC's inability to pay billions in loans throughout 2022.  *See infra* note 22 and surrounding text.

---

[11]   *Global Notes and Statements of Limitations, Methodology, and Disclaimers* (Mar. 15, 2023) ("Alameda Research Ltd. March 15, 2023 Schedules"), at 12 [D.I. 1027] (emphasis added); *Global Notes and Statements of Limitations, Methodology, and Disclaimers* (July 13, 2023) ("Alameda Research Ltd. July 31, 2023 Schedules"), at 14 [D.I. 2002]; *Global Notes and Statements of Limitations, Methodology, and Disclaimers* (Aug. 31, 2023) ("Alameda Research Ltd. Aug. 31, 2023 Schedules"), at 13 [D.I. 2291].

[12]   Alameda Research Ltd. March 15, 2023 Schedules, at 12; Alameda Research Ltd. July 31, 2023 Schedules, at 14; Alameda Research Ltd. Aug. 31, 2023 Schedules, at 13.

[13]   Alameda Research Ltd. March 15, 2023 Schedules, at 6 (emphasis added); Alameda Research Ltd. July 31, 2023 Schedules, at 8; Alameda Research Ltd. Aug. 31, 2023 Schedules, at 7.

[14]   The "Alameda Silo" refers to "a group composed of Debtor Alameda Research LLC and its Debtors subsidiaries," including Plaintiff Alameda Research Ltd.  First Day Decl. at 3, 30.  The "Ventures Silo" refers to "a group composed of Debtor Clifton Bay Investments LLC," *i.e.*, Plaintiff Alameda Ventures, "Debtor Clifton Bay Investments Ltd., Debtor Island Bay Ventures Inc. and Debtor FTX Ventures Ltd."  *Id.* at 3-4.

*Third*, the cases that the K5 Defendants cite for the proposition that "Alameda Research [Ltd.] cannot show that avoidance [of the K5 and Mount Olympus Transactions] would benefit its creditors," (Mot. at 26), are inapposite.  In particular, *Adelphia Recovery Trust* v. *Bank of Am., N.A.* and *In re HH Liquidation, LLC* are both cases in which the court considered whether a debtor had standing to bring a fraudulent conveyance claims where the debtor's creditors "ha[d] been paid in full" under the terms of a court-approved Chapter 11 plan.  *Adelphia Recovery Tr.* v. *Bank of Am., N.A*, 390 B.R. 80, 84-86 (S.D.N.Y. 2008); *In re HH Liquidation, LLC*, 590 B.R. 211, 264 (Bankr. Del. 2018) (observing that "fraudulent transfer claims are improper where . . . the creditors of the transferor are being paid in full").[15]  Clearly, this has not happened here.[16]  *In re U.S. Glove, Inc.* is even less on point.  There, the court denied **the plaintiffs'** motion for summary judgment, holding that the plaintiff had not established standing to bring a preference claim under 11 U.S.C. § 547.  2021 WL 2405399, at *10 (Bankr. D.N.M. June 11, 2021).  The court observed that "Plaintiff's standing hinges, in turn, on whether avoiding the security interest would benefit the estate.  Evidence is needed on this latter point."  *Id.*  Thus, to the extent *U.S. Glove* is relevant at all, it supports denial of the Motion so that a record may be developed through discovery.

---

[15]  *In re HH Liquidation* is distinguishable for a host of other reasons, including that it was decided after consideration of "hundreds of exhibits, numerous deposition transcripts and over 300 pages of . . . findings of fact"—and a trial.  590 B.R. at 219.  In addition, its key holding relating to fraudulent transfers was that a committee of unsecured creditors, which brought suit on behalf of several debtors, "lacks standing to seek recovery on behalf of persons who are not creditors of" a debtor.  *Id.* at 263 (citation omitted).  Although the K5 Defendants appear to dispute that there are any creditors of Alameda Research Ltd. that would benefit from avoidance, there is no dispute that Alameda Research Ltd. has standing to seek recovery of fraudulent transfers that could inure to the benefit of its creditors.

[16]  *In re Refco, Inc. Sec. Litig.* is equally irrelevant.  In that case, the special master found that neither (i) an active participant in the alleged fraudulent transaction nor (ii) the Internal Revenue Service can be a creditor for the benefit of whom an avoidance action is brought where the debtor "had no assets of its own."  2010 WL 11712926, at *6-8 (S.D.N.Y. Aug. 26, 2010).  *In re Lewis* is the furthest afield.  There, the court considered whether funds paid by a state agency directly to a university without ever being in the "possession or control" of the debtor were property of the debtor's estate.  574 B.R. 536, 540 (Bankr. E.D. Pa. 2017).  The K5 Defendants, however, do not dispute that the funds they received pursuant to the Transactions were in the possession or control of Plaintiffs, which they were (Compl. ¶¶ 80, 89).

**B.    Plaintiff Alameda Research Ventures Has a Property Interest in the Fraudulent K5 Transfer.**

The K5 Defendants incorrectly claim that the Complaint "alleges that [Alameda Ventures] never owned an interest in the transferred funds." (Mot. at 26.)  In fact, the Complaint alleges that on March 8, 2022, "Bankman-Fried caused Alameda Research Ltd. to wire $300 million to Alameda Ventures, and he directed Alameda Ventures the same day to wire the $300 million received from Alameda Research Ltd. to K5 Global." (Compl. ¶ 80.)  This is sufficient to plead that Alameda Ventures has an interest in the K5 Transfer.[17]

Plaintiff Alameda Ventures has an enforceable property interest in funds transferred from its accounts.  It is "well-settled case law" that "any bank accounts under the legal title of the debtor, as well as any deposits in such accounts credited to the debtor, are presumptively considered property of the debtor's estate." *In re FBI Wind Down, Inc.*, 581 B.R. 387, 400 (Bankr. D. Del. 2018) (citation omitted); *see also In re Meadows*, 396 B.R. 485, 490 (B.A.P. 6th Cir. 2008) (holding that funds in a debtor's checking account are property of the estate); *In re USA Diversified Prods., Inc.*, 100 F.3d 53, 55 (7th Cir. 1996) ("Property of the debtor is defined to include 'all legal or equitable interests of the debtor' . . . and obviously that includes the interest that a depositor has in the money in his account, more precisely the money owed him by the bank by virtue of the account.") (citation omitted).[18]  Thus, the Complaint's allegation that Alameda Ventures received

---

[17]    Even if this is not sufficient—which it is—the K5 Defendants do not dispute that the Complaint adequately alleges that the $300 million was the property of Alameda Research Ltd., and, therefore, dismissal of this claim with respect to Alameda Ventures would not affect Alameda Research Ltd.'s right to recover those funds as a fraudulent transfer.

[18]    *See also In re Amdura Corp.*, 75 F.3d 1447, 1451 (10th Cir. 1996) ("We presume that deposits in a bank to the credit of a bankruptcy debtor belong to the entity in whose name the account is established."); *In re Southmark Corp.*, 49 F.3d 1111, 1116-17 (5th Cir. 1995) (finding that a debtor had a property interest in funds in a "general bank account containing commingled funds, to which [it] held complete legal title"); 5 *Collier on Bankruptcy* 541.08 (16th ed. 2023) ("Deposits in the debtor's bank accounts become property of the estate under [11 U.S.C. §] 541(a)(1).").

$300 million from Alameda Research Ltd. and held it for a time establishes Alameda Ventures' interest in those funds sufficient to plead fraudulent transfer claims.

The fact that the $300 million used to execute the K5 Transaction was in Alameda Ventures' possession for a short time does not bar Alameda Ventures' recovery, and none of the cases the K5 Defendants cite say otherwise. In *In re Chase & Sanborn Corp.*, an individual named Duque—who owned the sole stockholder of the debtor but was not the debtor himself—transferred funds obtained via a personal loan to an account of a "previously defunct entity" that was "separate" from the debtor and that "had been reopened solely for the purpose of laundering this money." 813 F.2d 1177, 1179 (11th Cir. 1987). Then that "separate" entity transferred a portion of that amount to Duque's personal secretary who, in turn, transferred the funds to a third party to pay off a personal debt owned by Duque. *Id.* The trustee, who argued that the "separate entity" was an "alter ego" of the debtor, sued to avoid the transfer from the "separate" entity to Duque's personal secretary as a fraudulent transfer. *Id.* at 1179-80. Based on the record developed at trial, the court observed that that "the circumstances of the transactions clearly demonstrate that the debtor . . . did not control the funds transferred to" the secretary because (i) "[t]he source of the funds was the *personal loan* obtained by Duque," and (ii) "[t]heir eventual use was *to repay the loan obtained for Duque*" by the third party. *Id.* at 1182 (emphasis added). The fact that there was a "two-day layover" in an account belonging to a purported "alter ego" of the debtor, *id.*, was one of many that the court considered in its analysis of the transaction as a whole. Unlike in *Chase*, the K5 Transaction was not structured as a transfer of funds resulting from a "personal loan" to Bankman-Fried to repay another loan obtained by Bankman-Fried. Instead, the K5 Transaction

involved a transfer of $300 million in the possession of one debtor (Plaintiff Alameda Research Ltd.) to another debtor (Plaintiff Alameda Ventures) to K5 Global.[19]  (Compl. ¶ 80.)

**C.    The Complaint Adequately Pleads Insolvency at the Time of the Transactions and Therefore States a Claim for Constructive Fraudulent Transfers Under Federal and State Law.**

The K5 Defendants' argument that "Plaintiffs' failure to plead insolvency at the times of the [Transactions] is fatal to their constructive fraudulent transfer claims" also relies on an incorrect reading of the Complaint.   The Complaint alleges numerous facts sufficient to adequately plead insolvency at the time of both the K5 and Mount Olympus Transactions, and "other judicial proceedings" that have occurred since the Complaint was filed—on which the Court may rely, *Kane*, 10 F. Supp. 3d at 680 (citation omitted)—only reinforce this point.

"At the motion to dismiss stage, to plead adequately a constructive fraud claim 'all that is needed . . . is an allegation that there was a transfer for less than reasonably equivalent value at a time when the Debtors were insolvent.'"[20]  *In re Cred Inc.*, 650 B.R. 803, 835 (Bankr. D. Del 2023) (Dorsey, J.) (quoting *In re PennySaver*, 602 B.R. at 266); *see also* 11 U.S.C. § 548(a)(1)(B);

---

[19]   *In re Gutpelet*, cited by the K5 Defendants, is also irrelevant.   That case addressed the question of whether an individual had a property interest in real estate that she held for a period of five months, 137 F.3d 748, 752 (3d Cir. 1998); it says nothing of whether transfers to an account held by an affiliate of the transferor are the property of that affiliate.  *In re Montreal, Maine & Atl. Ry., Ltd.* similarly held only that where "the debtor holds funds as a mere disbursing agent *pursuant to a contract* that prevents it from putting the funds to any use other than that designated in the contract, the trustee cannot avoid the debtor's transfer of the funds in compliance with the contract."  888 F.3d 1, 10 (1st Cir. 2018).   There is nothing in the Complaint to suggest that the $300 million transfer from Alameda Ventures was made in its capacity as a disbursing agent or that it was "not authorized" to use the funds for some other purpose.   Rather, the Complaint clearly alleges that Bankman-Fried caused one debtor (Alameda Research Ltd.) to transfer misappropriated funds to another debtor (Alameda Ventures), and then on to the K5 Defendants.  (Compl. ¶ 80.)  *In re Lewis* is even further afield.   As explained *supra* note 16, that case considered whether a loan issued "only . . . to pay for [a] student's cost of" tuition and transferred from a government agency directly to a third party on behalf of a debtor was the property of the debtor subject to a fraudulent transfer claim.   574 B.R. at 539-40.   The Complaint clearly alleges that Plaintiff Alameda Ventures was in possession of the $300 million transferred from Plaintiff Alameda Research Ltd.  (Compl. ¶ 80.)

[20]   The K5 Defendants do not argue that Plaintiffs' constructive fraudulent transfer claims fail because the Complaint fails to adequately plead that Plaintiffs did not receive reasonably equivalent value for the K5 and Mount Olympus Transaction, nor can they.  (*See* Compl. ¶¶ 71, 74, 78, 81, 85, 91 (alleging that the interests Plaintiffs received pursuant to the Transactions were not worth the price paid).)

Del. Code Ann. tit. 6, § 1305(a).   Debtors are "not required to include precise calculations evidencing balance sheet insolvency," *In re Glencoe Acquisition, Inc.*, 2015 WL3777972, at *4 (Bankr. D. Del. June 16, 2015), and "a close analysis of insolvency is not necessary at this stage in the proceeding." *In re Our Alchemy, LLC*, 2019 WL 4447545, at *6 (Bankr. D. Del. Sept. 16, 2019).[21]   Thus, "[s]pecific findings of insolvency are best determined following discovery and should not be generally decided on a motion to dismiss." *Miller*, 2023 WL 6467368, at *6 (citing *In re PennySaver*, 587 B.R. at 459).

"In the absence of 'specific financial information,' the Court may 'reasonably infer' insolvency from other facts." *In re Rosenblum*, 545 B.R. 846, 869 (Bankr. E.D. Pa. 2016) (citation omitted).   For example, insolvency may be shown by "a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the fact thereof, or . . . an inability to meet maturing obligations as they fall due in the ordinary course of business."   *In re Tropicana Ent., LLC*, 520 B.R. 455, 472 (Bankr. D. Del. 2014) (citing *Prod. Res. Grp., LLC* v. *NCT Grp., Inc.*, 863 A.2d 772, 782 (Del. Ch. 2004); *see also In re Neighbors Legacy Holdings, Inc.*, 645 B.R. 864, 895 (Bankr. S.D. Tex. 2022) ("A plaintiff plausibly alleges insolvency with 'specific reference to [the transferor's] financial condition at the time' of the transfer." (quoting *In re ATP Oil & Gas Corp.*, 711 F. App'x 216, 223 (5th Cir. 2017))).

Plaintiffs sufficiently plead facts showing both factors set forth in *Tropicana*.   In addition to the allegation that "Plaintiffs were insolvent when, or became insolvent shortly after, the [K5 and Mount Olympus Transactions] were made" (Compl. ¶ 101; *see also id.* ¶¶ 113, 118, 134, 141, 150), Plaintiffs have alleged the following:

---

[21]   *See also In re Green Field Energy Servs., Inc.*, 2015 WL 5146161, at *7 (Bankr. D. Del. Aug. 31, 2015) ("With respect to insolvency . . . of the Debtors, . . . the Trustee did not provide a detailed valuation analysis demonstrating an exact pre-petition time frame in which the Debtors became insolvent.   But such an analysis is not necessary at this stage in the proceeding." (citing *In re DBSI, Inc.*, 445 B.R. 344, 349 (Bankr. D. Del. 2011))).

- "[T]he ***FTX Group faced a severe liquidity crisis*** that necessitated the filing of emergency Chapter 11 Cases on November 11 and 14, 2022." (Compl. ¶ 47 (emphasis added).)

- Wang admitted that in 2019 he made changes to FTX.com's code "to give Alameda Research LLC 'special privileges on the FTX platform,' including to allow Alameda Research LLC unfettered use of assets on the FTX.com exchange, even while ***Alameda Research LLC maintained negative balances*** in its own holdings of fiat (*i.e.*, government-issued) currencies and cryptocurrencies." (*Id.* ¶ 52 (emphasis added) (citation omitted).)

- Ellison admitted that "by approximately July 2022, [she] had conspired with Bankman-Fried to 'provide ***materially misleading financial statements to Alameda's lenders,'*** such as '***balance sheets that concealed the extent of Alameda's borrowing and the billions of dollars in loans that Alameda had made*** to FTX executives and to related parties.'" (*Id.* ¶ 54 (emphasis added) (quoting Ex. C (Ellison December 19, 2022 Plea Hearing Transcript) at 28:9-16).)

Additionally, documents "explicitly relied upon in the [Complaint]," which this Court may consider, *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted), provide further support for Plaintiffs' allegations that it was insolvent at the time of the Transactions. In particular, the First Day Declaration (*see* Compl. ¶ 47) states that "the main companies in ***the Alameda Silo and the Ventures Silo did not keep complete books and records of their investments and activities***." (First Day Decl. at 24 (emphasis added).) *See also In re DBSI, Inc.*, 447 B.R. 243, 248 (Bankr. D. Del. 2011) ("fail[ure] to properly account for . . . assets and liabilities" relevant to finding of insolvency). Additionally, Ellison admitted in her plea hearing (*see* Compl. ¶ 54) that:

- "Alameda" was "permitted . . . to ***maintain negative balances*** in various fiat currencies and crypto currencies." (Ellison Plea at 27:9-10 (emphasis added).)

- "Alameda had made numerous large illiquid venture investments" that were "financed . . . with short-term and open-term loans worth several billion dollars from external lenders. . . . ***When many of those loans were recalled by Alameda's lenders in and around June 2022, I agreed with others to borrow several billion dollars from FTX to repay those loans***." (*Id.* at 27:20-25–28:1-2.)

Further evidence adduced at Bankman-Fried's trial indicates that the FTX Insiders had recognized by June 2022 that "Alameda" "did not have enough liquid assets to repay all of [its] lenders" because "[it] had used a lot of them for loans and investments," Ex. A. (Transcript of Bankman-Fried Trial, October 11, 2023) at 762:4-12, and by September 2022, "Alameda" had borrowed "13 billion" and "[they could not] pay it all." Ex. B at 1403:22-23; 1407:5-11.[22]

These are not "threadbare recitals and conclusory statements of insolvency as of the time of the transaction." (Mot. at 31.) In fact, courts have routinely found plaintiffs plead insolvency for purposes of constructive fraudulent conveyance claims on the basis of similar allegations. For example, in *In re Centaur, LLC*, plaintiffs alleged that (i) the debtor had "incurred massive debt prior to making the" allegedly fraudulent transfers, (ii) the value of the debtor's assets was "grossly overestimated," and (iii) the debtor incurred additional debt to execute an allegedly fraudulent transfer. 2013 WL 4479074, at *4 (Bankr. D. Del. Aug. 19, 2013). Similarly, as explained above, Plaintiffs plead (i) that Alameda Research LLC had "special privileges" to "maintain negative balances" (Compl. ¶ 52; Ex. C at 27:5-18); (ii) that Alameda's lenders were provided "materially misleading financial statements" (Compl. ¶ 54; Ex. C at 28:9-21); and (iii) that Plaintiffs intended to incur debts beyond Plaintiffs' ability to repay (Compl. ¶¶ 113, 118, 134; *see also* Ex. C at 27:19–28:1-8 (explaining that in June 2022—immediately after, during, and before the transfers at issue[23]—Alameda had to incur more debt to pay off its existing lenders)). These "factual allegations, taken as true, provide enough detail of insolvency upon which to base the avoidance claims." *In re Direct Response Media, Inc.*, 466 B.R. 626, 655-56 (Bankr. D. Del.

---

[22]    Ellison also testified that "Alameda" documents show that "its total liability on all of Alameda's FTX accounts" in June 2022 "was around negative $10 billion" and that loans were paid "[b]y taking money from various sources, including FTX customer funds as well as our other liquid assets." Ex. A, at 770:1-18.

[23]    The $300 million K5 Transfer occurred on March 8, 2022, and the K5 Transaction closed on May 26, 2022. (Compl. ¶ 67.) Transfers made pursuant to the Mount Olympus Transaction were made on May 26, 2022, June 7, 2022, and September 20, 2022. (Compl. ¶ 89.)

2012) (finding plaintiffs had adequately pleaded insolvency on the basis that, among other allegations, the debtor "was unable to pay its obligations" and had sought a loan to pay its debts); *see also In re Midway Games Inc.*, 428 B.R. 303, 321 (Bankr. D. Del. 2010) (finding plaintiffs had adequately pleaded insolvency on the basis that, among other allegations, the debtor was "not paying its debts," "had large trade debt," and had informed its board that it "was running out of cash").

### D. The Complaint Adequately Pleads Intentional Fraudulent Transfer Under Federal and State Law.

The K5 Defendants argue that Plaintiffs' actual fraudulent conveyance claims fail because (i) "Plaintiffs do not assert any allegations with respect to their creditors" and (ii) "Plaintiffs do not allege fraudulent intent in connection with" the Transactions. (Mot. at 32.) Both assertions are wrong and, indeed, puzzling, in light of the fact that all of the FTX Insiders have either pleaded guilty to, or been convicted of, committing a massive fraud to the detriment of scores of creditors. Plaintiffs clearly pleaded that the Transactions were "to the detriment" of their creditors. (Compl. ¶¶ 80, 90.) And Plaintiffs clearly pleaded that Bankman-Fried coordinated the Transactions with actual intent to defraud Plaintiffs' creditors, and have alleged multiple "badges of fraud."

#### 1. Plaintiffs Are Not Required to Identify a Specific Creditor with Respect to Their Actual Fraudulent Transfer Claims.

The K5 Defendants provide no support for their argument that "there is immediate cause to dismiss Plaintiffs' actual fraudulent transfer claims" because "Plaintiffs do not assert any allegations with respect to their creditors." (Mot. at 32.) In fact, the Complaint contains several well-pleaded allegations that the Transactions were "to the detriment of Plaintiffs, Debtors, *and creditors*, including customers." (Compl. ¶¶ 80, 90; *see also id.* ¶ 49.) Drawing all reasonable inferences in Plaintiffs' favor, the Complaint adequately alleges that Plaintiffs' creditors were

defrauded by the Transactions.  To the extent that the K5 Defendants argue that Plaintiffs must specifically identify which of Plaintiffs' creditors were defrauded by the Transactions, that is not required.  *See In re PennySaver*, 602 B.R. at 267 (interpreting 11 U.S.C. § 544 and stating, "[a]t the pleading stage, the Trustee does not need to allege the existence of or name an unsecured creditor, and may claim avoidance of any transfers incurred by the debtor under 'applicable law.'").[24]

### 2.  Plaintiffs Adequately Allege Fraudulent Intent.

A debtor may avoid any transfer "of an interest of the debtor in property" if such transfer was made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made . . . , indebted."  11 U.S.C. § 548(a)(1)(A); *accord* Del. Code Ann. tit. 6 § 1304(a)(1).  "Actual intent to defraud is usually not susceptible to direct evidence; courts therefore may rely on circumstantial evidence to infer such intent," including "badges of fraud."  *In re Millennium Lab Holdings II, LLC*, 2019 WL 1005657, at *3 (Bankr. D. Del. Feb. 28, 2019).  But badges of fraud "are essentially beside the point" where, as here, "the plaintiff[s] make[] specific factual allegations, in a non-conclusory fashion, of [debtors'] actual intent to defraud [their] creditors."  *Drivetrain, LLC* v. *X. Com., Inc.*, 2023 WL 1804627, at *3 (Bankr. D. Del. Feb. 7, 2023).  Here, the Complaint adequately alleges that (i) Bankman-Fried, both generally and with respect to the Transactions, actually intended to

---

[24]   *See also In re Pitt Penn Holding Co., Inc.*, 2011 WL 4352373, at *12 (Bankr. D. Del. Sept. 16, 2011) (observing that in the context of a § 544 claim for constructive fraudulent conveyance, "[w]hen analyzing the sufficiency of a complaint for purposes of Rule 12(b)(6), courts do not generally require a trustee to plead the existence of an unsecured creditor by name") (citation omitted).  In any event, the very Schedules cited in the Motion evidence the existence of numerous secured and unsecured creditors of both Plaintiffs.  Alameda Research Ltd. Aug. 31, 2023 Schedules, at 48-77; *Global Notes and Statements of Limitations, Methodology, and Disclaimers* (Aug. 31, 2023), at 49-52 [D.I. 2300].

defraud creditors and, in any event, (ii) there were several "badges of fraud" sufficient to infer actual intent to hinder, delay or defraud Plaintiffs' creditors.

*First*, Plaintiffs "adequately allege[] facts that would support a direct inference that a transfer was made with the actual intent to hinder, delay, or defraud creditors." *Drivetrain,* 2023 WL 1804627, at *3. Specifically, the Complaint alleges that "[t]he FTX Insiders . . . took advantage of the FTX Group's lack of controls and recordkeeping to perpetrate a massive fraud— lavishly spending the FTX Group's assets on, among other things . . . various investments. The K5 Transaction and Mount Olympus Transaction were two such investments." (Compl. ¶ 48.) To execute this "massive fraud," "Bankman-Fried and other FTX Insiders had surreptitiously and unlawfully transferred assets from FTX.com . . . to Alameda Research LLC and its affiliates, including Plaintiffs." (*Id.* ¶ 49.)[25] Specifically, Bankman-Fried set up an entity he and other FTX Insiders owned, SGN Albany, "for the purpose of engaging in the [Transactions]." (*Id.* ¶ 35.) Thus, by entering into the Transactions, Bankman-Fried used "other people's money" to enrich himself and "burnish his own political and social influence," and not to benefit the FTX Group, generally, or Plaintiffs, specifically—a classic case of looting. (*Id.* ¶ 50.)

This Court's recent decision in *Drivetrain, LLC* is instructive. In *Drivetrain*, the disputed "transaction was part of an elaborate ruse that played a critical role in the debtor's larger fraudulent scheme," which was "one in which the debtor sought to defraud its creditors." 2023 WL 1804627, at *4. Thus, the "complaint sufficiently allege[d] actual intent to defraud creditors to survive a motion to dismiss." *Id.* The same is true here. Plaintiffs allege that the Transactions "served no other purpose but to allow [Bankman-Fried] and his associates . . . to perpetuate fraud

---

[25] Although the K5 Defendants would have this Court ignore the context in which the Transactions took place by arguing "allegations regarding non-plaintiff debtors are irrelevant" (Mot. at 34), they cite to no case law that requires—or even suggests—that the Court disregard any well-pleaded facts of the Complaint.

on [the FTX Group's] . . . investors" and other creditors, including customers. *Id.* at *3 (internal quotation marks omitted). (*See also* Compl. ¶¶ 80, 90.)

The out-of-circuit decision upon which the K5 Defendants rely, *In re Rollaguard Sec., LLC*, 570 B.R. 859 (Bankr. S.D. Fla. 2017), is not to the contrary, and the facts are easily distinguishable. In that case, the trustee-plaintiff sought to avoid as actual fraudulent transfers "the Debtors' deposits in [the Debtors'] own bank accounts," but fell short of alleging that the debtors "had fraudulent intent when it deposited funds into its own bank accounts." 570 B.R. at 879. In contrast, here, the "Complaint[] . . . includes allegations of fact tending to show that" there was "fraudulent intent in making" the transfers *from* Plaintiffs accounts, *id.*, including by alleging that the Transactions were two "investments" that were executed with looted funds, and personally benefited Bankman-Fried, Wang, and Singh (*see* Compl. ¶¶ 48-50). This is sufficient "to prosecute a claim based on actual intent to hinder, delay, or defraud a creditor." *In re Rollaguard*, 570 B.R. at 878-79.

*Second*, although not necessary, Plaintiffs' well-pleaded allegations support at least *five* badges that this Court has found sufficient to plead actual intent to defraud.[26] In particular, the Complaint alleges (i) a close relationship between Bankman-Fried and the K5 Defendants; (ii) that Plaintiffs were insolvent when the Transactions were made; (iii) that Plaintiffs did not receive reasonably equivalent value in exchange for either of the Transactions; (iv) that the Transactions were "hasty transfer[s] not in the usual course of business"; and (v) that the

---

[26] The "badges of fraud" include, but are not limited to, "(1) a close relationship among the parties to the transaction; (2) a secret and hasty transfer not in the usual course of business; (3) inadequacy of consideration; (4) the transferor's knowledge of the creditor's claim and the transferor's inability to pay it; (5) the use of dummies or fictitious parties; and (6) retention of control of property by the transferor after the conveyance." *In re DSI Renal Holdings*, 574 B.R. at 465. Courts also look to allegations of insolvency and lack of reasonably equivalent value as "badges of fraud." *See In re Live Well Fin., Inc.*, 2023 WL 3995900, at *15 (Bankr. D. Del. June 13, 2023); *see also In re J & M Sales, Inc.*, 2021 Bankr. LEXIS 2268, at *88-89 (Bankr. D. Del. Aug. 20, 2021) (identifying six badges of fraud courts "rely on . . . to infer fraudulent intent"); *In re Zohar III, Corp.*, 631 B.R. 133, 174 (Bankr. D. Del. 2021) (same).

Transactions relied on "the use of dummies or fictitious parties." *In re Live Well Fin., Inc.*, 2023 WL 3995900, at *15 ("[T]he confluence of several [badges] in one transaction generally provides conclusive evidence of an intent to defraud." (quoting *In re Fedders N. Am., Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009))); *In re DSI Renal Holdings, LLC*, 574 B.R. 446, 465 (Bankr. D. Del. 2017) (identifying the latter two as "badges of fraud").

> **(i)      Badge of Fraud No. 1:  The Close Relationship Between Bankman-Fried and the K5 Defendants.**

Plaintiffs adequately pleaded "a close relationship among the parties to the transaction." *In re DSI Renal Holdings*, 574 B.R. at 465; *In re PennySaver*, 602 B.R. at 272 ("The Trustee sufficiently alleges a relationship between the Debtors and each . . . Defendant" as a "badge of fraud."). Specifically, the Complaint alleges the following:

- Bankman-Fried considered himself "aligned with [Defendant Bryan Baum] and K5, and ***treats $1 to it as $1 to FTX*** even though we only own 33%, because whatever, we can always true up cash if needed, but also who cares." (Compl. ¶ 96 (emphasis added).)

- Bankman-Fried stated, "There are logistical, PR, regulatory, etc[.] reasons to not just merge K5 100% into FTX ***but I and Br[y]an will both act how we would if they were merged***." (*Id.* (emphasis added).)

- When asked whether Baum agreed with the above two statements, Baum responded, "***Agree with all***—FTX FTW!" (*Id.* (emphasis added).)

- FTX's former Chief Regulatory Officer, Daniel Friedberg, "instructed an FTX executive to 'send [Baum] the stuff FTX Ventures has bought into recently' to ensure that 'K5 and our internal ventures team' were 'keep[ing] each other informed on what is being invested,'" and stated that "this is important as ***we view K5 as part of SBF's team***." (*Id.* ¶ 97 (emphasis added).)

- "The luxury apartments that Bankman-Fried purchased in the Bahamas even included a room reserved for Baum." (*Id.* ¶ 6; *see also id.* ¶ 93.)

- Kives and Baum "[took] advantage of opportunity to benefit themselves at Bankman-Fried's expense" by over-charging for services allegedly rendered to the FTX Group. (*Id.* ¶ 98.)

- Kives and Baum attempted to assist Bankman-Fried "when [his] fraudulent scheme began to collapse" by "work[ing] behind the scenes . . . on a strategy to find someone to bail out the FTX Group." (*Id.* ¶¶ 99-100.)

These facts, taken together, are sufficient to allege a close relationship between the Plaintiffs and K5 Defendants that would indicate a "badge of fraud." *See In re PennySaver*, 602 B.R. at 272 (finding a "badge of fraud" where plaintiff had "sufficiently allege[d] a relationship" between the debtor and defendant that allowed defendant to "remov[e] cash [from the debtor] to pay . . . itself").

### (ii)    Badge of Fraud No. 2:  Plaintiffs' Insolvency at the Time of the Transactions.

As explained above, Plaintiffs adequately pleaded that they were insolvent at the time of the Transactions. *See supra* Section I.C; *see also In re Live Well Fin., Inc.*, 2023 WL 3995900, at *15 (finding debtor's "insolven[cy] at the time the obligations were incurred" constituted a "badge of fraud"). These "factual allegations, taken as true, provide enough detail of insolvency upon which to base the avoidance claims." *In re Direct Response Media*, 466 B.R. at 655-56; *see also In re PennySaver*, 602 B.R. at 270 ("Insolvency is best left to discovery to determine and should not generally be decided on a motion to dismiss.").

### (iii)   Badge of Fraud No. 3:  Plaintiffs' Failure to Receive Reasonably Equivalent Value for the K5 and Mount Olympus Transactions.

The issue of whether Plaintiffs received "reasonably equivalent value" is a fact question, and the K5 Defendants cannot litigate the merits of whether they, in fact, provided "substantial consideration" (Mot. at 35) on a motion to dismiss. *In re Qimonda Richmond, LLC*, 467 B.R. 318, 327 (Bankr. D. Del. 2012) (finding that "the issue of 'reasonably equivalent value' requires a factual determination that cannot be made on a motion to dismiss"). Nonetheless, Plaintiffs have adequately pleaded that they did not receive reasonably equivalent value for the $700 million they provided to the K5 Defendants. *See In re Live Well Fin., Inc.*, 2023 WL

3995900, at *15 (finding debtor's receipt of "less than reasonably equivalent value" constituted a "badge of fraud").  As explained *supra* page 6, Plaintiffs have alleged that they have not identified any information to justify the $300 million "investment" in Defendants K5 Global (Compl. ¶¶ 71, 81), MBK Capital (*id.* ¶ 75), and K5 Technology (*id.* ¶ 78); and Alameda Research Ltd., as an 8.33% owner of SGN Albany, did not receive anything approaching reasonably equivalent value in exchange for the $400 million it transferred to Mount Olympus.

### (iv) Badge of Fraud No. 4:  The Transactions Constituted a "Hasty Transfer Not in the Usual Course of Business."

In addition, Plaintiffs have adequately alleged that the Transactions resulted in a "hasty transfer not in the usual course of business."  *In re DSI Renal Holdings*, 574 B.R. at 465. The $300 million used to pay for it was transferred *one day after* the informal Term Sheet was signed (Compl. ¶ 80) and more than two months before SGN Albany, which was to receive the interests in certain of the K5 Defendants, was formed.  Moreover, no due diligence was conducted before signing the Term Sheet (*id.* ¶¶ 5, 50; *see also id.* ¶¶ 71, 75, 78, 81), and no financial advisors assisted with the Transactions (*id.* ¶¶ 71, 85).

### (v) Badge of Fraud No. 5:  The Use of a Dummy or Fictitious Party.

Finally, Plaintiffs have adequately alleged that Bankman-Fried used a "dumm[y] or fictitious part[y]."  *In re DSI Renal Holdings*, 574 B.R. at 465.  SGN Albany was a "newly-created shell corporation[]" specifically set up for the Transactions, and which was operated "with near-total disregard for corporate formalities" (Compl. ¶¶ 8-9).

## II. THE COMPLAINT ADEQUATELY PLEADS A PREFERENTIAL TRANSFER UNDER FEDERAL LAW.

The Complaint adequately alleges that the $100 million transfer from Alameda Research Ltd. to Mount Olympus was a preferential transfer.  In particular, Plaintiffs allege that the payment was made (i) "on account of an antecedent debt" to Mount Olympus and (ii) "for the

benefit of a creditor" of Alameda Research Ltd.  With respect to the latter element, the K5 Defendants would have this Court accept that because on paper SGN Albany owed the obligation to Mount Olympus, Alameda Research Ltd. owed no "antecedent debt." (*See* Mot. at 37-38.)  But this argument ignores the allegation that Bankman-Fried operated the companies he controlled "with near-total disregard for corporate formalities." (Compl. ¶ 9.)  As a result, Bankman-Fried treated the debt owed by SGN Albany as an "antecedent debt" owed by Alameda Research Ltd. Together with the presumption that Alameda Research Ltd. was insolvent at the time of the transfer, these allegations are sufficient to recover the $100 million as a preferential transfer.

The Bankruptcy Code uses "the broadest possible definition of 'debt,'" *Crumpton* v. *McGarrity*, 2012 WL 4466527, at *4 (M.D. Fla. Sept. 27, 2012), *aff'd sub nom. In re Northlake Foods, Inc.*, 518 F. App'x 604 (11th Cir. 2013), and the term "debt" applies "even if the claim is unliquidated, unfixed or contingent." *In re Energy Coop., Inc.*, 832 F.2d 997, 1001 (7th Cir. 1987); *see also In re First Jersey Sec., Inc.*, 180 F.3d 504, 510 (3d Cir. 1999) (noting that the definition of "debt" includes "all legal obligations of the debtor, no matter how remote or contingent" (internal quotations omitted)).  The Term Sheet for the Transactions provided for "the subscription by [Bankman-Fried] for a limited partnership interest in" Mount Olympus.  (Compl. ¶ 62.)  The Term Sheet further provided that "Mount Olympus would start with an initial capital contribution of $200 million 'from SBF,' and would target a total annual contribution of $1 billion 'for at least the first three years'" (*id.* ¶ 65), thus incurring a debt to Mount Olympus for a period of three years.  SGN Albany had no assets and was therefore unable to pay the required $100 million (*see id.* ¶¶ 8, 50), so Bankman-Fried treated this debt as belonging to Alameda Research Ltd., which owned approximately 8% of SGN Albany, and caused Alameda Research Ltd. to transfer the funds.

The K5 Defendants have argued to this Court that "there appears to be no basis for Plaintiffs to allege that SGN is a separate legal entity from Plaintiffs."[27]  This argument is baseless. SGN Albany was a non-Debtor entity, and its only apparent purpose was to serve as a vehicle for Bankman-Fried to route misappropriated FTX Group funds.  But the K5 Defendants cannot have it both ways.  On the one hand, they argue that SGN Albany "[was] obligated" to pay Mount Olympus in the event of a capital call—not Alameda Research Ltd.—and, thus, Alameda Research Ltd. owed no antecedent debt.  (Mot. at 37-38.)  On the other hand, they argue that "SGN appears to be a mere shell with no corporate separateness from Plaintiffs."  (K5 Defendants' Statement at 3.)  If the latter is true, however, then the $100 million transfer must be treated as a transfer "on account of an antecedent debt" owed by Alameda Research Ltd.[28]

For that same reason, Plaintiffs adequately plead the second element of their preference claim, *i.e.*, that Alameda Research Ltd.'s $100 million transfer to Defendant Mount Olympus was "for the benefit of a creditor."  11 U.S.C. § 547(b)(1).  Mount Olympus, as a creditor of Alameda Research Ltd.—which was treated as having owned the debt to Mount Olympus— "benefited" from the $100 million transfer to Mount Olympus.

Although the K5 Defendants attempt to argue that Plaintiffs' purported failure to plead insolvency either at the time of the Transactions or as of November 2022 defeats their preference claim, it is well settled that "for the purposes of preferential transfers, it is presumed that the debtor is insolvent for the 90-day period before the date of filing."  *In re NWL Holdings,*

---

[27]  *K5 Defendants' Statement Regarding Plaintiffs' Motion for Default Judgment Against SGN Albany Capital LLC* ("K5 Defendants' Statement") [Adv. D.I. 30] at 3.  They appear to have done so to manufacture an argument that they gave "value" to a Debtor and therefore have a "good faith" defense under 11 U.S.C. § 548(c).

[28]  The K5 Defendants' reliance on *In re Oakland Physicians Med. Ctr., LLC* is misplaced.  In that case, the court interpreted the phrase "antecedent debt" as used in 11 U.S.C. § 548—not § 547—and based its conclusion that certain advances "were not on account of an antecedent debt" only after a trial because the court had determined that "there [was] a genuine issue of material fact on whether the advances constituted debt or capital contributions."  596 B.R. 587, 624 (Bankr. E.D. Mich. 2019).

*Inc.*, 2013 WL 2436667, at *4 (Bankr. D. Del. June 4, 2013) (quoting 11 U.S.C. § 547(f)). Nonetheless, the Complaint alleges that Alameda Research Ltd. was insolvent for the entirety of the preference period. *See supra* Section I.C. Even if the Schedules provided any support for Plaintiffs' position—which they do not, *supra* Section I.A—"insolvency is best left to discovery to determine and should not generally be decided on a motion to dismiss." *In re PennySaver USA Publ'g, LLC*, 602 B.R. at 270.

Finally, Plaintiffs have adequately pleaded that they undertook "due diligence" before filing their preference claim. Although "the due diligence requirement is an element of the preference claim" and a "condition precedent" for pleading a preference claim pursuant to Section 547, "it suffices to allege generally that all conditions precedent have occurred or been performed." *In re Pinktoe Tarantula Ltd.*, 2023 WL 2960894, at *5 (Bankr. D. Del. Apr. 14, 2023) (quoting Federal Rule of Civil Procedure 9(c)). Thus, "[a] general allegation that all conditions precedent have occurred satisfies this pleading requirement." *Id.* Here, the Complaint alleges that "Plaintiff Alameda Research Ltd. has undertaken reasonable due diligence under the circumstances of the case and taken into account known or reasonably knowable affirmative defenses and believes the September 2022 Transfer is avoidable." (Compl. ¶ 153.) This is sufficient to satisfy Rule 9(c)'s "modest pleading standard." *Jean-Pierre* v. *Schwers*, 682 F. App'x 145, 147 (3d Cir. 2017).

## III.    THE COMPLAINT ADEQUATELY PLEADS PROPERTY RECOVERY.

Because Plaintiffs have adequately pleaded all of their fraudulent and preferential transfer claims, Plaintiffs' Section 550 property recovery claims (*i.e.*, Counts 10-11) should not be dismissed as the K5 Defendants argue (Mot. at 41). *See Miller*, 2023 WL 6467368, at *6 (declining to dismiss a claim pursuant to 11 U.S.C. § 550 where a claim for fraudulent transfer survives a motion to dismiss). "Whenever a claim is one heretofore cognizable only after another claim has been prosecuted to a conclusion, the two claims may be joined in a single action." Fed. R. Bankr.

P. 18.   Thus, "[b]ecause it is possible that the Plaintiffs' [Section 550] claim may become 'cognizable' after the fraudulent transfer claims are prosecuted to conclusion, the [Section 550] claim is legitimately joined with the Plaintiffs' other claims . . . and is not subject to dismissal for failure to state a claim."   *See In re Com. Fin. Servs., Inc*., 322 B.R. 440, 452 (Bankr. N.D. Okla. 2003) (discussing disallowance of claims pursuant to Section 502(d)).[29]

## IV.   THE COMPLAINT ADEQUATELY PLEADS AIDING AND ABETTING BREACH OF FIDUCIARY DUTY UNDER DELAWARE LAW AND DISHONEST ASSISTANCE UNDER BRITISH VIRGIN ISLANDS LAW.

### A.   The Complaint Adequately Alleges Aiding and Abetting Breach of Fiduciary Duty Under Delaware Law.

Under Delaware law,[30] a valid claim for aiding and abetting a breach of fiduciary duty requires:  "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach."   *In re DSI Renal Holdings*, 574 B.R. at 474.   The Complaint properly pleads each element of its claim against Kives and Baum for aiding and abetting Bankman-Fried's breach of fiduciary duty against Plaintiff Alameda Ventures (*i.e.*, Count 13).

### 1.   Bankman-Fried Breached a Fiduciary Duty He Owed to Plaintiff Alameda Ventures.

The Complaint alleges that "[a]t all relevant times, Bankman-Fried was a managing member of Alameda Ventures and owed fiduciary duties to Alameda Ventures under Delaware law, including duties of care, loyalty, honesty, and disclosure."  (Compl. ¶ 166.)  *See In re W.J. Bradley Mort. Capital, LLC*, 598 B.R. 150, 162-63 (Bankr. D. Del. 2019) ("Delaware law is clear

---

[29]   The K5 Defendants argue that because they have not filed a proof of claim against Plaintiffs, Plaintiffs' Section 502(d) claim must be dismissed.  (Mot. at 41.)  Plaintiffs do not object to the dismissal without prejudice of its Section 502(d) claim against the K5 Defendants (*i.e.*, Count 16).

[30]   The parties do not dispute that the law of Delaware, where Alameda Ventures is incorporated, governs this claim. *See In re Fedders*, 405 B.R. at 539, 543  (finding that "the state under which the corporation in question is chartered" has authority to adjudicate "claim[s] for aiding and abetting breach of fiduciary duty").

that officers, directors, and managers owe a company they serve the traditional triad duties of care, loyalty and good faith" (citing *In re Fedders N. Am., Inc.*, 405 B.R. at 539)).  The Complaint clearly alleges that Bankman-Fried breached these duties.

As an initial matter, Bankman-Fried has been convicted of seven counts of fraud and conspiracy for embezzling billions of dollars of customer deposits from the FTX Group exchanges.  Thus, that Bankman-Fried breached his fiduciary duties with respect to the FTX Group is a matter of public record.  Nonetheless, the Complaint itself alleges that Bankman-Fried and the FTX Insiders perpetrated a massive fraud against "Plaintiffs, Debtors and creditors, including customers" by "surreptitiously and unlawfully transferr[ing] assets from FTX.com . . . to Alameda Research LLC and its affiliates, including Plaintiffs, to spend on the FTX Insiders' pet projects." (Compl. ¶ 49.)  In addition, Plaintiffs allege that Bankman-Fried, specifically, "fail[ed] to inform [himself] fully and in a deliberate manner" before instructing Alameda Ventures to transfer $300 million to the K5 Defendants, and thereby breached his duty of care.  *See In re Fedders*, 405 B.R. at 539 (observing that "[a] plaintiff cannot prove a breach of the duty of care without a showing of gross negligence," which "generally requires directors and officers to fail to inform themselves fully and in a deliberate manner").  Specifically, the Complaint alleges that "[n]o meaningful due diligence was conducted prior to signing the Term Sheet [or] wiring $300 million to K5 Global," and that "no financial advisor assisted in evaluating the terms of this transaction or its expected return" (Compl. ¶¶ 5, 71).  This is sufficient to allege that Bankman-Fried breached *at least* his duty of care.  *In re Solutions Liquidation LLC*, 608 B.R. 384, 398 (Bankr. D. Del. 2019) ("[G]ross negligence may be pled by a complaint alleging that a board undertook a major acquisition without

conducting due diligence, [or] without retaining experienced advisors." (quoting *In re Fedders*, 405 B.R. at 539)).[31]

**2.      Defendants Kives and Baum Knowingly Participated in the Breach.**

The Complaint adequately alleges that Kives and Baum "knowingly participated" in Bankman-Fried's breaches of fiduciary duty to Alameda Ventures. "To establish knowledge, 'the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper.'" *New Enterprise Assocs. 14, LP* v. *Rich*, 292 A.3d 112, 175 (Del. Ch. 2023). "[O]n the question of pleading knowledge, however, Rules 12(b)(6) and Rule 9(b) are very sympathetic to plaintiffs." *Wells Fargo & Co.* v. *First Interstate Bancorp*, 1996 WL 32169, at *11 (Del. Ch. Jan. 18, 1996). "For purposes of a motion to dismiss under Rule 12(b)(6), a complaint need only plead facts supporting a reasonable inference of knowledge." *New Enterprise*, 292 A.3d at 175 (citation omitted). "[T]he Rule 9(b) heightened pleading requirement generally does not apply to the state law claims . . . of aiding and abetting breach of fiduciary duty." *In re Fruehauf Trailer Corp.*, 250 B.R. 168, 198 (D. Del. 2000). Moreover, "in some circumstances, the nonfiduciary's actions may be so suspect as to permit, if proven, an inference of knowledge of an intended breach of trust." *Triton Constr. Co., Inc.* v. *Eastern Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *16 (Del. Ch. May 18, 2009). "To satisfy the requirement of participation, a plaintiff can plead that . . . a third party . . . facilitat[ed] or induc[ed] a breach of the duty of care." *Firefighters' Pension Sys. of City of Kan. City* v. *Presidio, Inc.*, 251 A.3d 212, 275 (Del. Ch. 2021) (citing cases). "[G]iving 'substantial assistance or encouragement' to the

---

[31]   The $300 million transfer from Plaintiff Alameda Research Ltd. to Alameda Ventures is "presumptively considered property of [Alameda Ventures'] estate." *In re FBI Wind Down, Inc.*, 581 B.R. 387, 400 (Bankr. D. Del. 2018); *see supra* Section I.B. Therefore, Plaintiffs sufficiently plead the fourth element of aiding and abetting breach of fiduciary duty, *i.e.*, that Alameda Ventures suffered "damages proximately caused by the breach." *In re DSI Renal Holdings*, 574 B.R. at 474.

fiduciary in breaching its duty is sufficient to satisfy the participation requirement." *Id.* at 276 (quoting *Restatement (2nd) of Torts* § 876 (1979)).

The Complaint alleges ample facts supporting a reasonable inference that Kives and Baum knowingly participated in Bankman-Fried's breaches of fiduciary duty. Specifically, the Complaint alleges that "Kives and Baum knew that the K5 Transaction Entities were overvalued and that the K5 Transaction did not provide Alameda Ventures (which had no stake in SGN Albany) . . . with reasonably equivalent value." (Compl. ¶ 81.)[32] The Complaint also alleges that "Kives and Baum . . . understood that, by virtue of SGN Albany's ownership structure, nearly all of the economic benefit of Alameda Research Ltd.'s investment," *i.e.*, the K5 Transfer, "went to Bankman-Fried, Wang and Singh personally." (*Id.*) In addition, the Complaint alleges that Kives and Baum failed to provide Bankman-Fried information about the "investments," which they controlled and which were necessary to conduct even minimal due diligence on the Transactions and, therefore, knew that no such due diligence occurred. (*See id.* ¶ 71 ("Plaintiffs' investigation has not uncovered any information to substantiate the implied $106.5 million valuation for K5 Global.").) By failing to provide this information, Kives and Baum also "facilitate[d] [Bankman-Fried's] breach." *Firefighters' Pension Sys.*, 251 A.3d at 275 (observing that "a third party can facilitate a breach by withholding information in a manner that misleads the fiduciary on a material point" and citing cases).

Together, these allegations support a reasonable inference that Kives and Baum (i) *knew* that Bankman-Fried was using the K5 Transaction to divert funds from Alameda Ventures

---

[32] This is supported by additional allegations that (i) $214.5 million of the K5 Transfer was used to purchase an approximately 38% partnership interest in Defendant MBK Capital, despite MBK Capital having "a gross asset value of just $2.94 million" in March 2022, "meaning that SGN Albany overpaid more than 200-fold" (*id.* ¶ 74); and (ii) that the "funds that K5 Technology managed would have needed to produce astronomical returns to justify the valuation implied by SGN Albany's investment" (*id.* ¶ 78). As owners of each of these entities, Kives and Baum were perfectly aware that they were fleecing Bankman-Fried and the Plaintiffs.

into his own pockets; (ii) *knew* that Bankman-Fried was doing so on the basis of incomplete information as a result of their failure to provide necessary information; and (iii) that by selling interests **in their own companies** to Bankman-Fried, Kives and Baum *facilitated* this conduct. *See In re Rural Metro Corp.*, 88 A.3d 54, 99 (Del. Ch. 2014) ("[A] claim for aiding and abetting a breach of the duty of care can be maintained . . . when a third party, for improper motives of its own, misleads the directors into breaching their duty of care."). Discovery is likely to reveal additional information about the close relationship between Kives and Baum and Bankman-Fried.

*In re Cred Inc.* is fundamentally different from this case and is not to the contrary. (*See* Mot. at 45-46.) There, this Court found that plaintiffs had failed to allege facts sufficient to establish either knowledge or participation where (i) "[t]he breach alleged is the gross mismanagement of" the debtor, and (ii) the defendant's alleged "participation" was unrelated to "the management of [the debtor], let alone with the aspects of management that were lacking." *In re Cred Inc.,* 650 B.R. 803, 829 (Bankr. D. Del. 2023) (finding that "[n]othing in the Complaint suggests that [the defendant] was involved in any way with the management of" the debtor). Therefore, this Court determined that the plaintiff sought "to hold [defendant] liable for doing nothing more than creating circumstances that enabled [debtor] to assume more debt," which led to its downfall. *Id.* This is not the case here. As explained above, the Complaint alleges that Kives and Baum were considered "part of [Bankman-Fried's] team" (Compl. ¶ 97), and used their position of trust to induce Bankman-Fried to grossly overpay for minority interests in management companies Kives and Baum owned, and for minority interests controlled by Kives and Baum in unproven companies, for which Kives and Baum provided no information with which Bankman-Fried could satisfy his duty of care to Alameda Ventures. This is sufficient to draw a reasonable inference of knowing participation. *Jackson Nat'l Life Ins. Co.* v. *Kennedy*, 741 A.2d

377, 392 (Del. Ch. 1999) (finding that a non-fiduciary's knowing participation can be inferred "if a fiduciary breaches its duty in an inherently wrongful manner, and the plaintiff alleges specific facts from which that court could reasonably infer knowledge of the breach").

### 3. The Aiding and Abetting Breach of Fiduciary Duty Is Not Barred by the Doctrine of *In Pari Delicto*.

The K5 Defendants incorrectly argue that the Court should dismiss the breach of fiduciary duty claim on the basis of the *in pari delicto* defense. As an initial matter "the general rule that knowledge of an officer or director of a corporation will be imputed to the corporation," *Teachers' Ret. Sys. of La.* v. *Aidinoff*, 900 A.2d 654, 671 n.23 (Del. Ch. 2006), does not apply where, as here, "third parties conspire with the faithless insider in a plan to impoverish the corporation for the benefit of the insider and the other conspirators," *In re Am. Int'l Grp., Inc.*, 976 A.2d 872, 891 (Del. Ch. 2009). In such cases, "the doctrine of *in pari delicto* gives way in order to allow recovery from anyone who helped steal from the corporation," and "the corporation should be able to sue the third party that helped the fiduciary harm the corporation." *Id.* As explained above, the Complaint alleges that Bankman-Fried—the paradigmatic "faithless insider"—"personally benefited from the K5 Transaction" because he was the majority owner of Defendant SGN Albany, the entity that subsequently received the interests in the K5 Defendants involved in the K5 Transaction. (Compl. ¶¶ 35, 81, 168.) Alameda Ventures, meanwhile, "did not receive, and had virtually no prospect of receiving, reasonably equivalent value" for the K5 Transaction. (*Id.* ¶ 167.)[33]

---

[33] Moreover, "*in pari delicto* will not bar an action where the suit involves sufficiently important countervailing interests of public policy." *In re Am. Int'l Grp., Inc.*, 976 A.2d at 883. Here, denying Alameda Ventures the possibility to recover for aiding and abetting of Bankman-Fried's breach of fiduciary duty described in the Complaint based on the latter's decisions when they controlled Alameda Ventures would serve only to reward the K5 Defendants while leaving the Alameda Ventures' creditors empty-handed. This outcome would create—not avoid—an injustice.

To the extent the K5 Defendants dispute these allegations, they should not be litigated at this stage.   As other courts have observed, the doctrine of *in pari delicto* "is an affirmative defense, so while it can be decided on a motion to dismiss in certain circumstances, if factual issues exist, such a motion must be denied." *In re Seaboard Hotel Member Assocs., LLC*, 2021 Bankr. LEXIS 1564, at *42 (Bankr. D. Del. June 10, 2021); *see also In re Green Field Energy Servs., Inc.*, 554 B.R. 315, 322 (Bankr. D. Del. 2016) (deferring ruling on an *in pari delicto* defense where the "[d]efendants' conduct remains alleged and the Court would want to know more than is available at the motion to dismiss stage").

B.      **The Complaint Adequately Alleges Dishonest Assistance Under British Virgin Islands Law.**

The K5 Defendants argue that the Complaint fails to adequately plead a claim for dishonest assistance because Plaintiffs do not adequately allege two elements of the claim:[34] (i) that Kives and Baum "assisted in, induced or procured the breach;" and (ii) that Kives and Baum "acted dishonestly in providing the assistance."   (Mot. at 48-50.)   To do so, the K5 Defendants rely on the legal conclusions contained in the *Declaration of Tom Smith KC* ("Smith Decl.") [Adv. D.I. 34].   Although courts sometimes rely upon "affidavits of lawyers who practice law in the country at issue, or who are from the country at issue and are familiar with its laws," *In re SpA*, 645 B.R. 48, 58 (Bankr. D. Del. 2022) (quoting *Transportes Aereos Pegaso, S.A. de C.V. v. Bell Helicopter Textron, Inc.*, 623 F. Supp. 2d 518, 534 (D. Del. 2009)), "[t]hose affidavits . . . may not make factual determinations" or "offer legal conclusions." *Id.* at 58 (citing *Nkansah*

---

[34]     To state a claim for dishonest assistance under British Virgin Islands law, a plaintiff must plead facts from which the court may infer that (i) there was a breach of a fiduciary duty; (ii) defendants "assisted in, induced or procured the breach"; and (iii) defendants "acted dishonestly in providing the assistance."  *See* Smith Decl. ¶ 27.  The K5 Defendants do not dispute that the Complaint adequately alleges the first element, *i.e.*, that Bankman-Fried breached a fiduciary duty to Alameda Research Ltd.  *See id.* ¶ 40 ("In my opinion, so far as this element of the cause of action is concerned, the Complaint (at paragraphs 171 and 172) pleads sufficient facts.").

v. *Kleinbard LLC*, 2022 WL 843486, at *5 (3d Cir. Mar. 22, 2022); 9A Fed. Prac. & Proc. Civ. § 2444 (3d ed.)).  "[T]he purpose of an expert witness in foreign law is to aid the court in determining the content of the applicable foreign law, not to apply the law to the facts of the case." *Id.* (quoting 9A Fed. Prac. & Proc. Civ. § 2444 (3d ed.)).  Thus, to the extent the Smith Declaration "has attempted to identify relevant facts and discuss the outcome[] of the case, or to the extent his opinions appear partial to [the K5 Defendants], the Court may exercise its discretion not to consider his statements."  *HTC Corp.* v. *IPCOM GMBH & Co., KG*, 2009 WL 5908010, at *1 (D.D.C. 2009).  This is particularly appropriate in light of the Smith Declaration's failure to acknowledge allegations from the Complaint showing that (i) Kives and Baum "assisted in, induced or procured the breach" and (ii) "acted dishonestly in providing that assistance," and where there is significant disagreement as to a BVI court's likely assessment of Alameda Research Ltd.'s claim, as set forth in the *Declaration of David Mumford KC*[35] ("Mumford Decl.").

*First*, the Complaint adequately alleges that Kives and Baum "assisted in, induced or procured the breach" with respect to Alameda Research Ltd.  Specifically, as explained *supra* Section IV.A.2, the Complaint alleges, among other things, that (i) Kives and Baum negotiated the Term Sheet with Bankman-Fried, which contemplated a transfer of $3.3 billion in cash from Plaintiffs to the K5 Defendants (Compl. ¶¶ 62-65); (ii) Kives and Baum repeatedly accepted wires from Alameda Research Ltd. (*id.* ¶ 89); (iii) Kives and Baum did not produce information to substantiate the implied valuation of the funds they managed (*id.* ¶¶ 71, 80); and (iv) Kives and Baum did not produce information to support their ability to prudently manage investment funds

---

[35] David Mumford KC is a barrister in full-time practice at Maitland Chambers, Lincoln's Inn, London, who specializes in, among other things, matters of company and commercial law, and civil claims relating to fraud. Mumford Decl. ¶ 3.  He was called to the Bar of England and Wales in 2000, and to the Bar in the British Virgin Islands in 2017. *Id.* ¶¶ 3-4.  He was appointed Queen's (now King's) counsel in 2016. *Id.* ¶ 3.  The Mumford Declaration is filed simultaneously with Plaintiffs' Opposition.

(*id.* ¶ 85).  *See* Mumford Decl. ¶ 21 ("I take the view that on the pleaded facts there is at least a properly arguable case that Mr Kives and Mr Baum assisted the breaches in a more than minimal way.").

> *Second*, the Complaint adequately alleges that Kives and Baum acted "dishonestly in providing [their] assistance" to Bankman-Fried.  The test for dishonesty is two-fold.  First, "the fact-finding tribunal must . . . ascertain (subjectively) the actual state of the [defendants'] knowledge or belief as to the facts.  The reasonableness or otherwise of [their] belief is a matter of evidence."  Smith Decl. ¶ 31 (quoting *Ivey* v *Genting Casinos (UK) t/a Crockfords* [2018] AC 391 at [74]).  Second, "the fact-finder . . . appl[ies] the (objective) standards of ordinary[,] decent people" to determine "whether [the defendants'] conduct was honest or dishonest."  *Id.*  "[T]hese are issues for trial."  Mumford Decl. ¶ 25.

> With respect to the first prong, the Complaint alleges that Kives and Baum were aware that Bankman-Fried had received no information in order for Bankman-Fried to undertake any meaningful due diligence, as they failed to provide any such information.  (Compl. ¶¶ 71, 85.)  Therefore, they knew that Bankman-Fried was unable to satisfy his fiduciary duties with respect to Alameda Research Ltd.  With respect to the second prong, the Complaint alleges several facts for why it would be "'objectively dishonest' for [the K5 Defendants] to enter into an allegedly favorable commercial agreement."  (Mot. at 50.)  As explained above, any "ordinary[,] decent person in Kives and Baum's position would have known that they would be accepting money from a counterparty in breach of his fiduciary duties.  That is because Kives and Baum knew that Bankman-Fried had no basis whatsoever to agree to transfer $3.3 billion in cash to the K5 Defendants as a result of their own failure to provide any due diligence.  (Compl. ¶¶ 71, 85.)  *See*

*also* Mumford Decl. ¶¶ 27-29 (identifying allegations "capable of supporting a case of dishonesty").

Finally, the *ex turpi causa* doctrine does not bar Alameda Research Ltd.'s dishonest assistance claim. Because "[t]he doctrine is essentially the same as *in pari delicto*," *In re AlphaStar Ins. Grp. Ltd.*, 383 B.R. 231, 274 (Bankr. S.D.N.Y. 2008), Plaintiffs' argument in Section IV.A.3 applies with equal force here. As the K5 Defendants' cited authority observes, "the wrongful acts done to the company by a director will not" be attributed to the corporation so as to bar recovery of the corporation on the basis of *ex turpi causa*. *Id.*; *see also* Mumford Decl. ¶¶ 35-37. In any event, the *ex turpi causi* doctrine may not be used to dismiss the claim at this stage. *See In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004) ("[A]n affirmative defense may not be used to dismiss a plaintiff's complaint under Rule 12(b)" (citation omitted)).

## V.     THE COURT SHOULD GRANT PLAINTIFFS LEAVE TO AMEND THE COMPLAINT IF IT GRANTS THE K5 DEFENDANTS' MOTION.

For the reasons discussed above, the Court should deny the K5 Defendants' Motion in its entirety. If, however, the Court grants the Motion in whole or in part, the Court should grant Plaintiffs leave to amend the Complaint.

Federal Rule of Civil Procedure 15(a)(2), made applicable by Federal Bankruptcy Rule 7015, provides that where a party seeks leave to amend, "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). This reflects the "principle that the purpose of pleading is to facilitate a proper decision on the merits." *Foman* v. *Davis*, 371 U.S. 178, 182 (1962). "The Third Circuit has adopted a liberal approach to the amendment of pleadings to ensure that 'a particular claim will be decided on the merits rather than on technicalities.'" *Robinson* v. *Beckles*, 2012 WL 13206064, at *1 (D. Del. Mar. 20, 2012) (quoting *Dole* v. *Arco Chem. Co.*, 921 F.2d 484, 486-87 (3d Cir. 1990)). "If the underlying facts or circumstances relied upon by a

plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman*, 371 U.S. at 182. A court's denial of leave to amend a potentially viable claim requires a "justifying reason," including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Id.* None of these reasons are present here.

The Debtors continue to investigate the wide-ranging fraudulent scheme that led to the FTX Group's collapse and the Chapter 11 Cases. This investigation has included further examination of the Transactions, as well as the evidence adduced at Bankman-Fried's criminal trial. As a result, if given leave to amend upon dismissal of any of their claims, Plaintiffs could plead additional facts in an amended Complaint on various subjects, including the following:

- At the direction of the FTX Insiders, the FTX Group funneled customer deposits and withdrawals of fiat currency through bank accounts of Plaintiffs. At the same time, also at the FTX Insiders' direction, the FTX Group used those accounts for many other purposes, commingling and misusing vast sums of customer and corporate funds in the process. In short, the FTX Group made no meaningful distinction between funds deposited by customers, Alameda funds, and the funds of other FTX Group entities. The funds used to invest in the Transactions consisted of such commingled funds.

- Alameda Research Ltd. and Alameda Ventures were insolvent at all relevant times.

- Mount Olympus and SGN Albany were parties to a subscription agreement pursuant to which SGN Albany agreed to make payments at such times and in such manner as called for by Mount Olympus Capital, LLC, up to $3 billion. Mount Olympus Capital, LLC issued capital calls to SGN Albany pursuant to a subscription agreement, which were paid for by Alameda Research Ltd. The K5 Defendants knew that Alameda Research Ltd. made all payments pursuant to the subscription agreement.

- The K5 Defendants made no meaningful inquiry into SGN Albany, the Plaintiffs, or any FTX Group entity in order to conduct due diligence regarding the Transactions and, therefore, deliberately ignored all indicia of fraud surrounding the Transactions.

Plaintiffs expect that they could cure any pleading deficiencies identified by the Court in its decision on the K5 Defendants' Motion, and therefore request leave to file an amended Complaint if the Court dismisses any of Plaintiff claims.[36]

## CONCLUSION

For all of the foregoing reasons, the Court should deny the K5 Defendants' Motion.

---

[36] Plaintiffs are mindful of this Court's recent decisions holding that requests for leave to amend made in opposition briefs may be procedurally improper in some circumstances.  *See In re Our Alchemy, LLC*, 642 B.R. 155, 172 (Bankr. D. Del. 2022); *In re Daily Bread Winddown, LLC*, 2022 Bankr. LEXIS 3078, at *12-13 (Bankr. D. Del. Nov. 1, 2022).  If, upon dismissal of any of Plaintiffs' claims, the Court prefers that Plaintiffs file a separate motion for leave to amend stating the particular grounds on which amendment is sought and attaching the proposed amended complaint, Plaintiffs are prepared to do so promptly.

Dated:  November 10, 2023
        Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
        mcguire@lrclaw.com
        brown@lrclaw.com
        pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**

Steven L. Holley (admitted *pro hac vice*)
Andrew G. Dietderich (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Jacob M. Croke (admitted *pro hac vice*)
Jonathan M. Sedlak (*pro hac vice* application
pending)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: holleys@sullcrom.com
        dietdericha@sullcrom.com
        gluecksteinb@sullcrom.com
        dunnec@sullcrom.com
        crokej@sullcrom.com
        sedlakj@sullcrom.com

*Counsel for the Debtors*
*and Debtors-in-Possession*